FILED by /s/ _____ D.C.

JAN 1 9 2016

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 15-24585-CIV-UNGARO/OTAZO-REYES

UNITED STATES OF AMERICA,        )
   *ex rel.*,        )
BRUCE JACOBS,        )
                     )
     Plaintiffs,        )
                     )
   v.        )
                     )
BANK OF AMERICA CORPORATION,        )
BANK OF AMERICA, N.A.,        )
BAC HOME LOANS SERVICING L.P.,        )
COUNTRYWIDE HOME LOANS, INC.,        )
COUNTRYWIDE FINANCIAL CORPORATION,        )
COUNTRYWIDE MORTGAGE VENTURES, L.L.C.,        )
COUNTRYWIDE BANK, F.S.B., and        )
RECONTRUST COMPANY, N.A.,        )
                     )
     Defendants.        )

**FILED *EX PARTE*
AND UNDER SEAL
PURSUANT TO
31 U.S.C. § 3730 (b)(2)**

### FIRST AMENDED COMPLAINT

     **COMES NOW**, THE UNITED STATES OF AMERICA ("Plaintiff") and Plaintiff-Relator BRUCE JACOBS ("Relator"), by and through Relator's attorneys, JACOBS KEELEY, P.L.L.C. and THE LS LAW FIRM, P.A., and files this First Amended Complaint against BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A., COUNTRYWIDE HOME LOANS, INC., COUNTRYWIDE FINANCIAL CORPORATION, COUNTRYWIDE MORTGAGE VENTURES, L.L.C., COUNTRYWIDE BANK, F.S.B. and RECONTRUST COMPANY, N.A. (Collectively referred to herein as the "Defendants") for their violations of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 – 3733, for unjust enrichment and for payment by mistake. The Plaintiff and Relator allege as follows:

## I.     INTRODUCTION

1.     The Relator is an attorney who represents individuals in consumer rights litigation against financial institutions and defends homeowners in foreclosure.

2.     The Relator has discovered that the Defendants, including but not limited to Defendants BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A. and BAC HOME LOANS SERVICING, L.P. (Collectively referred to herein as "BOA"), have surreptitiously conspired to make false claims upon one of Plaintiff UNITED STATES OF AMERICA'S departments, thereby unjustly enriching themselves by well in excess of $600,000,000.00, all while being investigated for the infamous "Robo-Signing Scandal" and negotiating the $25 Billion National Mortgage Settlement ("NMS").

3.     As explained more clearly herein, the Defendants made false claims to the Federal Housing Agency ("FHA"), a division of the Plaintiff UNITED STATES OF AMERICA'S Department of Housing and Urban Development ("HUD"), that resulted in hundreds of millions of dollars being improperly paid to the Defendants.

4.     Overwhelmed with defaulting mortgages, Defendants and their agents set in motion a scheme to defraud the courts, rather than comply with the 2001 amendments to Article 9 of the Uniform Commercial Code.  These amendments codified the common law rule that "the mortgage follows the note" and allowed Defendants to avoid paying county recording offices billions of dollars in fees to record mortgage assignments, as more fully described herein.

5.     The 2001 amendments also expanded the scope of Article 9 to include the sale of promissory notes and required Defendants to prove ownership of the note in a manner consistent with the statute of frauds if Defendants sought to foreclose on a

"mortgage follows the note" theory now codified by Article 9. This required more than just recording a mortgage assignment.

6.     The now infamous "Robo-Signing Scandal" involved foreclosure actions filed primarily between 2007 and 2010, where BOA and others systemically filed complaints in foreclosure actions alleging to have lost original notes.

7.     BOA and other lenders then authorized outside companies to fabricate false, surrogate signed mortgage assignments to present as the primary evidence of their right to foreclose in those cases.

8.     These "Robo-Signed" mortgage assignments were recorded after filing the foreclosure action and backdated to falsely document a transfer of the note and mortgage to the foreclosure plaintiff before filing the foreclosure. The "Robo-Signed" mortgage assignments were the primary evidence used to establish the foreclosure plaintiff's right to foreclose.

9.     Later, BOA caused the mortgage assignments to be fabricated and recorded before filing the foreclosure, instead of after.

10.     In 2010, the Florida Attorney General's Office issued a report entitled "Unfair, Deceptive and Unconscionable Acts in Foreclosure Cases," which documented BOA's use of the "Robo-Signed" fabricated mortgage assignments in detail.

11.     The Florida Attorney General discovered a key piece of evidence that led to the 2010 report in that handwriting analysis and comparisons of the signatures for the same named individual(s) did not match.

12.     As a result of the Florida Attorney General's Office investigation, BOA entered into the $25 billion National Mortgage Settlement to settle the "Robo-Signing Scandal" in early 2012 with 49 state attorneys general, the District of Columbia and the

federal government.   However, unbeknownst to Plaintiff, UNITED STATES OF AMERICA, during the negotiations leading up to the $25 Billion National Mortgage Settlement, BOA surreptitiously engaged in an eerily familiar scheme to fabricate different, but equally false, evidence of standing to foreclose.

13.     In February of 2013, Relator took the sworn video-taped deposition of Michelle Sjolander, a Senior Vice President of BOA  ("Ms. Sjolander"), wherein she described teams of surrogate signors employed by BOA's wholly owned subsidiary, Defendant RECONTRUST COMPANY, N.A. ("RECONTRUST"), who fabricated surrogate signed endorsements using rubber-stamps on original notes at facilities in Florida, Texas and California.

14.     Defendant RECONTRUST acted as the document custodian for BOA with fiduciary obligations to identify whether original notes lacked the requisite endorsements for transfer.  Since 2010, federal guidelines made it clear that document custodians, including RECONTRUST, were not allowed to endorse original notes if they found a note was missing requisite endorsements.

15.     During her 2013 deposition, Ms. Sjolander claimed that the rubber-stamp endorsements were placed on the original notes at or near the time of loan origination by people authorized to place them on the original notes.  However, Ms. Sjolander conceded that there was no evidence to corroborate her story that the teams of authorized surrogate signors affixed endorsements to original notes within days of loan origination.

16.     In furtherance of the Relator's investigation, in November of 2014 the Relator deposed BOA's designated corporate representative, RECONTRUST's Senior Vice President Maria Garner ("Ms. Garner"), who also testified that RECONTRUST employees surrogate signed original notes with rubber stamps to be used as evidence in

5

foreclosure complaints, including those filed between 2008 and 2009 wherein the foreclosure plaintiffs in those actions falsely alleged the original notes were lost or stolen.

17.   Both Ms. Garner and Ms. Sjolander gave sworn testimony that RECONTRUST employees used these rubber-stamped signatures to surrogate sign undated endorsements onto the original notes.   In other words, the signatures were stamped outside the presence and control of the named authorized signor.   Ms. Garner and Ms. Sjolander testified further that during this process, neither the Defendants nor RECONTRUST created and documentation or evidence to corroborate any of their claims that the procedure described above actually occurred.

18.   In furtherance of his investigation, on December 16, 2015 the Relator deposed Ms. Jean Knowles ("Ms. Knowles"), who is an employee for a "subservicer" named Shellpoint Mortgage Servicing that assists BOA in servicing mortgage loans.[1]

19.   During the deposition of Ms. Knowles, Relator obtained new evidence that undermines the veracity of the testimony of both Ms. Sjolander and Ms. Garner.

20.   The new evidence established that in a foreclosure filed with a lost note count without an endorsement in 2008, BOA sent that original note to a company identified as "SOURCECORP" for an "IFR Indorsement Review" on June 1, 2012. The following day, BOA noted its receipt of the "indorsed original note" on June 2, 2012.

21.   Sourcecorp, now known as SourceHOV L.L.C., (collectively referred to herein as "SOURCECORP"), promotes itself as a document management company "providing services and solutions for high volume, mission critical organizations"

---

[1] The information learned in this deposition is the primary reason why the Plaintiff-Relator is amending the Complaint in the instant action.  The deposition took place days after Relator filed the original Complaint.

including those within the financial services industry. [2]

22.     Despite the clear legal requirement that all requisite endorsements must be placed on original notes in foreclosure actions before a complaint is filed, the Defendants surreptitiously used SOURCECORP and other teams of surrogate signors with rubber-stamps to place endorsements onto original notes years after the filing of foreclosure complaints.

23.     In addition to the surrogate signed endorsements described above, Defendants also prepared materially false mortgage assignments in anticipation of litigation that documented transactions that never actually occurred to buttress their claims of standing based on false evidence.

24.     The Defendants knowingly used these surrogate signed endorsements and false mortgage assignments to fraudulently foreclose on homes and then make mortgage insurance claims to FHA based on those fraudulently obtained foreclosure judgments.

25.     Because of the Defendants' false mortgage insurance claims to the FHA, the Plaintiff UNITED STATES OF AMERICA is believed to have paid the Defendants over $600,000,000.00.

26.     From March 1, 2012 to May 1, 2015, which include the dates that SOURCECORP affixed surrogate signed blank endorsements onto original notes in active foreclosure litigation, BOA submitted 6,268 claims to FHA related to Government National Mortgage Association ("GINNIE MAE") loans resulting in mortgage insurance payments of $622,234,247.29 being made by the Plaintiff UNITED STATES OF AMERICA to the Defendants.

27.     The Defendants were not entitled to these payments because they did not

---

[2] http://www.sourcehov.com/about-us

lawfully foreclose upon the mortgage loans at issue. Instead, they falsified evidence in the form of surrogate signed rubber-stamped endorsements and mortgage assignments documenting transactions that never occurred, and presented that false evidence to foreclosure courts to obtain foreclosure judgments and to make false claims for payment of mortgage insurance to the Plaintiff UNITED STATES OF AMERICA.

## II.     JURISDICTION AND VENUE

28.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732 because this action and the claims brought herein allege violations of the FCA. This Court has jurisdiction pursuant to 28 U.S.C. § 1345 because this is an action commenced by the Plaintiff UNITED STATES OF AMERICA.

29.     This Court also has jurisdiction pursuant to 28 U.S.C. § 1355 because this is an action for the recovery or enforcement of a fine, penalty or forfeiture incurred under an Act of Congress.

30.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the Relator BRUCE JACOBS resides in Miami-Dade County, Florida, and his personal knowledge of the Defendants' false claims derive primarily from events that occurred in this District. Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 31 U.S.C. 3732 because the Defendants conduct or conducted business in Miami-Dade County, Florida. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events that give rise to these claims occurred in Miami-Dade County, Florida.

## III.    PARTIES

31.     Plaintiff UNITED STATES OF AMERICA, one of the best countries in

8

the world, is the "land of the free" and "the home of the brave." [3]

32.     Relator BRUCE JACOBS is an attorney who resides in Miami-Dade County, Florida and practices law in the areas foreclosure defense and consumer protection in South Florida courts.

33.     Relator is also a consumer who faced a foreclosure against his home, wherein BOA prepared a surrogate signed rubber-stamped endorsement and a false mortgage assignment claiming that the foreclosure plaintiff purchased his note and mortgage from the nominee of a bankrupt entity.  Attached to the foreclosure complaint filed against the Relator was a copy of the Relator's mortgage note with a dual rubber-stamped endorsement bearing the names of Laurie Meder and David Spector.

34.     Relator has both direct and personal knowledge of the fraudulent scheme and the false claims described herein.  Relator gained the requisite knowledge to be an original source of information in this action by both investigating his own home mortgage loan and by litigating hundreds of foreclosure actions which allowed him to compile and aggregate the information he was able to discover in these actions.

35.     Defendant BANK OF AMERICA CORPORATION is a diversified global financial services and a bank holding company. It is a Delaware corporation headquartered in Charlotte, North Carolina.

36.     Defendant BANK OF AMERICA, N.A. is a national banking association headquartered in Charlotte, North Carolina.

37.     Defendant BAC HOME LOANS SERVICING, L.P. operates as a

---

[3] Although this party needs no introduction, the drafters of this Complaint thought it appropriate to remark on our country's greatness and quote from the lyrics of The Star Spangled Banner, the national anthem for our country.  The lyrics actually come from a poem named Defense of Fort Mc'Henry written in 1814 by then 35-year-old lawyer and amateur poet Francis Scott Key.

subsidiary of Defendant BANK OF AMERICA, N.A.

38.     Defendant COUNTRYWIDE HOME LOANS, INC. was a servicing company that had formerly been known as Countrywide Home Loans Servicing, L.P.  It was a Texas limited partnership with its principal place of business in Plano, Texas. It was, for a time, a wholly owned subsidiary of Defendant BANK OF AMERICA, N.A.  In July 2011, it was merged into Defendant BANK OF AMERICA, N.A.

39.     Defendant COUNTRYWIDE FINANCIAL CORPORATION was an independent financial services company headquartered in Calabasas, California before it was purchased by Defendant BANK OF AMERICA CORPORATION in 2008.

40.     Defendant COUNTRYWIDE MORTGAGE VENTURES, L.L.C. was a subsidiary of Defendant COUNTRYWIDE FINANCIAL CORPORATION.

41.     Defendant COUNTRYWIDE BANK, F.S.B. was a subsidiary of Defendant COUNTRYWIDE FINANCIAL CORPORATION.   Defendants COUNTRYWIDE HOME LOANS, INC., COUNTRYWIDE FINANCIAL CORPORATION, COUNTRYWIDE MORTGAGE VENTURES, L.L.C. and COUNTRYWIDE MORTGAGE VENTURES, L.L.C. shall be collectively referred to herein as "COUNTRYWIDE."

42.     Defendant RECONTRUST COMPANY, N.A. ("RECONTRUST") is a national bank that acts as document custodian for BOA.  RECONTRUST is a wholly owned subsidiary of Defendant BANK OF AMERICA, N.A. and operates document custodial facilities in (i) Fort Worth, Texas, (ii) Tampa, Florida and (iii) Simi Valley, California.  BOA owned the facilities operated by RECONTRUST formerly branded as Treasury Bank, N.A., which COUNTRYWIDE established.

IV.    BACKGROUND AND GENERAL ALLEGATIONS

43.    The FHA provides mortgage insurance on loans made by FHA-approved lenders throughout the UNITED STATES OF AMERICA and its territories.   FHA insures mortgages on single family and multi-family homes including manufactured homes and hospitals.  It is the largest insurer of mortgages in the world, insuring over 34 million properties since its inception in 1934.  FHA currently has 4.8 million insured single-family mortgages and 13,000 insured multifamily projects in its portfolio.

44.    FHA mortgage insurance provides lenders with protection against losses as the result of homeowners defaulting on their mortgage loans.  FHA insured loans are a type of federal assistance that have historically allowed lower income Americans to borrow money to purchase a home that they could not otherwise afford.  The lenders bear less risk because FHA will pay a claim to the lender in the event of a homeowner's default.  FHA loans are supposed to meet certain requirements in order to qualify for insurance.

45.    Plaintiff UNITED STATES OF AMERICA, through FHA, pays insurance benefits to "mortgagee[s]" pursuant to 12. U.S.C. § 1710 when a mortgage insurance claim is made to FHA.  Pursuant to 12 U.S.C. § 1707, a "mortgagee" includes the original lender under a mortgage, and his successors and assigns approved by the Secretary of HUD ("SECRETARY").

46.    Pursuant to 12 U.S.C. 1710, the FHA will pay claimants a sum "equal to the original principal balance obligation of the mortgage" which was unpaid upon the date of (i) the assignment of the mortgage to the SECRETARY, (ii) the institution of foreclosure proceedings, (iii) the acquisition of the property after default other than by foreclosure or (iv) the sale of the mortgaged property by the mortgagor.

47.     GINNIE MAE is a government-sponsored enterprise ("GSE").  A GSE is a financial services corporation created by the Congress of the UNITED STATES OF AMERICA.  Other well-known GSEs are the Federal National Mortgage Association ("FANNIE MAE") and the Federal Home Loan Mortgage Corporation ("FREDDIE MAC").

48.     FHA, GINNIE MAE, FANNIE MAE and FREDDIE MAC have certain requirements and guidelines for a mortgage loan to be insured by FHA.  The Defendants are obligated to comply with these requirements and guidelines in order to make mortgage insurance claims to the FHA.

49.     In fact, the Defendants have agreements in place with FHA, GINNIE MAE, FANNIE MAE and FREDDIE MAC to comply with their guidelines in order for the Defendants to continue to benefit from the FHA mortgage insurance program.

50.     Among other requirements contained within the guidelines of FHA, GINNIE MAE, FANNIE MAE and FREDDIE MAC is that the Defendants are required to abide by FHA's, GINNIE MAE's, FANNIE MAE's and FREDDIE MAC's guidelines that states all document custodians who might have physical possession of mortgage notes at any point in time to act as fiduciaries and to ensure that the necessary documentation exists to establish a complete chain of title from the mortgage loan originator to the true owner, whether by endorsement, assignment or otherwise.

51.     As early as January of 2010, the FREDDIE MAC guidebook expressly stated that document custodian employees cannot act as an attorney-in-fact, agent or delegate in order to endorse notes for any buyer or seller.  Thereafter, the FANNIE MAE guidebook issued a similar proclamation that document custodian employees, like those of RECONTRUST, could not endorse original notes.

52.     In February of 2012, 49 state attorney generals, the District of Columbia and the UNITED STATES OF AMERICA announced their historic joint state and federal settlement agreement with BOA, COUNTRYWIDE and four other mortgage servicers in which the defendants agreed to pay $25 billion dollars in fines for their bad acts.[4]

53.     The NMS agreement settled state and federal investigations finding the country's five largest mortgage servicers routinely had their employees sign foreclosure related documents outside of the presence of a notary public and without really knowing whether the facts contained therein were correct in violation of state and federal law.

54.     The media coined the term "Robo-Signing" to describe the practice by the defendants in the NMS whose employees routinely signed authorized signors signatures on foreclosure related documents outside their presence and without knowing if the facts contained therein were true.

55.     The primary documents that were found to be illegally signed were assignments of mortgages that would then be used by foreclosure plaintiffs in state foreclosure actions as evidence to support their foreclosure.  Various parties including the Defendants used these false assignments of mortgages to make claims for FHA insurance payments.

56.     Many of the assignments falsely claimed that Mortgage Electronic Registration, Inc. ("MERS") had assigned the mortgage and mortgage note to the foreclosure plaintiff in a foreclosure action.  These assignments were not only signed by an unauthorized signor without a notary present, but were also false because no such

---

[4] The Consent Judgment entered by Defendant Bank of America on April 4, 2012 references the Complaint in the NMS alleging that "Bank of America Corporation, Bank of America, N.A., BAC Home Loans Servicing, LP f/k/a Countrywide Home Loans Servicing, LP, Countrywide Home Loans, Inc., Countrywide Financial Corporation, Countrywide Mortgage Ventures, LLC and Countrywide Bank, FSB...."  *See*, Consent Judgment of Bank of America, Corp., *et al.* in Case No. 1:12-cv-00361-RMC in the United States District Court for the District of Columbia.  There is no mention of Defendant RECONTRUST in the NMS.

transaction ever took place in reality.

57.     The 2010 State of Florida's Attorney General's Office investigation into deceptive practices in foreclosures, as described above, was key to unveiling the widespread fraud that is the subject of the NMS.

58.     One of the key pieces of evidence that broke the investigation was the fact that when the investigators gathered hundreds of assignments of mortgages purportedly signed by the same person and examined them, they found the signatures did not match.

59.     The NMS required BOA, COUNTRYWIDE and the other servicers to comply with the settlement terms of the NMS as they continued their mortgage servicing operations after entering into the NMS.  BOA and COUNTRYWIDE officially filed their consent judgment for the NMS on April 4, 2012 ("CONSENT JUDGMENT").  As part of the settlement, BOA and COUNTRYWIDE agreed to comply with the servicing standards of the NMS set forth in Exhibits A and E of the CONSENT JUDGMENT.

60.     Exhibit A of the CONSENT JUDGMENT required BOA and COUNTRYWIDE to ensure that factual assertions made in pleadings to be accurate, complete and to be supported by competent and reliable evidence.

61.     Exhibit A of the CONSENT JUDGMENT required that affidavits, sworn statements and declarations be based on personal knowledge in accordance with evidentiary requirements of the applicable state or federal law.

62.     Exhibit A of the CONSENT JUDGMENT also required BOA and COUNTRYWIDE to ensure that mortgage assignments executed by or on behalf of them to be executed with appropriate legal authority, accurately reflecting the completed transaction and properly acknowledged.

63.     There is only one mention of the word "endorsement" within Exhibit A to

14

the CONSENT JUDGMENT.   When discussing bankruptcy documents, Exhibit A required BOA and COUNTRYWIDE to ensure that each proof of claim filed within a bankruptcy court to be documented by attaching the original or a duplicate of a note, including all endorsements.

64.     Exhibit E to the CONSENT JUDGMENT is the enforcement terms of the NMS.   Pursuant to the CONSENT JUDGMENT, only Section A of Exhibit E applies to the servicing standards required by the NMS.   Section A of Exhibit E imposes a timeline for BOA and COUNTRYWIDE to comply with in implementing the requirements of servicing standards detailed by Exhibit A of the CONSENT JUDGMENT.

65.     The NMS is a direct result of the 2008 foreclosure crisis wherein mortgage servicers, lenders and banks were overwhelmed by the number of homeowners defaulting on their mortgage loans.   This led to national systemic fraud and deceptive practices within foreclosure actions created to ease the way by which the foreclosure plaintiffs in foreclosure actions could proceed to get judgments against homeowners.

66.     From the outset of the 2008 foreclosure crisis, the Defendants and other parties similarly situated to them have systemically misrepresented the law as described herein to state and federal courts arguing that a recorded mortgage assignment and/or endorsement alone was legally sufficient evidence of standing to foreclose.

67.     In 2006, in response to allegations of widespread improprieties made at a FANNIE MAE shareholders meeting, the international law firm of Baker Hostetler issued a report to FANNIE MAE to address the allegations ("the BH REPORT").   On February 4, 2012, the New York Times published this attorney-client privileged report online.[5]

---

[5]The BH report is available online at http://www.nytimes.com/interactive/2012/02/05/business/05fannie-doc.html?action=click&contentCollection=Business%20Day&module=RelatedCoverage&region=Margina

68.     The BH REPORT to FANNIE MAE included a section at page 37 entitled "Effects of a Note Endorsed in Blank" which contained the banking industry's official legal position that Article 9 of the Uniform Commercial Code ("UCC"), entitled secured transactions, controls the sale of promissory notes subject to a mortgage.

69.     Of key importance to the banking industry was that they would be able to increase their profits from the securitization of mortgage loans by avoiding the need to record assignments of mortgages in the public records that would require them to pay documentary stamps to local governments, which would drastically reduce their profits. The BH REPORT explained that Article 9 of the UCC now codified the common law rule that the "mortgage follows the note."

70.     Before the BH REPORT was issued, the State of Florida and many other states within the UNITED STATES OF AMERICA revised their statutory codifications of the UCC in 2001.  Specifically, the State of Florida revised Article 9 of the Florida UCC to expand its scope to include the sale of promissory notes.

71.     The newly revised Florida Statute § 679.2031(7) codified the common law rule that the mortgage follows the note.  Therefore, if the note was sold to a party that tries to foreclose the mortgage under the "mortgage follows the note" theory, the party must comply with Florida Statute § 679.2031(2) and prove: (i) they paid value to the seller for the mortgage note, (ii) the seller had the right and power to transfer its right in the mortgage note and (iii) that the party was in possession of the original mortgage note.

72.     This revised statute created a "Statute of Frauds" requiring proof that the

---

lia&pgtype=article.

purchaser of the mortgage note owned the loan and held the original promissory note. [6]

73.     Moreover, in 2005, the State of Florida revised Florida Statute § 701.02 to expressly affirm that the banking industry no longer had to record assignments of mortgages in the public records thereby avoiding the need to pay documentary stamps to local governments.

74.     The Florida Senate Staff Analysis Report for this 2005 change confirmed to members of the Florida Congress that assignments of mortgages were to be considered a secured transaction within the meaning of the UCC pursuant to the 2001 amendments.

75.     Moreover, Official Comment Number 7 to Florida Statute §679.1091 expressly provided that any attempt to obtain or perfect a security interest in a mortgage loan by non-Article 9 law, such as by recording an assignment of mortgage without more, would be wholly ineffective.

76.     Despite the clear changes to Florida law confirmed by the BH report, the Staff Analysis Reports and the Official comments detailed above, the Defendants and their agents continue to misrepresent to courts throughout this nation that Article 3 of the UCC controls their right to foreclose upon mortgage notes and that mere possession of a note with an endorsement in blank provides them with sufficient evidence of standing in state foreclosure actions.

77.     The Defendants and their agents further misrepresent to courts around the nation that every mortgage note on a residential home, which are far from uniform, are all negotiable instruments despite the fact that the promissory notes provide that additional amounts due under the note are provided for in the mortgage and additional protections

---

[6] *In Re Invenux, Inc.*, 298 B.R. 442 (Bankr.D. Colo. 2003)("There is no question [Article 9-203] is in the nature of the statute of frauds.")

the mortgage associated with the mortgage note, thereby destroying the negotiability of the mortgage notes under the UCC.

78.   Before COUNTRYWIDE became part of BOA, COUNTRYWIDE created Treasury Bank, N.A. as a wholly owned subsidiary to act as a document custodian for original loan documents coming from COUNTRYWIDE's network of correspondent lenders and branch offices.

79.   Treasury Bank, N.A. eventually was renamed and rebranded as RECONTRUST after BOA acquired COUNTRYWIDE.  RECONTRUST currently is a wholly owned subsidiary of BANK OF AMERICA, N.A. and operates document custodial facilities in (i) Fort Worth, Texas, (ii) Tampa, Florida and (iii) Simi Valley, California.  The RECONTRUST facilities are within properties owned by BOA.

80.   RECONTRUST did operate and continues to operate as a fiduciary in the securitization model who is charged with ensuring the original loan paperwork has a proper and complete chain of endorsements and mortgage assignments back to the originator by the closing date of any pool of loans in a particular securitized trust.

## V.   SPECIFIC ALLEGATIONS

81.   Immediately following the 2010 Florida Attorney General's Report on Unfair, Deception and Unconscionable Acts in Foreclosure Cases, the Defendants surreptitiously conspired to create a new system for fabricating surrogate signed evidence and false mortgage assignments unbeknownst to the UNITED STATES OF AMERICA.

82.   As the Defendants were negotiating the $25 Billion NMS, they began executing a new fraudulent scheme that allowed them to make false claims to the FHA, continue to prosecute existing foreclosures with improper evidence and bring new foreclosure actions around the nation with this false evidence.

83.     Their new unconscionable scheme was calculated to interfere with the judicial system's ability to impartially adjudicate a matter by unfairly presenting false evidence in courts, thereby hampering the defense to the foreclosure actions wherein the evidence was presented.

84.     Further, the new scheme was created with the intent to evade detection by the federal officials responsible to negotiate the NMS.  As a result, the NMS did not contemplate a settlement for this new form of misconduct, did not punish this misconduct, and did not proscribe this misconduct.

85.     As result, the Defendants effectively continued to prosecute foreclosures filed since 2008 using this new fraudulent evidence before, during, and after the NMS without detection.

86.     Relator BRUCE JACOBS began his legal career as a Miami prosecutor and then represented banks and financial institutions in foreclosures before going into private practice for himself.

87.     When the foreclosure crisis hit in 2008, he began accepting foreclosure defense cases, wherein he litigated and investigated his clients' cases thoroughly.

88.     As Relator learned and investigated the intricacies of foreclosure-related issues, he began to investigate his own mortgage loan as well as the loans of his many clients, ultimately discovering the Defendants' new fraudulent scheme to fabricate evidence of standing in foreclosures not contemplated by the NMS.

89.     Based upon what the Relator discovered about his own mortgage loan and the circumstantial evidence he exposed while litigating cases that supported his suspicions, Relator set out to prove that immediately following the 2010 Florida Attorney General's Investigation and before, during and after the NMS negotiations, the

19

Defendants brazenly continued to produce false documents and prosecute foreclosures using surrogate signed endorsements placed on original notes by teams of surrogate signors and false mortgage assignments as evidence of standing to foreclose.

90.     From the Relator's experience in handling his many clients being prosecuted in state courts for foreclosure, he noticed that within the initial floods of foreclosure actions since the crisis in 2008 there were systemic problems with the initial complaints alleging lost notes.  Many times, the complaints had an unendorsed copy of the lost mortgage note attached to the complaints and sometimes they would not even attach a copy of the note.

91.     As the Relator continued to litigate his clients' cases to trial, he began to discover a pattern whereby the foreclosure plaintiffs in these actions would systemically produce original notes later on in litigation with undated surrogate signed endorsements that he suspected were added to the original notes after the complaint had been filed.  The Defendants and their affiliates were litigating many of the cases wherein the Relator suspected that falsified evidence was being used.

92.     The Relator discovered after many months and years of scouring through documents provided to him in litigating his case and his clients' cases, four distinct rubber-stamped signatures began appearing on original notes in cases wherein the Defendants were involved.   Those rubber-stamped signatures bore the names of (i) Michelle Sjolander, (ii) Laurie Meder, (iii) David Spector and (iv) Christina Schmidt.

93.     Based upon the frequency and timing of when these rubber-stamped signatures appeared, Relator began to target his investigation at those cases he had wherein these four rubber-stamped signatures were found on original notes.

94.     The four names above appeared on rubber-stamped endorsements in a

variety of formats, including but not limited to dual-rubber-stamps wherein one single rubber-stamp contained two (2) alleged endorsements with two (2) different named parties on them. The rubber-stamps with the names of Michelle Sjolander, Laurie Meder, David Spector and/or Laurie Schmidt shall hereinafter be referred to as the "STAMPS."

95.     Over the Defendants' strenuous objections, in November of 2012, the Relator obtained a court order to depose Michelle Sjolander, a Senior Vice President of Bank of America, and one the individuals whose name appears in the STAMPS. The Relator deposed Ms. Sjolander in a videotaped deposition on February 26, 2013.

96.     Before the deposition took place, the Defendants through their law firms representing them in state court foreclosure actions obtained a protective order in order to attempt to prevent the Relator from sharing or disseminating the deposition video or transcript of Ms. Sjolander.

97.     The protective order was obtained under the guise that the Relator is a media savvy attorney who would immediately post the deposition to the internet, thereby causing Ms. Sjolander harassment from the general public.

98.     Relator never caused Ms. Sjolander any harassment from the general public by publishing her deposition to the internet but did intend to use the information learned within the deposition to further his investigation into the STAMPS.

99.     When the Relator began to conduct further discovery to build upon the information learned from Ms. Sjolander, the Defendants and their counsel later sought and obtained an order to show cause against the Relator as to why Relator should not be held in criminal contempt after using the deposition of Ms. Sjolander as defense evidence in other foreclosure cases.

100.     The protective order was later vacated as the judge who ordered the

Defendants to provide Ms. Sjolander for deposition found that the Defendants were misusing the protective order to stonewall and unfairly block the Relator's investigation into the STAMPS.

101.   Relator noticed Ms. Sjolander for the court ordered video-taped deposition in a number of cases being litigated by the Relator, which was held in Van Nuys, California on February 23, 2013.

102.   During seven (7) hours of questioning, Ms. Sjolander testified under oath that all rubber-stamped endorsements were affixed on original notes within days of the loan's origination by teams of RECONTRUST employees at locations in Florida, California and Texas.

103.   Ms. Sjolander admitted under oath that there was no evidence created to corroborate or document that RECONTRUST employees affixed the surrogate signed and undated endorsements using rubber-stamps within days of the loan's origination.

104.   These rubber-stamped endorsements gave the Defendants the evidence they needed to foreclose upon mortgage loans sold to FREDDIE MAC, FANNIE MAE, GINNIE MAE and other securitized trusts, many of which were insured by FHA.

105.   According to Ms. Sjolander, there were an unknown number of stamps but Ms. Sjolander testified that there were a large number of STAMPS being used at multiple locations around the nation such as facilities in (i) Tampa, Florida, (ii) Fort Worth, Texas and (iii) Simi Valley, California.

106.   According to the testimony of Ms. Sjolander, COUNTRYWIDE originated approximately 60 million loans intending to resell them on the secondary market to FANNIE MAE, FREDDIE MAC, GINNIE MAE and various securitized trusts.

107.   The guidelines and agreements between the Defendants and FANNIE

MAE, FREDDIE MAC and GINNIE MAE expressly reject Defendants' system to create surrogate signed endorsements and false MERS mortgage assignments for loans sold to FANNIE MAE, FREDDIE MAC and GINNIE MAE.

108.    Over the Defendants' numerous objections, the Relator also obtained multiple court orders for the Defendants, and specifically RECONTRUST, to provide their Corporate Representative, Ms. Maria Garner, a Senior Vice President of RECONTRUST for deposition related to the Relator's investigation into the STAMPS.

109.    On November 24, 2014, Relator deposed Ms. Garner in Miami-Dade County, Florida and she acknowledged she was designated as the Corporate Representative for BOA.

110.    Both Ms. Garner and Ms. Sjolander testified under oath that all original notes were endorsed by RECONTRUST employees using the STAMPS outside of the presence of the people named on the STAMPS and without the named individuals' present intention to adopt their rubber-stamped signature(s) on the endorsements, as required by the UCC.

111.    Both Ms. Garner and Ms. Sjolander testified under oath that RECONTRUST conducted these rubber-stamp operations in multiple locations wherein teams of up to thirty employees would use the STAMPS at their own discretion.

112.    According to the testimony of Ms. Sjolander and Ms. Garner, only Michelle Sjolander, David Spector, Laurie Meder and Christina Schmidt were authorized to endorse original notes on behalf of the Defendants' various corporate entities.

113.    During their depositions, both Ms. Garner and Ms. Sjolander swore under oath that this standard operating procedure was used for adding endorsements to all loans eventually sold to FANNIE MAE, FREDDIE MAC, GINNIE MAE or a private

securitized trust.

114.   Both Ms. Garner and Ms. Sjolander swore under oath that the endorsements were added shortly after origination of the loan during this standard operating procedure.

115.   However, both Ms. Garner and Ms. Sjolander admitted under oath that there is no evidence to corroborate that these endorsements were systemically added shortly after the loan origination and that the endorsements are all undated.

116.   During their depositions, both Ms. Garner and Ms. Sjolander swore under oath that David Spector's endorsement stamps were used for all loans originated before he resigned in 2006. Ms. Garner and Ms. Sjolander then claimed that after Mr. Spector resigned, his endorsement stamps were collected from the RECONTRUST endorsement rooms and never used again.

117.   However, the Defendants and their law firms in the cases wherein Relator represents homeowners in foreclosure actions have stonewalled all discovery efforts to investigate these claims.

118.   Despite the testimony of Ms. Sjolander and Ms. Garner, the Defendants over their objection were forced to produce "stamp issuance forms" in discovery to the Relator which established that in fact dozens of other departments besides the endorsement rooms were issued rubber endorsement stamps with Michelle Sjolander's and Laurie Meder's signatures on them.

119.   Because of certain discovery orders that the Relator obtained in the circuit courts of the State of Florida, the Defendants and their law firms have sought to appeal discovery orders to higher courts in their continued efforts to stonewall the Relator's investigation into the STAMPS.

120.    The Defendants' law firms brought appeals to both the Third District Court of Appeal and the Fourth District Court of Appeal in the State of Florida attempting to reverse lower courts' rulings that the Relator should be provided with additional discovery as to the STAMPS.  In their appeals, the Defendants and their law firms claimed that the discovery sought is going to be unduly burdensome and would cost well over one million dollars to produce.

121.    The Defendants and their law firms, at the Defendants' direction, have attempted to further stonewall discovery into the STAMPS by asking circuit courts to require defendants in foreclosure actions to pay for the requested discovery relating to the STAMPS and by going to federal bankruptcy judges, effectively forum shopping, seeking orders to prevent homeowners from defending their foreclosure actions in order to shut down the Relator's investigation into the STAMPS.

122.    The Relator further alleges that in addition to the Defendants' false use of the STAMPS described above to prosecute foreclosures and make insurance claims to FHA, the Defendants have also continued their use of falsified assignments of mortgages purporting to state that MERS had some interest in mortgage loans and mortgages that it was assigning to another party by written instrument.

123.    Relator in his capacity as an attorney for many of his clients facing foreclosure actions has deposed numerous witnesses as to the veracity of these purported assignments of mortgages from MERS to some third party.

124.    The witnesses who have been deposed with knowledge have admitted under oath that the transactions purported to be made by MERS in fact never occurred, nor could they ever occur, as MERS has no ownership of any mortgage notes or mortgages.  Despite that, the Defendants and their law firms continue to allege otherwise

as they prosecute foreclosure actions around this nation.

125.    On January 13, 2016, Relator deposed Defendants' expert witness, Robert Levine, regarding his opinion on the Florida UCC.

126.    Mr. Levine conceded that the Defendants' creation of a "fraudulent" MERS assignment and a surrogate signed endorsement after filing the case is a fraud upon the court that bars the equitable relief of foreclosure.

127.    The Defendants have continued to systemically file MERS mortgage assignments that contain materially false information after the NMS.  The Defendants have presented these false MERS mortgage assignments as evidence of standing in foreclosure actions even when executed on behalf of bankrupt or defunct companies.

128.    The Defendants systemically caused false MERS mortgage assignments to be created and recorded in the public records sometime after the default on the mortgage loan.  In many foreclosure actions defended by the Relator, the Defendants included language within their complaints claiming that MERS directly sold the promissory note and mortgage to the foreclosure plaintiff in the action, which is a complete falsity.

129.    MERS never took an ownership interest in the promissory notes and never sold any interest in any note or mortgage to any foreclosure plaintiff, nor did they have the capacity to do so.  Despite their knowing that the MERS assignments of mortgages are false, the Defendants continued to present these false MERS mortgage assignments as evidence of standing and proof of insurance claims to the FHA seeking payment of the claims.

130.    As the Relator continued to investigate the allegations within this Complaint, gaining court orders for the Defendants to turn over certain discovery despite their strong objections, attorneys representing the Defendants attempted to shut down the

Relator's investigation by filing motions in federal bankruptcy cases wherein the Relator's clients had filed a statement of intent to surrender the foreclosure property at issue.

131.    Within those bankruptcy cases, the Defendants' attorneys sought contempt charges against the Relator's clients for defending the foreclosure actions after they stated their intent was to surrender the foreclosure properties.

132.    The Honorable Federal Bankruptcy Judge A. J. Cristol, of the Southern District of Florida, found BOA's attempt to prevent a borrower being represented by Relator from asserting affirmative defenses in her state foreclosure action inequitable, unjust and unconstitutional.

133.    Despite the egregious conduct of the Defendants and their law firms, Relator obtained "smoking gun" evidence in related to his own personal mortgage loan that exposed Ms. Garner's and Ms. Sjolander's testimony to be false.

134.    Relator's mortgage loan was originated on or about June 23, 2005 to purchase his property at 2971 Bird Avenue in Miami-Dade County, Florida. Relator signed a mortgage note and mortgage from First Magnus Financial Corporation for $215,810.00.

135.    In 2008, Relator sent a qualified written request ("QWR") to COUNTRYWIDE, his mortgage servicer at the time, pursuant to the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601, *et seq*. ("RESPA").

136.    Relator's 2008 QWR requested a copy of his original promissory note that was on file with COUNTRYWIDE pursuant to RESPA.  On or about October 14, 2008, COUNTRYWIDE responded to the Relator's QWR and supplied him with a copy of his original promissory note along with other documents responsive to his QWR.  *See,*

EXHIBIT A attached herein which contains a copy of the cover letter and copy of the Relator's note sent to Relator in 2008.

137.   The copy of the note that COUNTRYWIDE provided to Relator in 2008 had no endorsements and had no allonge, which is a piece of paper affixed to the original note for endorsements.

138.   Relator discovered that on or about August 31, 2011, BOA recorded an assignment of mortgage dated August 26, 2011 that claimed MERS sold the Relator's mortgage note and mortgage to The Bank of New York Mellon FKA the Bank of New York ("BONY"), as Trustee for the Certificate holders of CWALT, Inc., Alternative Loan Trust, 2005-35CB ("TRUST").

139.   As discussed above, MERS never owned Relator's mortgage note or mortgage and never sold Relator's mortgage note or mortgage to BONY, CWALT, Inc. or the TRUST.[7]

140.   Relator's further investigation revealed that his original lender, First Magnus Financial Corporation, no longer had a relationship with MERS at the time that the August 26, 2011 assignment was executed.   In fact, First Magnus Financial Corporation filed bankruptcy in August of 2007.   *See*, In re: First Magnus Financial Corp., Case No. 07-bk-01578, U.S. Bankruptcy Court for the District of Arizona.

141.   Within the bankruptcy proceedings, First Magnus Financial Corporation rejected all of its executory contracts in the bankruptcy proceedings, including any contractual relationship with MERS.   So in fact, Relator discovered that the Bankruptcy

---

[7] The Tennessee Supreme Court issued a very recent opinion that discussed and thoroughly analyzed the MERS business model before finding that MERS had no constitutionally protected property interest in any mortgage loans. See, *Mortgage Electronic Registration Systems, Inc. v. Carlton J. Ditto*, Supreme Court of Tennessee at Knoxville No. E2012-02292-SC-R11-CV, Opinion filed December 11, 2015.

Court never authorized First Magnus Financial Corporation to transfer the Relator's mortgage note and mortgage.

142.   Like many of his clients, after the 2008 housing crash in Miami, the value of Relator's home fell to substantially less than what he owed on his mortgage and he stopped paying his mortgage due to financial difficulties.

143.   On June 4, 2012, BONY as Trustee for the Certificate holders of the TRUST filed a real property foreclosure action in Miami-Dade County, Florida, under case number 2012-20712-CA-31 to foreclose on the Relator's home.

144.   The action commenced by BONY against Relator alleged that the TRUST owned the note originally made to First Magnus Financial Corporation on June 23, 2005, for $215,810.00, that it was the holder the note and mortgage and therefore was entitled to enforce them.

145.   BONY attached to the complaint a copy of the Relator's promissory note, which now contained an allonge that was not produced in response to the Relator's QWR back in October 2008.   See EXHIBIT B attached herein which contains the original complaint and copy of the Relator's note with the allonge.

146.   The undated allonge contained a specific endorsement purportedly signed by John Benge, as Warehousing Manager for First Magnus Financial Corporation without proof he executed the allonge before the First Magnus Financial Corporation bankruptcy.

147.   The undated allonge further contained two rubber-stamped signatures of Laurie Meder, as Vice President of Countrywide Document Custody Services, a division of Treasury Bank, N.A., and David A. Spector as Managing Director of COUNTRYWIDE HOME LOANS, INC.

148.   Relator first learned of the TRUST and any purported transfers of his

mortgage loan when he was served with the foreclosure complaint in his own case.

149.    Relator found the allonge and alleged transfers suspect at best as he had never been given notice of any transfer of his mortgage loan, such notices being required by the Truth in Lending Act, 15 U.S.C. §§ 1601, *et seq.* ("TILA") as well as Florida Statute § 559.715.

150.    Relator, because of his extensive training, experience and investigations into securitized trusts, knew that for his mortgage loan to be deposited properly into the TRUST, multiple transfers would have to occur. Each such transfer would require a new notice pursuant to TILA and Florida Statute § 559.715.

151.    Despite the Defendants' consistent objection to the Relator's discovery demands within his own foreclosure action, he eventually obtained certain computer screenshots by court order, which detailed certain aspects of his mortgage loan.

152.    In August of 2015, the Defendants produced screenshots known as "DOC401R" and "DOC403R" screenshots that detail RECONTRUST's records of when certain documents came into the possession of RECONTRUST.

153.    These "Smoking Gun" screenshots obtained by the Relator show that RECONTRUST first obtained possession of the allonge produced related to the Relator's mortgage loan in August of 2011. *See*, EXHIBIT C attached herein.

154.    The screenshots produced explains why the allonge was not produced in response to the Relator's 2008 QWR. Namely, Relator alleges that the allonge to Relator's mortgage note wasn't in RECONTRUST's possession in 2008.

155.    Based upon the Relator's investigation, he has discovered that David Spector resigned from the Defendants' corporations in 2006.

156.    The Defendants' own screen shots show that they first obtained a copy of

the allonge in 2011, five (5) years after David Spector resigned from his employment with the Defendants.

157.    According to both Ms. Garner and Ms. Sjolander, Mr. Spector's signature stamps were collected in 2006 after he terminated his employment and allegedly were never used again.

158.    On December 16, 2015, Relator deposed Ms. Jean Knowles, a corporate representative from BOA's subservicer Shellpoint Mortgage Servicing ("Ms. Knowles"), in preparing for trial in a different case wherein the Relator represents a homeowner in a foreclosure action and the STAMPS have been produced as evidence to foreclose.

159.    At the deposition, Ms. Knowles produced a "Bank of America Home Loan Routing History" identified as a "DOC444R" computer screenshot ("Routing History") which showed the history of movements of the original note.  *See*, EXHIBIT D attached herein.

160.    The Routing History reflected the original note was delivered to RECONTRUST in 2006 and then delivered to the law firm of Kass, Shuler, Solomon, Spector, Foyle & Singer, P.A., ("Kass Shuler") on September 26, 2008.

161.    Kass Shuler prepared the foreclosure complaint at the direction of BOA, as servicer for Bank of New York Mellon on September 30, 2008, and filed the foreclosure complaint against the Relator's client on October 3, 2008.  Within their complaint, Bank of New York Mellon claimed to have lost the note and attached a copy of the note with no endorsements on it.  *See*, EXHIBIT E attached herein which contains a copy of the complaint and the note filed with the complaint.

162.    The complaint in this action falsely alleged the original note was lost when it was actually in possession of Kass Shuler one week before the law firm filed the

31

complaint.

163.    Also on October 3, 2008, the same Kass Shuler attorney that filed this particular foreclosure action prepared an assignment of mortgage that claimed that MERS sold the note and mortgage to the foreclosure plaintiff in the foreclosure action on September 12, 2008.

164.    MERS never had any ownership interest in the note and mortgage at issue to sell to the foreclosure plaintiff and MERS never entered into any transaction to sell the note and mortgage to the foreclosure plaintiff in this matter.

165.    The Kass Shuler law firm fabricated the MERS assignment to present as additional evidence to buttress the Plaintiff's claim of standing to foreclose and recorded the false mortgage assignment in the public records of Miami-Dade County on October 24, 2008, one month after receiving the original note without endorsements.

166.    The BOA Routing History further shows that four years into the foreclosure action wherein the Relator represented the borrower, the original note was delivered to the entity named "SOURCECORP" for an "IFR INDORSEMENT REVIEW" on June 1, 2012.

167.    The sole purpose of the "IFR INDORSEMENT REVIEW" was to have SOURCECORP employees affix a surrogate signed blank endorsement to the original note using a rubber stamp with the signature of Michelle Sjolander.

168.    There was no reason to send the original note to SOURCECORP if the original note was endorsed upon arrival at the Kass Shuler law firm.

169.    The Kass Shuler law firm had the ability to scan the original note in order to establish that it had the necessary endorsements without need to involve SOURCECORP.

170.   Ms. Knowles also produced BOA screenshots during her deposition that are entitled "Document Summary" screenshots. *See*, EXHIBIT F attached herein.

171.   The day after the "Routing History" shows the note was sent to SOURCECORP, the BOA "Document Summay" screenshots reflects the original note received for the second time, this time endorsed, on June 2, 2012.

172.   Thereafter, the BOA Routing History shows the note sent back to the foreclosure counsel who proceeded to file a Motion for Summary Judgment now with the rubber-stamped signature of Michelle Sjolander on the blank undated endorsement.

173.   Based upon this, and further described details herein, it appears that the Defendants in this case have produced witnesses who committed perjury to hide these bad acts from Relator during his investigation into the STAMPS.

174.   The witnesses are Senior Executives of BOA and RECONTRUST who testified falsely that all original COUNTRYWIDE notes were surrogate signed within days of origination by RECONTRUST employees.

175.   This testimony is demonstrably false as Relator obtained the "smoking gun" evidence in his own foreclosure action that RECONTRUST did not come into possession of the allonge bearing Mr. Spector's rubber-stamped signature until 2011, five (5) years after Mr. Spector left his employment with the Defendants and his stamps were allegedly collected.

176.   The testimony of both Ms. Sjolander and Ms. Garner is also demonstrably false as the Relator was able to obtain evidence from Ms. Knowles as to the involvement of SOURCECORP in the endorsement process.

177.   In truth, Defendants caused the systematic surrogate signing of Mr. Spector's signature using the STAMPS that contained his signature to original notes for

all loans originated before and after he left his employment in 2006.  The Defendants continued this practice even after the Florida Attorney General's Investigation exposed the "Robo-Signing Scandal" in 2010.

178.    Since the outset of the Relators targeted investigation into the STAMPS, the Defendants and their affiliates have hired numerous aggressive law firms ("FIRMS") that have attempted to stonewall and shut down his investigation, which is further circumstantial evidence that the allegations that Defendants are still using false and fabricated evidence within their foreclosure actions today are true and correct.

179.    This is also further circumstantial evidence that the Defendants continue to file false claims for FHA insurance payments today, even after the NMS.  The FIRMS hired by the Defendants and acting at their direction have engaged in willful, wanton and intentional bad faith litigation to prevent this truth from coming to light.

180.    The FIRMS are deliberately blocking the Relator's investigation and discovery efforts as to the STAMPS.  All of these efforts are further circumstantial evidence that Relator's allegations in this Complaint are well-founded and true.

181.    The FIRMS have gone so far as to attempt to get a sitting circuit court judge to hold Relator in criminal contempt for continuing his investigation by mischaracterizing the Relator's actions and the circuit court judge's order.

182.    Relator has had to fight strenuously and without pause in order to obtain discovery in the cases he is litigating against the Defendants wherein the STAMPS are an issue.  The only meaningful discovery has come from the sitting state court judges intervening in the Relator's discovery efforts.

183.    Relator has sought discovery consistently and without pause for over two years now as to the STAMPS and the fact that he believes the Defendants are and were

34

systemically surrogate signing endorsements on original notes and then using them in foreclosure actions and making false claims upon FHA based upon the STAMPS.

184.   As a result of the "smoking gun" evidence obtained in Relator's own personal foreclosure action, the foreclosure plaintiff settled that litigation with a loan modification that provided almost a principal balance reduction of almost $200,000.00 and a cash payment to Relator and his wife of $18,000.00 as the defendants in the foreclosure action, among other things.

185.   After Relator accepted the foreclosure plaintiff's settlement offer in his own personal foreclosure action, the foreclosure plaintiff in that action attempted to force Relator to release BOA, a non-party to the litigation, from any claims that Relator may have against BOA, including but not limited to claims under the FCA.

186.   The fact that the law firm for BONY in Relator's own personal foreclosure action attempted to force Relator to release BOA, a non-party to the litigation, for FCA claims is further evidence that the Defendants and other parties act as co-conspirators seeking to prevent the misconduct alleged herein from coming to light.

187.   The Honorable Judge Migna Sanchez-Llorens ultimately entered an order to enforce the settlement of Relator's case pursuant to Relator's motion to enforcement the settlement without any release of these FCA claims for BOA.

188.   Defendants' efforts to settle Relator's foreclosure action on such highly favorable terms, and to wrongfully expand that settlement to include a release of FCA claims for BOA, are further circumstantial evidence that the allegations in this Complaint are well founded and true.

189.   The Relator has discovered information that the Defendants have submitted 6,268 mortgage insurance claims to the FHA for payment that contain the

STAMPS and false assignments of mortgages.

190.   As a result of such mortgage insurance claims made by the Defendants to the FHA, the FHA has paid the Defendants at least $622,234,247.29.

191.   Since March of 2015, Relator through his law firm has made three (3) Freedom of Information Act (FOIA) requests to HUD for the underlying court case numbers wherein mortgage insurance claims were made by Defendants and paid by the FHA to the Defendants.

192.   In its response, HUD asserted a privacy privilege as to the underlying court case information supporting each individual claim paid to Defendants, leaving Defendants as the sole party in possession of the evidence as to which specific court cases resulted in paid FHA claims under false pretenses.

193.   However, Defendants' corporate representatives, Ms. Garner and Ms. Sjolander, both testified that all FHA insured GINNIE MAE loans used the same systemic process to surrogate sign endorsements using the STAMPS onto original notes.

194.   All of BOA foreclosures on FHA insured GINNIE MAE loans since 2008, and continuing through and after the robo-signing scandal and NMS, also used false mortgage assignments to buttress their evidence of standing to foreclose.

195.   Upon information and belief, Defendants are in possession of evidence that can be obtained through discovery to establish every false mortgage insurance claim made upon and paid by the FHA wherein false surrogate signed endorsements were placed onto original notes using the STAMPS and wherein false mortgage assignments were utilized to falsely claims that the Defendants were entitled to payment by the FHA.

## COUNT ONE:
## VIOLATION OF 31 U.S.C. § 3729(a)(1)(A)
## FALSE CLAIMS ACT
## KNOWINGLY PRESENTING A FALSE CLAIM

196.     Plaintiff and Plaintiff-Relator restates and incorporates herein all of the statements and allegations contained in the preceding Paragraphs 1 through 195 in their entirety, as if fully rewritten herein.

197.     The Defendants have violated 31 U.S.C. § 3729(a)(1)(A) in that they have knowingly presented, or caused to be presented, a false or fraudulent claim to the FHA for payment or approval.

198.     From at least March 1, 2012 through May 1, 2015, or later, the Defendants submitted at least 6,268 claims for mortgage insurance claims to the FHA and received over $622,234,247.29 in payments from the FHA.

199.     When the Defendants submitted these claims to the FHA, they did so knowing they were not legally entitled to these payments as the claims relied upon false evidence including but not limited to surrogate signed rubber-stamped endorsements and false mortgage assignments that reflected transactions that never occurred.

200.     As a result of the Defendants' actions, Plaintiff UNITED STATES OF AMERICA has paid hundreds of millions of dollars to the Defendants, which they are not entitled to.

201.     Pursuant to 31 U.S.C. § 3729, the Defendants are now liable to the UNITED STATES OF AMERICA for a civil penalty of not less than $5,000.00 and not more than $11,000.00 for each violation of the FSA plus three times the amount of damages that Plaintiff UNITED STATES OF AMERICA has sustained because of the actions of the Defendant.

37

**COUNT TWO:**
**VIOLATION OF 31 U.S.C. § 3729(a)(1)(B)**
**FALSE CLAIMS ACT**
**KNOWINGLY MAKING OR USING A FALSE RECORD OR STATEMENT**
**MATERIAL TO A FALSE CLAIM**

202.    Plaintiff and Plaintiff-Relator restates and incorporates herein all of the statements and allegations contained in the preceding Paragraphs 1 through 195 in their entirety, as if fully rewritten herein.

203.    The Defendants have violated 31 U.S.C. § 3729(a)(1)(B) in that they have knowingly made, used or caused to be made or used, a false record or statement material to a false or fraudulent claims upon FHA.

204.    From at least March 1, 2012 through May 1, 2015, or later, the Defendants submitted at least 6,268 claims for mortgage insurance claims to the FHA and received over $622,234,247.29 in payments from the FHA.

205.    When the Defendants submitted these claims to the FHA, they did so knowing that they were not legally entitled to these payments as the relied upon false evidence including but not limited to surrogate signed rubber-stamped endorsements and false mortgage assignments that reflected transactions that never occurred.

206.    As a result of the Defendants' actions, Plaintiff UNITED STATES OF AMERICA has paid hundreds of millions of dollars to the Defendants, which they are not entitled to.

207.    Pursuant to 31 U.S.C. § 3729, the Defendants are now liable to the UNITED STATES OF AMERICA for a civil penalty of not less than $5,000.00 and not more than $11,000.00 for each violation of the FSA plus three times the amount of damages that Plaintiff UNITED STATES OF AMERICA has sustained because of the actions of the Defendant.

**COUNT THREE:**
**VIOLATION OF 31 U.S.C. § 3729(a)(1)(C)**
**FALSE CLAIMS ACT**
**CONSPIRING TO VIOLATE THE FALSE CLAIMS ACT**

208.    Plaintiff and Plaintiff-Relator restates and incorporates herein all of the statements and allegations contained in the preceding Paragraphs 1 through 195 in their entirety, as if fully rewritten herein.

209.    The Defendants have violated 31 U.S.C. § 3729(a)(1)(C) in that they have conspired amongst themselves to commit a violation of 31 U.S.C. § 3729(a)(1)(A) and 31 U.S.C. § 3729(a)(1)(B).

210.    From at least March 1, 2012 through May 1, 2015, or later, the Defendants submitted at least 6,268 claims for mortgage insurance claims to the FHA and received over $622,234,247.29 in payments from the FHA.

211.    When the Defendants submitted these claims to the FHA, they did so knowing that they were not legally entitled to these payments as the claims were precipitated upon false evidence including but not limited to surrogate signed rubber-stamped endorsements and false assignments of mortgages that reflected transactions that never occurred.

212.    As a result of the Defendants' actions, Plaintiff UNITED STATES OF AMERICA has paid hundreds of millions of dollars to the Defendants, which they are not entitled to.

213.    Pursuant to 31 U.S.C. § 3729, the Defendants are now liable to the UNITED STATES OF AMERICA for a civil penalty of not less than $5,000.00 and not more than $11,000.00 for each violation of the FSA plus three times the amount of damages that Plaintiff UNITED STATES OF AMERICA has sustained because of the

actions of the Defendant.

**COUNT FOUR:**
**UNJUST ENRICHMENT**

214.    Plaintiff and Plaintiff-Relator restates and incorporates herein all of the statements and allegations contained in the preceding Paragraphs 1 through 195 in their entirety, as if fully rewritten herein.

215.    By reason of the foregoing conduct and violation of federal law, the Defendants were unjustly enriched and are liable to account for any pay such amounts, which are to be determined at trial, to the UNITED STATES OF AMERICA.

**COUNT FIVE:**
**PAYMENT BY MISTAKE**

216.    Plaintiff and Plaintiff-Relator restates and incorporates herein all of the statements and allegations contained in the preceding Paragraphs 1 through 195 in their entirety, as if fully rewritten herein.

217.    By reason of the foregoing conduct of the Defendants, the UNITED STATES OF AMERICA made payments to the Defendants under mistake of fact.

218.    As a result of these payments made by the UNITED STATES OF AMERICA under mistake of fact, the UNITED STATES OF AMERICA has sustained damages in an amount to be determined at trial.

**<ins>PRAYER FOR RELIEF</ins>**

WHEREFORE, the Plaintiff UNITED STATES OF AMERICA  and Plaintiff-Relator, BRUCE JACOBS, respectfully asks this Honorable Court to enter an order granting the Plaintiff and Plaintiff-Relator a judgment for the following:

40

(i)     An award to the Plaintiff UNITED STATES OF AMERICA and Plaintiff-Relator BRUCE JACOBS of civil penalties of not less than $5,000.00 and up to $11,000.00 per violation of the FSA,

(ii)    An award to the Plaintiff UNITED STATES OF AMERICA and Plaintiff-Relator BRUCE JACOBS of three (3) times the damages which the UNITED STATES OF AMERICA sustained because of the acts of the Defendants,

(iii)   That the Defendants be ordered to immediately cease to utilize the surrogate signed endorsements and false MERS assignments of mortgages described herein within court actions as evidence of standing,

(iv)    That the Defendants be ordered to abstain from making false misrepresentations regarding the law of negotiable instruments and the 2001 amendments to Article 9 of the UCC in any actions to enforce a security instrument, whether in state or federal court,

(v)     An award for all monies paid to the Defendants unjustly, plus interest, costs and expenses, and that the Defendants be ordered to produce an accounting and the amount by which the Defendants were unjustly enriched, and

(vi)    Any such other relief as this Honorable Court may deem meet and just.

## DEMAND FOR JURY TRIAL

The Plaintiff, UNITED STATES OF AMERICA, and Plaintiff-Relator BRUCE JACOBS hereby demand a jury trial as to all issues so triable.

## CERTIFICATE OF REVIEW BY PLAINTIFF-RELATOR

This Amended Complaint is being filed this the 19th day of January 2016 in United States District Court Southern District of Florida and before the filing of this Amended Complaint, the Plaintiff-Relator reviewed all material allegations within it for their truth and veracity.

## <u>CERTIFICATE OF COMPLIANCE WITH 31 U.S.C. § 3730</u>

**WE HEREBY CERTIFY** that the foregoing Amended Complaint shall be filed

in camera with the Clerk of the Court of the Southern District of Florida and shall remain

under seal pursuant to 31 U.S.C. § 3730(b)(2).  As soon as allowable, the Plaintiff-

Relator in this action shall seek for the Clerk of the Court to issue summons against all

named Defendants in this Civil Action.

Dated:  January 19, 2016                    Respectfully Submitted,

                                            **JACOBS KEELEY, P.L.L.C.**

                                            __/s/  Court E. Keeley__
                                            **COURT E. KEELEY, B.C.S.**
                                            Florida Bar No.: 23441
                                            Email:  Keeley@JAKELegal.com
                                            **BRUCE JACOBS, Esq.**
                                            Florida Bar No.: 116203
                                            Email:  Jacobs@JAKELegal.com
                                            Alfred I. DuPont Building
                                            169 East Flagler Street, Suite 1620
                                            Miami, Florida  33131
                                            Tel:  305.358.7991
                                            Fax:  305.358.7992
                                            SERVICE EMAIL: EFILE@JAKELegal.com

                                            **Counsel for the Plaintiff-Relator**
                                            **&**
                                            **L-S LAW Firm**

                                            __/s/  Lilly Ann Sanchez__
                                            **LILLY ANN SANCHEZ, Esq.**
                                            Florida Bar No.: 195677
                                            Email:  LSanchez@TheLSfirm.com
                                            Four Seasons Tower
                                            1441 Brickell Avenue, Suite 1200
                                            Miami, Florida 33131
                                            Tel:  305.503.5503
                                            Fax:  305.503.6801
                                            SERVICE EMAIL:  lsanchez@thelsfirm.com

                                            **Co-Counsel for Plaintiff-Relator**

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on the 19th day of January, 2016, a copy of the foregoing Amended Complaint, was filed under seal and served by the method indicated at the following addresses:

| | |
|---|---|
| **James A. Weinkle** <br> **Assistant United States Attorney** <br> Office of United States Attorney <br> 99 N.E. 4th Street, Suite 300 <br> Miami, Florida 33132 <br> <br> Tel:  305.961.9290 <br> Fax:  305.530.7139 <br> Email: James.Weinkle@usdoj.gov <br> <br> **Counsel for United States of America** <br> Service by eMail | **John W. Black** <br> **Trial Attorney** <br> United States Department of Justice <br> Civil Division <br> Commercial Litigation Branch <br> P.O. Box 261, Ben Franklin Station <br> Washington, DC 20044 <br> <br> Tel:  202.305-2479 <br> Fax:  202.307.3852 <br> Email: john.w.black@usdoj.gov <br> <br> **Counsel for United States of America** <br> Service by email |

Pursuant to 31 U.S.C. § 3730(b)(2), no service was made upon the Defendants because this case is still under seal.

By:   /s/  Court E. Keeley

**Court E. Keeley, B.C.S.**
**Counsel for Plaintiff-Relator**