**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No. 1:15-CV-24585-UNGARO**

**UNITED STATES OF AMERICA,**
**Ex Rel. BRUCE JACOBS,**
        **Plaintiffs,**

**vs.**

**BANK OF AMERICA CORPORATION;**
**BANK OF AMERICA, N.A.;**
**BAC HOME LOANS SERVICING L.P.;**
**COUNTRYWIDE HOME LOANS, INC.;**
**COUNTRYWIDE FINANCIAL CORPORATION;**
**COUNTRYWIDE MORTGAGE VENTURES, L.L.C.;**
**COUNTRYWIDE BANK, F.S.B.; and**
**RECONTRUST COMPANY, N.A.,**
        **Defendants.**
_____/

**FILED _EX PARTE_ AND UNDER SEAL**
**PURSUANT TO 31 U.S.C. § 3730(b)(2)**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No. 1:15-CV-24585-UNGARO**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **FILED *EX PARTE*** |
| ***ex rel*. BRUCE JACOBS,** | **AND UNDER SEAL** |
| **Plaintiffs,** | **PURSUANT TO** |
| | **31 U.S.C. 3730(b)(2)** |
| **vs.** | |

**BANK OF AMERICA CORPORATION;**
**BANK OF AMERICA, N.A.;**
**BAC HOME LOANS SERVICING L.P.;**
**COUNTRYWIDE HOME LOANS, INC.;**
**COUNTRYWIDE FINANCIAL CORPORATION;**
**COUNTRYWIDE MORTGAGE VENTURES, L.L.C.;**
**COUNTRYWIDE BANK, F.S.B.; and**
**RECONTRUST COMPANY, N.A.,**
      **Defendants.**
_____/

## SECOND AMENDED COMPLAINT

RELATOR, Bruce Jacobs, by and through his undersigned attorneys on behalf of the United States of America, and brings this action under 31 U.S.C. §§ 3729-3732 (the federal "False Claims Act" or "FCA") to recover all damages, penalties and other remedies pursuant to the False Claims Act on behalf of the United States and themselves, and states as follows:

### I.     JURISDICTION AND VENUE

1.     Jurisdiction of this Court arises under the FCA, 31 U.S.C. § 3732(a), and the federal question statute, 28 U.S.C. § 1331. Jurisdiction also arises under 28 U.S.C. §§ 1345 and 1355.

2.     Venue is proper in this District pursuant to the FCA, 31 U.S.C. § 3732(a), which provides that "[a]ny action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant

can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred." Each of the Defendants named herein transacted business within this District. Venue is also proper under 28 U.S.C. § 1391.

## II.     PARTIES

3.      Relator BRUCE JACOBS is a citizen of Florida, residing in Miami-Dade County, Florida. Mr. Jacobs is an attorney who practices law in the areas of foreclosure defense and consumer protection in South Florida courts. He began his legal career as a Miami prosecutor. He thereafter represented banks and financial institutions in foreclosures. He has since been in private practice representing homeowners in foreclosure proceedings initiated by financial institutions, including the Defendants. He himself is also a consumer, who faced a foreclosure against his personal home.

4.      Defendant BANK OF AMERICA CORPORATION is a diversified global financial services and bank holding company. It is a Delaware corporation headquartered in Charlotte, North Carolina. It is authorized to do business and does business in the Southern District of Florida.

5.      Defendant BANK OF AMERICA, N.A. is a national banking association headquartered in Charlotte, North Carolina. It is authorized to do business and does business in the Southern District of Florida.

6.      Defendant BAC HOME LOANS SERVICING, L.P. operates as a subsidiary of Defendant BANK OF AMERICA, N.A. It is authorized to do business and does business in the Southern District of Florida.

7.      Defendant COUNTRYWIDE HOME LOANS, INC. was, for a time, a wholly owned subsidiary of Defendant BANK OF AMERICA, N.A. In July 2011, it was merged into Defendant BANK OF AMERICA, N.A. It was authorized to do business

and did business in the Southern District of Florida.

8.    Defendant COUNTRYWIDE FINANCIAL CORPORATION was an independent financial services company headquartered in Calabasas, California before it was purchased by Defendant BANK OF AMERICA CORPORATION in 2008. It was authorized to do business and did business in the Southern District of Florida.

9.    Defendant COUNTRYWIDE MORTGAGE VENTURES, L.L.C. was a subsidiary of Defendant COUNTRYWIDE FINANCIAL CORPORATION. It was authorized to do business and did business in the Southern District of Florida.

10.    Defendant COUNTRYWIDE BANK, F.S.B. was a subsidiary of Defendant COUNTRYWIDE FINANCIAL CORPORATION. Defendants COUNTRYWIDE HOME LOANS, INC., COUNTRYWIDE FINANCIAL CORPORATION, COUNTRYWIDE MORTGAGE VENTURES, L.L.C. and COUNTRYWIDE MORTGAGE VENTURES, L.L.C. were authorized to do business and did business in the Southern District of Florida.

11.    Defendant RECONTRUST COMPANY, N.A. ("RECONTRUST") is a national bank that acts as document custodian for BANK OF AMERICA, N.A. RECONTRUST is a wholly owned subsidiary of Defendant BANK OF AMERICA, N.A. and operates document custodial facilities in (i) Fort Worth, Texas, (ii) Tampa, Florida and (iii) Simi Valley, California. RECONTRUST was originally named Treasury Bank, N.A., which COUNTRYWIDE established as a wholly owned subsidiary to act as a document custodian for original loan documents from COUNTRYWIDE's network of correspondent lenders and branch offices. Currently, the RECONTRUST facilities are physically located within properties owned by BANK OF AMERICA, N.A.

### III.   OVERVIEW OF THE FALSE CLAIMS ACT

12.   The federal FCA was drafted "expansively … to reach all types of fraud, without qualification, that might result in financial loss to the Government." *Cook Cty. v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003).   A false promise to the Government, made with the intention of not performing the promise, is one type of fraud under the FCA.   *See, e.g.*, *United States ex rel. Miller v. Weston Educational, Inc.*, 840 F.3d 494, 502 (8th Cir. 2016).

13.   Under the FCA, a violation occurs when a person or entity "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3279(a)(1)(A).   Another kind of violation occurs when a person "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."   31 U.S.C. § 3279(a)(1)(B).   "Material" for purposes of the FCA "means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."   31 U.S.C. § 3279(b)(4).

14.   Separately, a person or entity also violates the FCA by "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceal[ing] or knowingly and improperly avoid[ing] or decreas[ing] an obligation to pay or transmit money or property to the Government."   31 U.S.C. § 3279(a)(1)(G).   Such a violation is sometimes called a "reverse false claim."   For purposes of making such a reverse false claim, under 31 U.S.C. § 3729(b)(3), "the term 'obligation' means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment."

15.     On February 9, 2012, the U.S. Department of Justice ("DOJ") and 49 State attorneys general announced a proposed settlement of $25 billion with Bank of America and four other mortgage servicers for their reported foreclosure misconduct.  Prior to that settlement, Bank of America's misconduct in pursuing foreclosures of  mortgages insured by the Federal Housing Agency ("FHA") (a division of United States Department of Housing and Urban Development ("HUD")) had resulting in thousands of FHA mortgage-insurance claims being improperly paid.  The United States had sued to recover damages for those false claims, and to impose civil penalties under the FCA and the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), and the Defendants agreed to imposition of a consent judgment.  EXHIBIT A to this Second Amended Complaint is a copy of the Government's complaint against the Defendants and various other banking entities, filed on March 14, 2012; EXHIBIT B is a copy of the Bank of America defendants' ensuing Consent Judgment, filed on April 4, 2012, against the Bank of America defendants in that action.  The State of Florida and other states also joined the complaint as plaintiffs, alleging violations of state laws against unfair and deceptive consumer practices.

16.     As used herein, the terms "National Mortgage Settlement" and "NMS" refer to the settlement of all those allegations detailed within EXHIBIT A hereto.  The "BOA NMS Consent Judgment" refers to the Consent Judgment specifically entered against the Bank of America defendants, with their consent, on April 4, 2012 and attached hereto as EXHIBIT B.

17.     The NMS Complaint and the ensuing BOA NMS Consent Judgment of April 4, 2012 resulted in part from an investigation of possible false claims by Bank of America.   The Office of Inspector General (the "OIG") within HUD conducted the

investigation.  On March 12, 2012, the OIG's Regional Inspector General for Audit in HUD's Region VI (which includes Charlotte, North Carolina) issued a report of that investigation.  EXHIBIT C to this complaint is a copy of that report.   That investigation confined itself to claims submitted within a "review period" of October 1, 2008 through September 30, 2010.

18.     As a result of identified misconduct when pursuing foreclosures of FHA-insured mortgages during that review period, the OIG investigation concluded that "Bank of America may have conveyed flawed or improper titles to HUD because it did not establish a control environment which ensured that affiants performed a due diligence review of the facts submitted to courts and that employees properly notarized documents."   In one example of the failure to ensure truthful submissions to courts in foreclosure cases, a notary employed by one of Bank of America's law firms "testified in a deposition that over a 3-year period, 'he falsely acknowledged tens of thousands of mortgage assignments' for the firm, often outside the signer's presence."

19.     In February 2011, HUD provided DOJ with OIG's analyses and preliminary conclusions as to whether Bank of America engaged in the alleged foreclosure practices.   The instant action does not seek relief on the basis of any allegation that Relator was an original source of information that the HUD OIG's investigation disclosed.   Nor is the instant action based upon allegations or transactions which were the subject of the resulting NMS Complaint.

20.     Rather, Relator is the source of other information showing additional and different acts of fraud committed by the Defendants against the United States, which occurred at the time when the Bank of America defendants subsequently negotiated and signed the BOA NMS Consent Judgment on or about April 4, 2012 (*see* pages 91-94 of

EXHIBIT B for the Defendants' signatures) and thereafter.

21.     HUD's OIG report had explained that, "From the beginning of our review in October 2010, Bank of America limited our access to employees and information."  In response to subsequent Civil Investigative Demands, "Bank of America provided incomplete data, which impeded identification of all affiants, notaries, and attorneys and the complete volume of documents" pertaining to the bank's foreclosure activities for FHA-insured mortgages.

22.     Relator discovered information showing that, when signing the consent judgment, the Defendants falsely promised that Bank of America, N.A. would ensure compliance with "Servicing Standards" that included standards for presenting documentation in foreclosure proceedings and bankruptcy cases.  As alleged herein, that promise was false when it was made, at the time of signing, on or about April 4, 2012. Instead of intending to comply with the Servicing Standards for foreclosures as provided in the BOA NMS Consent Judgment, the Defendants intended to commit new misconduct by presenting misleading and deceptive documentation in foreclosure actions promptly after April 4, 2012, and they have done so regularly since then, continuing after the expiration of the judgment's term on October 3, 2015.    By making that false statement, the Defendants decreased their obligations to the United States, as alleged in the NMS Complaint.

23.     The Defendants also conspired in submitting new claims for FHA insurance benefits after April 4, 2012 – claims that were false, as a result of that new foreclosure misconduct, because the Defendants knew that the resulting conveyances of title to the foreclosed properties to HUD were not "good marketable title" as required by HUD regulations in 24 C.F.R. § 203.366(a) and the applicable guidance contained in

HUD's handbook entitled "FHA Single Family Insurance Claims," Handbook No. 4330.4 ("HUD Handbook 4330.4"). Attached herein as EXHIBIT D is a true and correct copy of Chapter 2 of the HUD Handbook 4330.4 entitled "Conveyed Home Properties" which explains the process by which the Defendants could convey property to HUD in exchange for mortgage insurance benefits.

## IV.   PLAINTIFF- RELATOR'S ORIGINAL DISCOVERIES

24.   Mr. Jacobs is the original source of and has direct and independent knowledge of the non-public information upon which the allegations herein are based. *See* 31 U.S.C. § 3730(e)(4)(B). *See* Fed. R. Civ. P. 9(b); *see also Ashcroft v. Iqbal*, 556 U.S. 662 (2009); and *Bell Atlantic Corp. v. Twombly*, 425 F.3d 99 (2007). "Pursuant to *Twombly* and *Iqbal*, a complaint will survive a motion to dismiss only if it contains factual allegations in addition to legal conclusions. Factual allegations that are simply labels and conclusions, and a formulaic recitation of the elements of a cause of action are not sufficient. . . . [C]ourts need not accept the legal conclusions drawn from the facts alleged in a complaint, and they need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Cook v. Howard*, 2012 WL 3634451 (4th Cir. Aug. 24, 2012) (citations and internal quotation marks omitted). Mr. Jacobs has personally gathered all the documentation substantiating the allegations herein that Defendants knowingly submitted false claims to the United States Government. Mr. Jacobs has voluntarily provided all such information to the federal government prior to filing this action. *See* 31 U.S.C. § 3730(e)(4)(B). The specifics of the alleged fraud, as well as Mr. Jacobs status as an original source are more fully described below.

25.   Relator has discovered that Defendants intended to (and did) engage in a practice of misleadingly filing copies of promissory notes bearing rubber-stamped

endorsement signatures that were not legally authorized by the purported signatories, even after agreeing to the BOA NMS Consent Judgment that expressly barred the use of anything other than "competent" evidence in foreclosures during the 3½ year term that commenced on April 4, 2012.[1]   As Relator discovered, the Defendants intended to (and did) rely upon endorsements for which the purported signatories were not actually present when the stamps were affixed, and/or who did not intend to adopt those signatures at the time of the stamping, and the Defendants also continued to submit false statements and testimony about the date when endorsements were stamped.   That conduct has also continued, even after the 3½ year term of the consent judgment expired on October 3, 2015.

26.     Under Article 3 of the Uniform Commercial Code, a surrogate signed stamp is not valid as a signature to constitute an endorsement that would permit a subsequent holder of the note to exercise any rights in the note, including any right to foreclose a mortgage that secured the note.   Under Article 3, a valid signature is "a word, mark, or symbol executed or adopted by a person with present intention to authenticate a writing."   "Surrogate signing" occurs when unauthorized signors affix the signatures of an authorized signor outsider his or her presence and control.   The Defendants intended to (and did) pursue judicial foreclosure of mortgages secured by those falsely-stamped notes, while concealing the fact that the endorsements were affixed without any present intention of the purported signatories to authenticate them and by persons not authorized to sign endorsements on behalf of the corporate entity.

---

[1] The terms "endorsement" and "indorsement" are used interchangeably herein as various parties use each variation of these terms but they mean the same thing.  An endorsement as used herein is meant to refer to an endorsement placed upon a negotiable instrument, such as a blank check, in order to effectuate a transfer of the negotiable instrument.

27.     Under traditional principles of equity that govern foreclosures, a plaintiff lacks equitable standing to enforce a mortgage that secures a promissory note, unless the plaintiff was a holder and owner of the note itself, at the time when the foreclosure action is commenced.  Thus, "[w]here the plaintiff contends that its standing to foreclose derives from an endorsement of the note, the plaintiff must show that the endorsement occurred prior to the inception of the lawsuit."  *McLean v. JP Morgan Chase Bank Nat'l Ass'n*, 79 So. 3d 170, 174 (Fla. 4th DCA 2012).  Nevertheless, the Defendants intended to (and did) pursue judicial foreclosure cases to enforce mortgages secured by notes that had not been endorsed to them at the time of filing those cases.

28.     Defendants utilized Mortgage Electronic Registration System, Inc. ("MERS") as an instrumentality of fraud to fabricate documents that could be used to mislead courts into believing that Bank of America, N.A. or its related entities had received an assignment of a mortgage that would confer standing to foreclose.  Because a mortgage is a security interest that "follows" the underlying promissory note, a mortgage cannot validly be assigned, except with the note.  "[A]n assignment of the mortgage without an assignment of the debt creates no right in the assignee." *Vance v. Fields*, 172 So.2d 613, 614 (Fla. 1st DCA 1965).  MERS never owned any notes.  Nevertheless, the Defendants intended to (and did) pursue judicial foreclosure cases to enforce mortgages by relying upon purported assignments of the notes and mortgages from MERS.

29.     Title obtained by foreclosure is not "good marketable title," if the plaintiff foreclosed upon a mortgage that the plaintiff did not own.  *See, e.g., Rose Dev. Corp. v. Einhorn*, 65 App. Div. 3d 1115, 886 N.Y.S.2d 59 (2009).  In equity, the ownership of a mortgage is tied to ownership of the secured promissory note – equity courts sometimes say that the mortgage "follows" the note – which means that a foreclosure plaintiff does

not own the mortgage unless the plaintiff owns the note that the mortgage secures. Therefore, title obtained by a foreclosing plaintiff who did not own the secured promissory note when the action commenced is not "good marketable title."

30.     The fact that a claimant for FHA mortgage insurance benefits foreclosed without lawful evidence showing the claimant actually owned the secured promissory note at the time of commencing the action, is material to FHA in deciding whether to pay the claim.  That fact – and the failure to disclose that fact – are material to FHA, because the applicable regulations require conveying "good marketable title" when making a claim.   *See* 24 C.F.R. § 203.366(a) and the guidance contained in HUD Handbook 4330.4, ¶¶ 2-6 and 2-23 (in EXHIBIT D to this Second Amended Complaint).

31.     Contrary to their promises in signing the BOA NMS Consent Judgment on April 4, 2012, the Defendants never intended to stop misleading courts about their evidence presented to show the right to foreclose the secured promissory notes.  Shortly after DOJ had received HUD's OIG analyses and recommendations about Bank of America's foreclosure misconduct and the resulting false claims for FHA insurance benefits in February 2011, Bank of America, N.A. entered into a contract with a company called SOURCECORP BPS Inc.  The contract was embodied in a document styled as a "STATEMENT OF WORK" regarding "Notes-Indorsed-90 Day Default."   This "Statement of Work" or "SOW" contract was effective from April 1, 2011 until at least March 31, 2013.  A true and correct copy of that contract is attached hereto as EXHIBIT E.  The Defendants later entered into another SOW contract with SOURCECORP BPS Inc. that was effective from April 1, 2013 until at least March 31, 2015.  A true and correct copy of that contract is attached hereto as EXHIBIT F.   SOURCECORP BPS Inc. later became known as SourceHOV L.L.C.  Relator personally discovered these facts

after the entry of the BOA NMS Consent Judgment on April 4, 2012.

32.     EXHIBIT F, which is a copy of the latter SOW discussed above contained flowcharts entitled "90-Day Delinquent Note Indorsement Process", which is barely legible on several pages.  SourceHOV and Bank of America, N.A. have refused to provide a more legible copies of the SOWs, thereby furthering the Defendant's concealment.  However, the barely-legible copy of the latter SOW shows that Bank of America, N.A. contracted for work described in several charts of "High-Level Flow." Those "flow" charts all provided for adding endorsements to notes after the note was ninety (90) days delinquent.

33.     On June 4, 2012, Relator was sued to foreclose upon the mortgage against his home that secured a promissory note.  That lawsuit resulted in Relator's discovery of the fraud and false claims alleged in this action.  The foreclosure complaint included a copy of the original note as signed the Relator, together with an "allonge" – which is a paper attached to a note for the purpose of adding endorsements.  EXHIBIT G is a copy of the allonge that was attached to the note when the foreclosure complaint was filed.  It showed an endorsement from the original lender, in favor of "Countrywide Document Custody Services, A Division of Treasury Bank, N.A."  In turn, according to additional endorsements on the allonge, the note had been endorsed to Countrywide Home Loans, Inc. and subsequently endorsed in blank – meaning, with no specified endorsee – by Countrywide Home Loans, Inc.  Those endorsements purportedly were signed by Laurie Meder, as Vice President of Countrywide Document Custody Services A Division of Treasury Bank, N.A; and by David Spector, as Managing Director of Countrywide Home Loans, Inc.

34.     The foreclosure complaint of June 4, 2012 led Relator to discover that the

endorsements on the allonge had been fabricated.   Back on October 14, 2008, Countrywide Home Loans had provided to Relator a copy of the Relator's promissory note pursuant to his request – and, at that time it did not contain any endorsements or an allonge.   EXHIBIT H is a copy of that version of the note, together with Countrywide's cover letter of October 14, 2008.

35.   Furthermore, as Relator discovered, David Spector had already resigned from Countrywide in 2006.   Therefore, as the Relator discovered, the purported "signature" of Mr. Spector was not genuine but was false.   Relator's personal discovery of this information was confirmed, in subsequent discovery, when Relator obtained a document showing that Bank of America had affixed the purported endorsements on or after August 30, 2011 – five years after Mr. Spector's departure.   EXHIBIT I is a copy of the document showing the August 31, 2011 date of the purported endorsements.   Relator obtained that non-public document in August 2015.

36.   In defending the foreclosure action against him, Relator also discovered that the plaintiff had recorded an assignment of mortgage, purporting to evidence that MERS had sold the Relator's mortgage note and mortgage to the plaintiff.   EXHIBIT J is a copy of that purported assignment.   Bank of America routinely relied upon similar assignment documents to support its foreclosure cases, notwithstanding its earlier false promise to comply with the requirements of the BOA NMS Consent Judgment of April 4, 2012.

37.   As the Relator subsequently discovered, MERS never owned any interest in Relator's promissory note, or any promissory notes secured by any mortgages at all – and thus, MERS could never have assigned any such interests to anyone, including Bank of America, N.A. or any other purported mortgagee.   In fact, MERS maintains an internal

manual of procedures, called "MERS® Systems Procedure Manual," which specifically prohibits making any purported assignment of a promissory note, saying: "MERS should not be reflected as assigning the promissory note." EXHIBIT K is a copy of the relevant page from that internal manual, as of August 10, 2012. Yet, falsely, the Defendants created and relied upon MERS assignments in purporting to establish both the transfer of Relator's note and thousands of others, immediately after the entry of the BOA NMS Consent Judgment on April 4, 2012 and repeatedly since then.

38.     On September 23, 2014, in another pending foreclosure action, Relator conducted a deposition examination of Kim Harmstad, the litigation supervisor for a "subservicer" called Shellpoint Mortgage Servicing, which assists the Defendants in servicing and foreclosing mortgage loans. An excerpt of her testimony is attached hereto as EXHIBIT L. She testified that MERS never had any ownership interest in the note to sell to anyone. Relator subsequently obtained the same corroborative testimony in other foreclosure cases involving purported assignments by MERS. In fact, MERS never had any ownership interest in any of the notes that were secured by mortgages that MERS purported to assign – including to Bank of America, N.A. The only interest that MERS possessed, as Ms. Harmstad testified, "was that the mortgage was registered with them as a nominee to assign it to make a public record of who the owner and holder of the note is."

39.     On December 16, 2015, in another foreclosure case, Relator deposed Jean Knowles, another employee of Shellpoint Mortgage Servicing. Ms. Knowles testified that Bank of America sent the original note in that case for an "IFR Indorsement Review" and to SOURCECORP on June 1, 2012. An excerpt of her testimony is attached hereto as EXHIBIT M. Bank of America's own internal "Routing History" records show that

the note was sent on June 1, 2012 for an "IFR INDORSEMENT REVIEW" and to SOURCECORP on that same day.   A copy of that notation in their records is attached to this Complaint as EXHIBIT N on page 2.  Bank of America's own internal "Document Summary" records show that the note was received "indorsed" by Bank of America on June 2, 2012.  A copy of that notation in their records is attached to this Complaint as EXHIBIT O. Thus, as Relator discovered, the note had not been endorsed before the foreclosure complaint was originally filed in that case, on October 3, 2008, as required for any endorsement to be effective in conferring equitable standing to foreclose. Instead, on or about June 1, 2012 or June 2, 2012 – less than two months after the BOA NMS Consent Judgment of April 4, 2012 – Bank of America, N.A. and its contractors/agents were creating false records of its purported standing to foreclose.

40.    On November 25, 2014, in some other pending foreclosure actions, Relator conducted a deposition examination of Maria Garner, Senior Vice President of Defendant ReconTrust and its corporate representative with most knowledge of the endorsement rooms where the rubber stamps were used.  An excerpt of her testimony is attached hereto as EXHIBIT P. ReconTrust claimed it operated those rooms at the physical facilities of Defendant Bank of America, N.A.  In response to examination by Relator, Ms. Garner testified that document custodian employees affixed signatures of Michele Sjolander, David Spector and/or Laurie Meder to promissory notes by using rubber stamps.  She also testified, importantly, that employees affixed these stamped signatures entirely outside the presence of Ms. Sjolander, Mr. Spector and Ms. Meder, and without their present intention to adopt their signatures when affixed to the notes.

41.    In furtherance of their conspiracy to defraud the United States, the Defendants pursued extraordinary efforts to obstruct Relator's discovery efforts and to

prevent Relator from discovering or disclosing the facts which evidence the fraud. Before and after Ms. Garner's deposition, one of the judges who ordered the deposition to proceed issued two separate orders finding it "outrageous that … the [Liebler Gonzalez and Portuondo] firm would force Defense Counsel to jump through so many hoops clearly intended to deliberately block discovery ordered by several Circuit Court Judges." A copy of the orders granting sanctions for Bad Faith Discovery Tactics are attached as herein as EXHIBIT Q and EXHIBIT R.    Indeed, Ms. Garner falsely testified that all endorsements were affixed within days after the origination of each note, which Relator discovered (from Ms. Knowles) was not true.  Among other things, the Defendants and their counsel also sought to hold Relator in criminal contempt for supposedly violating a discovery protective order, after he had used deposition testimony of Ms. Sjolander as defense evidence in other foreclosure cases, even though the Defendants knew the protective order did not limit the use of the deposition in any court proceedings.  Relator was not held in contempt; instead, the court dissolved the protective order, to prevent further misuse of the protections that had been afforded.

42.    The fact that Defendants were continuing to pursue foreclosures by relying upon unauthorized rubber-stamped endorsements – affixed after commencement of the investigation by HUD's OIG, outside the presence of the purported signatories, and with no present intention of those individuals to adopt the signatures that were stamped upon the notes – had not previously been disclosed publicly before the Relator discovered these acts.

43.    Nor had there been public disclosure of the fact that Bank of America continued to rely upon MERS assignments of mortgages to establish ownership of the notes, even after commencement of the investigation by HUD's OIG and the resulting

consent judgment on April 4, 2012, despite that MERS did not own – and thus, could not assign – any interest in any notes.

###### V.    FALSE STATEMENTS AND CLAIMS BY THE DEFENDANTS

44.    By law, FHA pays insurance benefits to "mortgagee[s]" pursuant to 12 U.S.C. § 1710. The NMS Complaint had alleged that the Bank of America defendants had submitted false claims for FHA mortgage benefits.

45.    Among other things, the settlement embodied in the BOA NMS Consent Judgment allowed the Defendants to decrease their obligations to pay damages and penalties under the FCA and FIRREA, together with state-law obligations owed to Florida and many other States that had joined the NMS Complaint, upon a payment by Bank of America Corporation and/or its affiliated entities in the amount of $2,382,415,075.  That payment was deposited with other settlement payments from other banks, and the total of those payments (called the "Direct Payment Settlement Amount") was then allocated between the United States and the States.  By making a false statement in connection with the settlement, the Defendants violated the reverse false claim provision in 31 U.S.C. § 3279(a)(1)(G).

46.    Bank of America's direct settlement payment of $2,382,415,075, which was then partly allocated to the United States, represented a substantial decrease of the obligations owed by Bank of America to the United States, as identified by HUD's OIG. Despite the obstruction of HUD OIG's investigation by Bank of America, in February 2011, the investigation had identified potential FCA violations on the basis of HUD OIG's analyses and preliminary conclusions as to whether Bank of America engaged in the alleged foreclosure practices.  During the review period of October 1, 2008 through September 30, 2010, the OIG determined that Bank of America had submitted false

claims to FHA for $1.1 billion that included, in each of those claims, a conveyance title to mortgaged homes that the bank had obtained by foreclosure.

47.     The Bank of America claims identified in the OIG investigation had been false, within the meaning of the FCA, because the conveyances tendered by Bank of America were defective in failing to deliver "good marketable title," as required 24 C.F.R. § 203.366(a) and the applicable guidance contained in Chapter 2 of the HUD Handbook 4330.4.  *See*, EXHIBIT D hereto.  The OIG investigators concluded, "Bank of America used a flawed process to submit FHA conveyance claims for judicially foreclosed-upon properties and received FHA claim payments of more than $1.1 billion during the review period."  *See*, EXHIBIT C, page 6.  The Defendants have also made false claims upon HUD for mortgage insurance benefits without conveyance of title to HUD pursuant to Chapter 6 of the HUD Handbook 4330.4 without having any right to do so, which is attached hereto as EXHIBIT S.

48.     Damages are trebled under the FCA, which means that Bank of America's obligation to pay damages was $3.3 billion (not including damages for claims submitted before and after the OIG's review period) – on top of any civil penalties that were also owed under the FCA and FIRREA.  *See* 31 U.S.C. § 3279(a).   Adjusted for inflation, the FCA also authorized civil penalties between $5,500 and $11,000 per false claim, under § 3279(a), and HUD's OIG had identified 8,973 false "conveyance claims" during its review period.  The amount of those FCA penalties was therefore between $49,351,500 and $98,703,000 (not including penalties for other claims submitted before and after the review period).  FIRREA also imposed an obligation to pay penalties of up to $1 million per violation, as the NMS Complaint alleged too, under 18 U.S.C. § 1001(a), and (c). The amount of those penalties therefore was up to $8,973,000,000 (not including

penalties for other violations committed before and after the HUD OIG's review period).

49.     The DOJ had used the HUD OIG's review and analysis in negotiating a settlement agreement with Bank of America.  That settlement was embodied in the BOA NMS Consent Judgment on April 4, 2012.  The settlement decreased the combined total of the obligations owed by Bank of America to the United States (for damages and penalties under the FCA and FIRREA) and to the participating states like Florida (under state laws) to approximately $2.4 billion – namely, the $2,382,415,075 amount that Bank of American consented and was ordered to contribute to the Direct Payment Settlement Amount.

50.     Unknown to the United States or its officials at DOJ and HUD at the time of the BOA NMS Consent Judgment, the Bank of America defendants made a false statement – by signing the consent judgment itself – in order to decrease their obligations as alleged in its NMS Complaint against them.  The Consent Judgment was signed by Bank of America Corporation; Bank of America, N.A.; BAC Home Loans Servicing, L.P. (formerly known as Countrywide Home Loans Servicing, L.P.); Countrywide Financial Corporation; Countrywide Home Loans, Inc.; and Countrywide Mortgage Ventures, L.L.C.  (*See* pages 91-94 of EXHIBIT B).  By signing it, on or about April 4, 2012, those Defendants falsely promised (in Paragraph 2 of the consent judgment) that "Bank of America, N.A. shall comply with the Servicing Standards, attached hereto as Exhibit A, in accordance with their terms and Section A of Exhibit E, attached hereto."

51.     That promise was false, because the Defendants already intended that Bank of America would not perform as promised its obligation to make sure that foreclosure-related filings were to be "accurate and complete and … supported by competent and reliable evidence," as part of the Servicing Standards in Paragraph I.A of

Exhibit A to Consent Judgment.  Those standards – which the Defendants already knew and intended that Bank of America would not follow, in connection with purported endorsements and assignments of promissory notes – included the following (*See*, EXHIBIT B hereto, pages 94 – 136):

> a.      Servicer shall ensure that factual assertions made in pleadings …, Declarations, affidavits, and sworn statements filed by or on behalf of Servicer in judicial foreclosures or bankruptcy proceedings and notices of default, notices of sale and similar notices submitted by or on behalf of Servicer in non-judicial foreclosures are accurate and complete and are supported by competent and reliable evidence.  ….

> b.      Servicer shall ensure that affidavits, sworn statements, and Declarations are based on personal knowledge, which may be based on the affiant's review of Servicer's books and records, in accordance with the evidentiary requirements of applicable state or federal law.

> c.      Servicer shall ensure that affidavits, sworn statements and Declarations executed by Servicer's affiants are based on the affiant's review and personal knowledge of the accuracy and completeness of the assertions in the affidavit, sworn statement or Declaration, set out facts that Servicer reasonably believes would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. Affiants shall confirm that they have reviewed competent and reliable evidence to substantiate the borrower's default and the right to foreclose, including … required loan ownership information. ... Separate affidavits, sworn statements or Declarations shall be used when one affiant does not have

requisite personal knowledge of all required information.

…

e.      Servicer shall review and approve standardized forms … to ensure compliance with applicable law, rules, court procedure, and the terms of this Agreement ….

...

h.      Affidavits, sworn statements and Declarations shall not contain information that is false or unsubstantiated. …

…

o.      Servicer shall not file a [Proof of Claim] in a bankruptcy proceeding which, when filed, contained materially inaccurate information. ….

p.      Servicer shall not rely on [a] … sworn statement or Declaration filed in a pending pre-judgment judicial foreclosure or bankruptcy proceeding which … contained materially inaccurate information in order to obtain a judgment of foreclosure, order of sale, relief from the automatic stay or other relief in bankruptcy. In pending cases in which such affidavits, sworn statements or Declarations may have been filed, Servicer shall, at Servicer's expense, take appropriate action, consistent with state and federal law and court procedure, to substitute such affidavits with new affidavits and provide appropriate written notice to the borrower or borrower's counsel.

52.      Contrary to their stated promise of April 4, 2012, the Defendants fully intended to continue pursuing mortgage foreclosures by misleadingly filing copies of

promissory notes bearing rubber-stamped endorsement signatures that were not legally authorized by the purported signatories (and therefore, were invalid), and by filing copies of purported assignments by MERS, which never owned any interest in the notes that purportedly were being assigned (and therefore, were ineffective).  Relator discovered the facts that evidence that intention, as alleged herein.  Almost immediately, and repeatedly, the Defendants began using these false documents and evidence within their foreclosure cases in their efforts to obtain foreclosure judgments that would allow for them to make claims for mortgage insurance benefit payments from HUD.

53.     That false promise was material, in reducing the Defendants' obligations, because it was central to reaching the settlement of the Government's allegations.  The Government had alleged, in Paragraph 64 of its NMS Complaint, that the Defendants had violated FHA regulations and guidance and agreements with the Government, by failing to meet the applicable requirements to be followed in the foreclosure of single family residential mortgages that are FHA insured, which included the following (*See*, EXHIBIT A hereto, pages 27 – 28):

     a.     failing to properly identify the foreclosing party;

     …

     c.     preparing, executing, notarizing or presenting false and misleading documents, filing false and misleading documents with courts and government agencies, or otherwise using false or misleading documents as part of the foreclosure process (including, but not limited to, affidavits, declarations, certifications, substitutions of trustees, and assignments);

     d.     preparing, executing, or filing affidavits in foreclosure proceedings without personal knowledge of the assertions in the affidavits and without

review of any information or documentation to verify the assertions in such affidavits. This practice of repeated false attestation of information in affidavits is popularly known as "robosigning." Where third parties engaged in robosigning on behalf of the Banks, they did so with the knowledge and approval of the Banks;

e.      executing and filing affidavits in foreclosure proceedings that were not properly notarized in accordance with applicable state law;

f.      misrepresenting the identity, office, or legal status of the affiant executing foreclosure-related documents; [and]

g.      inappropriately charging servicing, document creation, recordation and other costs and expenses related to foreclosures; …

54.      Following the entry of the BOA NMS Consent Judgment on April 4, 2012, and continuing after the expiration of that judgment's term on October 3, 2015, the Defendants have made thousands of new affirmative false claims to FHA – by submitting new claims for FHA mortgage-insurance benefits based upon foreclosures that had been obtained by (i) reliance upon misleadingly rubber-stamped endorsements affixed to promissory notes, without any present intention of the purported signatories to adopt them (which are invalid) and (ii) upon purported assignments of mortgages by MERS without MERS owning any interest in the underlying notes (which were ineffective). Those endorsements and assignments were false records.

55.      The false claims made by Bank of America, N.A. in reliance upon the foreclosures that resulted from presenting those records were made before and after the expiration of the judgment's effective term on October 3, 2015.  In many of those claims (though, not all of them), Bank of America, N.A. also stated that it was conveying title to

HUD, and those statements were false too, because they certified implicitly that HUD was receiving "good marketable title" (as required by HUD regulations in 24 C.F.R. § 203.366(a) and the applicable guidance contained in Chapter 2 of the HUD Handbook No. 4330.4) – when, in fact, it was not.

56.     Upon information and belief, all of the Defendants' claims for FHA mortgage insurance payments made since April 4, 2012 have been false claims, for the foregoing reasons, when the mortgage foreclosures resulted from presenting endorsements purportedly signed with rubber stamps and/or assignments purportedly made by MERS.  The Defendants made these claims directly to HUD by way of either paper submission or electronic submission of form HUD-27011 as described in EXHIBIT T hereto.  The Defendants possess information sufficient to identify all such claims, but they have refused to provide any such information in response to discovery requests by Relator in this action.  HUD also possesses sufficient information to identify the false claims, but to date, HUD has withheld information in responding to requests under the Freedom of Information Act, citing the privacy rights of borrowers.  Through his own investigation, Relator has uncovered the following instances of such claims, which are alleged here as examples:

I.  CLAIMS WHERE PAYMENTS DATES AND AMOUNTS HAVE BEEN VERIFIED

      a.     On or about September 4, 2014, Bank of America, N.A. (as the successor by merger to BAC Home Loans Servicing, L.P., formerly known as Countrywide Home Loans Servicing, LP) granted to HUD a deed purporting to convey title to the foreclosed home of Barbara Johns.  *See*, EXHIBIT U hereto.  The purported conveyance was made for the purpose

of supporting a claim by Bank of America, N.A. for payment of FHA mortgage insurance benefits.  On or about February 25, 2015, Bank of America, N.A. submitted their claim to HUD/FHA and on February 28, 2015, HUD/FHA paid Bank of America, N.A. $183,971.05.  In pursuing the underlying foreclosure, on May 5, 2014 BAC Home Loans Servicing, LP filed Ms. Johns's promissory note, together with an allonge containing rubber-stamped endorsements purportedly signed by (i) Laurie Meder on behalf of Countrywide Bank, N.A., (ii) Michele Sjolander on behalf of Countrywide Home Loans, Inc. and (iii) Michele Sjolander on behalf of Countrywide Home Loans Servicing LP.  *See*, page 4 of EXHIBIT V hereto.  When making their claim to HUD for mortgage insurance benefits related to this mortgage loan, Bank of America, N.A. concealed from HUD/FHA the fact that the endorsements were invalid to confer ownership of the note upon a subsequent holder, because it also concealed that the purported signatories – Ms. Meder and Ms. Sjolander – had not actually affixed the endorsement or had any present intention to adopt their signatures when affixed to the endorsement.

b.      On April 18, 2013, Bank of America, N.A. granted to HUD a deed purporting to convey title to the foreclosed home of Tor Espen Nygren.  *See*, EXHIBIT W hereto.  The purported conveyance was made for the purpose of supporting a claim by Bank of America, N.A. for payment of FHA mortgage insurance benefits.  On or about June 4, 2013, Bank of America, N.A. submitted their claim to HUD/FHA and on June 7, 2013, HUD/FHA paid Bank of America, N.A. $176,730.56.   In pursuing the

underlying foreclosure, on March 9, 2012, Bank of America, N.A.,
successor by merger to BAC Home Loans Servicing, LP F/K/A
Countrywide Home Loans Servicing, LP filed a complaint against Tor
Espen Nygren. *See*, EXHIBIT X. Attached to the complaint was a copy
of Tor Espen Nygren's note bearing rubber-stamped endorsements
purportedly signed by (i) Laurie Meder on behalf of Countrywide Bank,
FSB and (ii) Michele Sjolander on behalf of Bank of America, N.A. *See*,
page 6 of EXHIBIT X. Also attached to the complaint was an assignment
of mortgage purporting to transfer the mortgage "together with the note(s)
and obligations therein" from MERS to BAC Home Loans Servicing, LP
FKA Countrywide Home Loans Servicing, LP on July 13, 2011. *See*,
page 16 of EXHIBIT X. When making their claim to HUD for mortgage
insurance benefits related to this mortgage loan, Bank of America, N.A.
concealed from HUD/FHA the fact that the endorsements were invalid to
confer ownership of the note upon a subsequent holder, because it also
concealed that the purported signatories – Ms. Meder and Ms. Sjolander –
had not actually affixed the endorsement or had any present intention to
adopt their signatures when affixed to the endorsement. Further, the
Defendants utilized an assignment of mortgage that was false.

c.   On September 10, 2014, Bank of America, N.A. granted to HUD a deed
purporting to convey title to the foreclosed home of David M. Gregory.
*See*, EXHIBIT Y hereto. The purported conveyance was made for the
purpose of supporting a claim by Bank of America, N.A. for payment of
FHA mortgage insurance benefits. On or about January 23, 2015, Bank of

America, N.A. submitted their claim to HUD/FHA and on January 26, 2015, HUD/FHA paid Bank of America, N.A. $222,481.44.  In pursuing the underlying foreclosure, on February 18, 2014 Bank of America, N.A. filed a complaint against David M. Gregory.  *See*, EXHIBIT Z.  Attached to the complaint was a copy of Mr. Gregory's note bearing a rubber-stamped endorsement purportedly signed by Michele Sjolander on behalf of Bank of America, N.A.  *See*, page 9 of EXHIBIT Z.  When making their claim to HUD for mortgage insurance benefits related to this mortgage loan, Bank of America, N.A. concealed from HUD/FHA the fact that the endorsements were invalid to confer ownership of the note upon a subsequent holder, because it also concealed that the purported signatory – Ms. Sjolander – had not actually affixed the endorsement or had any present intention to adopt their signatures when affixed to the endorsement.  Further, the Defendants utilized an assignment of mortgage that was false.

II.  CLAIMS WHERE PAYMENTS ARE PENDING VERIFICATION (WHERE BANK OF AMERICA, N.A. OR THEIR RELATED ENTITIES HAVE CONVEYED TITLED TO HUD BUT CLAIM SPECIFIC PAYMENT DATES AND AMOUNTS PAID ARE PENDING):

a.      On August 27, 2015, Bank of America, N.A. (as the successor by merger to BAC Home Loans Servicing, LP, formerly known as Countrywide Home Loans Servicing, LP) granted to HUD a deed purporting to convey title to the foreclosed home of Sheila Williams.  *See*, EXHIBIT AA hereto.  The purported conveyance was made for the purpose of supporting a claim by Bank of America, N.A. for payment of FHA

mortgage insurance benefits. In initiating the underlying foreclosure action, Countrywide Home Loans Servicing LP first filed a complaint alleging it had lost Ms. William's original note and attached to their complaint was a copy of Ms. Williams's note without any endorsements on it along with an Assignment of Mortgage purporting to have MERS "C/O Countrywide Home Loans, Inc." assign its interest in Ms. William's mortgage "together with the note" to Countrywide Home Loans Servicing, LP. *See*, EXHIBIT BB hereto. The Assignment of Mortgage attached to this foreclosure complaint is a classic example of a robo-signed assignment of mortgage. It is purportedly executed by Cheryl Samons, an admitted "robo-signor" who worked for the law offices of David J. Stern, Esq., one of the architects of the "robo-signing" scandal that led to the NMS. Then later in Ms. William's foreclosure action, BAC Home Loans Servicing, LP filed an Affidavit in Support of Summary Judgment in order to obtain their final judgment of foreclosure against her with a copy of her promissory note, which now included rubber-stamped endorsements purportedly signed by David Spector on behalf of (i) Countrywide Home Loans, Inc. and (ii) Countrywide Home Loans Servicing, LP. *See*, EXHIBIT CC hereto. Bank of America, N.A. concealed from FHA the fact that the endorsements of Mr. Spector on the mortgage note at issue were invalid to confer ownership of the note upon a subsequent holder, because it also concealed that the purported signatory – Mr. Spector – had left Countrywide in 2006, had not actually affixed his signature on the endorsement, and had no present intention to adopt his signature at the

time it was affixed to the original note.  Bank of America, N.A. also concealed from FHA the fact that MERS never owned any interest in the mortgage note at issue, that the MERS assignment was a classic example of a robo-signed David J. Stern/Cherly Samons assignment, and that the purported assignment of the mortgage from MERS to Countrywide Home Loans Servicing, L.P. was ineffective.

b.    On October 19, 2016, Bank of America, N.A. granted to HUD a deed purporting to convey title to the foreclosed home of Gregory Barnett.  *See*, EXHIBIT DD attached hereto.  The purported conveyance was made for the purpose of supporting a claim by Bank of America, N.A. for payment of FHA mortgage insurance benefits.    In initiating the underlying foreclosure action, Bank of America, N.A. filed a complaint claiming to be the "holder" of Mr. Barnett's note and thus entitled to enforce it.  *See*, EXHIBIT EE attached hereto.  Attached to the complaint was a copy of Mr. Barnett's mortgage note bearing rubber-stamped endorsements purportedly signed by (i) Laurie Meder on behalf of Countrywide Bank, FSB and (ii) Michele Sjolander on behalf of Bank of America, N.A.  *See*, page 6 of EXHIBIT EE.    Also attached to the compliant was an assignment of mortgage purporting to assign Mr. Barnett's mortgage "[T]ogether with any and all notes and obligations described therein" from MERS to BAC Home Loans Servicing, LP FKA Countrywide Home Loans Servicing LP.  *See*, page 18 of EXHIBIT EE.  When making their claim to HUD for mortgage insurance benefits related to this mortgage loan, Bank of America, N.A. concealed from HUD/FHA the fact that the

endorsements were invalid to confer ownership of the note upon a

subsequent holder, because it also concealed that the purported signatories

– Ms. Meder and Ms. Sjolander – had not actually affixed the endorsement

or had any present intention to adopt their signatures when affixed to the

endorsement.  Further, the Defendants utilized an assignment of mortgage

that was false.

The Relator has discovered numerous additional specific false claims made by the

Defendants to HUD/FHA resulting in payments made to the Defendants wherein the

Defendants concealed from HUD/FHA that the rubber-stamped endorsements and

assignments of mortgages used in the underlying foreclosure actions were invalid to

convey ownership.  Attached herein as EXHIBIT FF is a spreadsheet of thirty-nine (39)

specific examples and instances discovered by the Relator of HUD/FHA paying the

Defendants in response to their false claims for mortgage insurance benefits made upon

HUD/FHA.  Relator's efforts to identify additional specific claims are ongoing but such

efforts have been obstructed by the Defendants and their counsel.  Relator's efforts to

identify additional specific claims have also been frustrated by HUD/FHA's refusal to

respond to the Relator's requests for information, citing the privacy concerns of

borrowers.

### FIRST CLAIM FOR RELIEF

### VIOLATIONS OF THE FALSE CLAIMS ACT
### 31 U.S.C. § 3729

57.     The allegations in paragraphs 1 through 56 above are incorporated herein

by reference.

58.     By virtue of the acts described above, the Defendants knowingly presented or caused to be presented to the United States false or fraudulent claims for payment or approval, including but not limited to improper claims for payment of FHA residential mortgage insurance or guarantees.

59.     In so doing, the Defendants acted knowingly; that is, they possessed actual knowledge that the claims for payment were false or fraudulent; acted in deliberate ignorance of the truth or falsity of the claims for payment; or acted in reckless disregard of the truth or falsity of the claims for payment.

60.     By virtue of the acts described above, the Defendants made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim.

61.     In so doing, the Defendants acted knowingly; that is, they possessed actual knowledge that the information, statements and representations were false or fraudulent; acted in deliberate ignorance of the truth or falsity of the information, statements and representations; or acted in reckless disregard of the truth or falsity of the information, statements and representations.

62.     By virtue of the acts described above, the Defendants made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government, and concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the United States.

63.     In so doing, the Defendants acted knowingly; that is, the Defendants possessed actual knowledge that the information, statements and representations were false or fraudulent; acted in deliberate ignorance of the truth or falsity of the information, statements and representations; or acted in reckless disregard of the truth or falsity of the

information, statements and representations.

64.     By virtue of the acts described above, the Defendants conspired with one or more persons: to present or cause to be presented to the United States false or fraudulent claims for payment or approval; to make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim; and, to make, use, or cause to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the government; or to conceal or improperly avoid or decrease an obligation to pay or transmit money or property to the United States.

65.     Substantially the same allegations of fraud as those contained herein were not publicly disclosed in a federal criminal, civil or administrative proceeding to which the Government of the United States or its agent was a party, or in a congressional, Government Accountability Office, or other federal report, hearing, hearing, audit or investigation, or in the news media.  Relator Jacobs is an original source.  Nor is this action based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party.   As required by 31 U.S.C. § 3730(b) and (e), Relator Jacobs has voluntarily provided information, oral and/or written, and has sent disclosure statements of all material evidence, both before and contemporaneously with filing, to the Attorney General of the United States and to the United States Attorney for the Southern District of Florida.

## PRAYER FOR RELIEF

Plaintiff UNITED STATES OF AMERICA and Relator BRUCE JACOBS respectfully ask this Court to enter judgment against the Defendants and in favor of the Plaintiffs and Relator as follows.

(i)      An award to the Plaintiff UNITED STATES OF AMERICA of civil penalties of $11,000.00 per violation of the FCA occurring prior to November 2, 2015 and $21,563.00 for each violation thereafter, or an amount otherwise allowed by law,

(ii)     An award to the Plaintiff UNITED STATES OF AMERICA of three (3) times the damages the UNITED STATES OF AMERICA sustained because of the acts of the Defendants,

(iii)    An award to Relator BRUCE JACOBS of 25% of the proceeds of this action or any settlement, if the Government of the United States elects to intervene and proceed, or 30% of the proceeds if the Government does not so elect

(iv)     Costs and attorney's fees as allowed by law, including the costs and fees of Relator's attorneys and the costs of the United States.

## DEMAND FOR JURY TRIAL

On behalf of Plaintiff UNITED STATES OF AMERICA and himself, and Relator

BRUCE JACOBS hereby demand a jury trial as to all issues so triable.

## CERTIFICATE OF REVIEW BY RELATOR

This Amended Complaint is being filed on January 4, 2017, in United States

District Court Southern District of Florida. Before the filing of this Amended Complaint,

the Relator reviewed all material allegations within it for their truth and veracity.

/s/   Bruce Jacobs_____
as Plaintiff-Relator

## CERTIFICATE OF COMPLIANCE WITH 31 U.S.C. § 3730

**THE UNDERSIGNED HEREBY CERTIFIES** that the foregoing Amended

Complaint shall be filed in camera with the Clerk of the Court of the Southern District of

Florida and shall remain under seal pursuant to 31 U.S.C. § 3730(b)(2). As soon as

allowable, the Relator shall serve this the Second Amended Complaint upon all named Defendants through their counsel of record.


Date:  January 4, 2017                    Respectfully submitted,

                                          /s/  Court E. Keeley_____
                                          Court E. Keeley, B.C.S.
                                          **Jacobs Keeley, P.L.L.C.**
                                          Alfred I. DuPont Building
                                          169 East Flagler St., Suite 1620
                                          Miami, FL 33131
                                          Keeley@JAKElegal.com
                                          Efile@JAKElegal.com
                                          Tel:    (305) 358-7991
                                          Fax:    (305) 358-7992
                                          *Lead Counsel for Plaintiff-Relator*



## CERTIFICATE OF FILING AND SERVICE

I HEREBY CERTIFY that on this the 7th day of January, 2017, a copy of the foregoing Second Amended Complaint, was filed under seal and sent to the parties identified below.  Pursuant to 31 U.S.C. § 3730(b)(2), no service shall be made upon the Defendants named herein until the seal is lifted by this Honorable Court.  As soon as the seal is lifted, the undersigned shall serve the Defendants and their counsel with this, the Second Amended Complaint.

                                          /s/  Court E. Keeley_____
                                          Court E. Keeley, B.C.S.

**SERVICE LIST**
*United States of America, Ex. Rel., Bruce Jacobs vs. Bank of America Corporation, et.al.*
Case No. 1:15-cv-24585-Ungaro
United States District Court, Southern District of Florida

| | |
|---|---|
| **Jacobs Keeley, P.L.L.C.**<br>Court E. Keeley, B.C.S.<br>Bruce Jacobs, Esq.<br>Alfred I. DuPont Building<br>169 East Flagler St., Suite 1620<br>Miami, FL 33131<br>Keeley@JAKElegal.com<br>Jacobs@JAKElegal.com<br>Efile@JAKElegal.com<br>Tel:     (305) 358-7991<br>Fax:    (305) 358-7992<br>*Lead Counsel for Plaintiff Relator* | **John W. Black**<br>**Trial Attorney**<br>United States Department of Justice<br>Civil Division<br>Commercial Litigation Branch<br>P.O. Box 261, Ben Franklin Station<br>Washington, DC 20044<br>Tel:  202.305-2479<br>Fax:  202.307.3852<br>Email: john.w.black@usdoj.gov<br>**Counsel for United States of America**<br>Service by overnight mail and email |
| **The LS Law Firm**<br>Lilly Ann Sanchez, Esq.<br>Four Seasons Tower<br>1441 Brickell Ave., Suite 1200<br>Miami, FL 33131<br>LSanchez@TheLSfirm.com<br>Tel:     (305) 503-5503<br>Fax:    (305) 503-6801<br>*Co-Counsel for Plaintiff-Relator* | **James A. Weinkle**<br>**Assistant United States Attorney**<br>Office of United States Attorney<br>99 N.E. 4th Street, Suite 300<br>Miami, Florida 33132<br>Tel: 305.961.9290<br>Fax: 305.530.7139<br>Email: James.Weinkle@usdoj.gov<br>**Counsel for United States of America**<br>Service by overnight mail eMail |
| **Law Office of Benedict P. Kuehne, P.A.**<br>Benedict P. Kuehne, B.C.S.<br>100 S.E. 2nd Street, Suite 3550<br>Miami, Florida 33134-2154<br>Ben.Kuehne@KuehneLaw.com<br>Efiling@KuehneLaw.com<br>Tel:     (305) 789-5989<br>Fax:    (305) 789-5987<br>*Co-Counsel for Plaintiff-Relator* | **Haber Slade, P.A.**<br>David B. Haber, Esq.<br>Roger Slade, Esq.<br>201 S. Biscayne Blvd., Suite 1205<br>Miami, Florida  33131<br>DHaber@DHaberLaw.com<br>RSlade@DHaberLaw.com<br>Tel:     (305) 379-2400<br>Fax:    (305) 379-1106<br>*Co-Counsel for Plaintiff-Relator* |