## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No.: 1:15-cv-24585-UU

BRUCE JACOBS,

     Plaintiff,

v.

BANK OF AMERICA CORPORATION, *et al.*,

     Defendants.

_____/

### OMNIBUS ORDER

THIS CAUSE is before the Court upon Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint, D.E. 95, and Defendants' Motion for Judicial Notice, D.E. 96. The Motions are fully briefed and ripe for disposition.

THE COURT has reviewed the pertinent portions of the record and is otherwise fully advised in the premises. For reasons set forth below: (1) Defendants' Motion for Judicial Notice, D.E. 96, is GRANTED IN PART; and (2) Defendants' Motion to Dismiss, D.E. 95, is DENIED.

## I.  BACKGROUND

The following allegations are taken from Plaintiff's Second Amended Complaint (the "SAC"). D.E. 79.

Plaintiff, Bruce Jacobs, is an attorney who practices law in the areas of foreclosure defense and consumer protection in South Florida. Plaintiff brings this action under the *qui tam* provisions of the federal False Claims Act, 31 U.S.C. § 3729, *et seq.* (the "FCA"). Defendants, Bank of America Corporation, Bank of America, N.A., Countrywide Home Loans, Inc., Countrywide Financial Corporation, Countrywide Mortgage Ventures, LLC, Countrywide Bank,

FSB and Recontrust Company (collectively, "Defendants"), are corporate entities subsumed under Defendant Bank of America Corporation, which is a publicly traded company.

Plaintiff's claims hinge on allegations that Defendants falsified evidence in the form of surrogate signed rubber-stamped endorsements and mortgage assignments documenting transactions that never occurred ("robo-signing"), and presented that false evidence to foreclosure courts to obtain foreclosure judgments and to make false claims for payment of mortgage insurance.

In particular, Plaintiff alleges that Defendants submitted false claims, in violation of the FCA, in two principal ways.  First, Plaintiff alleges a false claims act claim, based on a theory of implied certification, on grounds that Defendants knowingly pursued, and continue to pursue, "mortgage foreclosures by misleadingly filing copies of promissory notes bearing rubber-stamped endorsement signatures that were not legally authorized by the purported signatories (and therefore, were invalid), and by filing copies of purported assignments by MERS [Mortgage Electronic Registration System, Inc.], which never owned any interest in the notes that purportedly were being assigned (and therefore, were ineffective)." *Id.* ¶ 52.

Second, Plaintiff alleges a reverse false claims act claim against Defendants based on their allegedly false statements made when signing an April 4, 2012 NMS Consent Judgment (the "Consent Judgment"), which required that Defendants comply with various HUD servicing standards and regulations, because Defendants knew—at the time of agreeing to the Consent Judgment—that they did not intend to "perform as promised [their] obligation to make sure that foreclosure-related filings were to be 'accurate and complete and . . . supported by competent and reliable evidence.'" *Id.* ¶ 51.

A.  United States Settlement

Sometime prior to February 2011, the Office of Inspector General within HUD (the "OIG") conducted an investigation of possible false claims by Bank of America and, in particular, allegations of robo-signing by Bank of America, its subsidiaries, and four other mortgage servicers.  *Id.* ¶¶ 15, 17, 18.

In February 2011, the OIG provided the U.S. Department of Justice ("DOJ") with OIG's analyses and preliminary conclusions as to whether Bank of America engaged in the allegedly fraudulent foreclosure practices.  *Id.* ¶ 19.  As a result of these investigations, the OIG Regional Inspector issued a General Report (the "OIG Report"), which concluded that Bank of America failed to establish effective control over its foreclosure process, such that: (1) "affiants routinely signed foreclosure documents, including affidavits, certifying they had personal knowledge of facts when they did not;" and (2) attorneys may have "improperly prepare[d] documents and misrepresent[ed] the work they performed."  D.E. 79-3 p. 6.  In other words, Bank of America filed "improper legal documents, thereby misrepresenting its claims to HUD and may have exposed it to liability under the False Claims Act."  *Id.*

On February 9, 2012, DOJ and 49 state attorney generals announced a proposed settlement of $25 billion with Bank of America and four other mortgage servicers for their reported foreclosure misconduct, including possibly conveying "flawed or improper titles to HUD because it did not establish a control environment which ensured that affiants performed a due diligence review of the facts submitted to courts and that employees properly notarized documents."  *Id.* ¶¶ 15, 18.

The parties officially filed their consent judgment on April 4, 2012 (the "Consent Judgment").  *Id.* ¶ 59.  Among other things, the Consent Judgment required that Bank of

America Corp., Bank of America, N.A., BAC Home Loans Servicing, L.P., Countrywide Home Loans, Inc., Countrywide Financial Corporation and Countrywide Mortgage Ventures, L.L.C. ensure that: (1) factual assertions made in pleadings be accurate; (2) affidavits, sworn statements and declarations be based on personal knowledge; and (3) mortgage assignments by or on behalf of Bank of America and Countrywide be executed with appropriate legal authority, accurately reflecting the completed transaction and properly acknowledged.

Plaintiff alleges that, <u>even after the Consent Judgment</u>, Defendants litigating foreclosure cases continued to rely upon endorsements that were robo-signed and, also, continued to submit false statements and testimony about the dates when endorsements were stamped. *Id.* ¶¶ 25-26. In addition, Plaintiff alleges that Defendants continue to use purported assignments to the Mortgage Electronic Registration System, Inc. ("MERS") as an "instrumentality of fraud to fabricate documents that could be used to mislead courts into believing that Bank of America, N.A. or its related entities had received an assignment of a mortgage that would confer standing to foreclose." *Id.* ¶ 28. In particular, Plaintiff alleges that MERS never owned any interest in Plaintiff's or other borrower's promissory notes, or "any promissory note secured by mortgages at all," but rather **only** had mortgages registered to them as nominees to "make a public record of who the owner and holder of the note [was]." *Id.* ¶ 38. Thus, "MERS could never have assigned any such interests to anyone, including Bank of America, N.A. or any other purported mortgagee." *Id.* ¶ 37. Nonetheless, Defendants "intended to (and did) pursue judicial foreclosure cases to enforce mortgages by relying on purported assignments of the notes and mortgages from MERS." *Id.* ¶ 28.

The aforementioned conduct has allegedly continued even after the Consent Judgment expired on October 3, 2015. *Id.* ¶¶ 25-26.

B. Basis of Plaintiff's Knowledge

Plaintiff's knowledge of Defendants' alleged fraud comes from two sources: (1) Plaintiff's experience in his own foreclosure proceedings; and (2) evidence he exposed while litigating various foreclosure cases.

Both in his own foreclosure case and while litigating various foreclosure cases, Plaintiff discovered that Defendants would: (1) produce false documents and prosecute foreclosures using surrogate signed endorsements placed on original notes by teams of surrogate signors and false mortgages assignments as evidence of standing to foreclose; and (2) create and rely upon assignments from MERS in "purporting to establish both the transfer of Relator's note and thousands of others, immediately after the entry of the Consent Judgment and repeatedly since then." *Id.* ¶ 37.

In particular, three distinct rubber-stamped signatures began appearing on original notes in cases wherein the Defendants were involved. These rubber-stamped signatures bore the names of (i) Michelle Sjolander, (ii) Laurie Meder, and (iii) David Spector. *Id.* ¶ 40.

Plaintiff thereafter deposed various supervisors and employees of Shellpoint Mortgage Servicing, a subservicer that assists Defendants in servicing and foreclosing mortgage loans, as well as Maria Garner, a Senior Vice President of Recontrust Company, in connection with defending clients in other foreclosure cases. *Id.* ¶¶ 38-40. During the course of these depositions and as a result of discovery requests propounded in these cases, Plaintiff allegedly uncovered that Defendants were continuing to robo-sign promissory notes in at least five (5) different instances, even after entry of the Consent Judgment, despite the fact that such conduct violated HUD regulations and the terms of the judgment itself. *Id.* ¶¶ 50-51. Plaintiff also discovered that Defendants continued to rely on promissory notes assigned to MERS even though, according

to Plaintiff, such assignments are invalid.  Each of these instances occurred after entry of the April 2, 2014 Consent Judgment.  *Id.*

Based on these foreclosure cases, Plaintiff alleges that Defendants continue to make "new affirmative false claims to FHA – by submitting new claims for FHA mortgage-insurance benefits based upon foreclosures that had been obtained by (i) reliance upon misleadingly rubber-stamped endorsements affixed to promissory notes, without any present intention of the purported signatories to adopt them (which are invalid) and (ii) upon purported assignments of mortgages by MERS without MERS owning any interest in the underlying notes (which were ineffective). *Id.* ¶ 54.

C.  Plaintiff's Claims

Based on this underlying conduct Plaintiff alleges, in a single Count, the following three claims: (1) an implied certification false claims act claim based on continued fraudulent use of robo-signed promissory notes, as well as ineffective MERS assignments, to obtain FHA residential mortgage insurance payments; (2) a reverse false claims act claim, on grounds that Defendants made a false statement by signing the Consent Judgment with knowledge that they did not intend to cease the fraudulent practice of relying on robo-signed promissory notes and MERS assignments in foreclosure cases; and (3) a conspiracy claim based solely on Defendants signing the Consent Judgment.  *Id.* ¶¶ 50-51, 54.

Defendants move to dismiss Plaintiff's Second Amended Complaint based on: (1) the public disclosure bar under the FCA; and (2) failure to state a claim under Federal Rules of Civil Procedure 12(b)(6) and 9(b).  D.E. 95.  Defendants also filed a motion requesting that the Court take judicial notice of six (6) different items, including news articles, a report from the Federal Reserve, and an OCC Consent Order.  D.E. 96.  Plaintiff opposes Defendants' Motions.

## II.    LEGAL STANDARD

A. Rule 12(b)(6)

In order to state a claim, Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  While a court, at this stage of the litigation, must consider the allegations contained in the plaintiff's complaint as true, this rule "is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In addition, the complaint's allegations must include "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

In practice, to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570).  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*  The plausibility standard requires more than a sheer possibility that a defendant has acted unlawfully. *Id.*  Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief. *Id.*  Determining whether a complaint states a plausible claim for relief is a context-specific undertaking that requires the court to draw on its judicial experience and common sense. *Id.* at 679.

Fraud claims are subject to Rule 9(b)'s heightened pleading requirements.  Rule 9(b) provides that "[i]n allegations of fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake" but "[m]alice, intent, knowledge, and other

condition of mind of a person shall be averred generally." Fed. R. Civ. P. 9(b).  The Eleventh

Circuit has stated that Rule 9(b)'s fraud particularity requirement is met as long as the complaint

sets forth (1) precisely what representations were made, and (2) the time and place of each such

statement and the person responsible for making (or, in the case of omissions, not making) the

same, and (3) the content of such statements and the manner in which they misled the plaintiff,

and (4) what the defendants obtained as a consequence of the fraud."  *Ziemba v. Cascade Int'l,*

*Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (internal citation omitted).

    B. Judicial Notice

    In considering a motion to dismiss under Rule 12(b)(6), the Court may judicial notice of

facts that are not subject to reasonable dispute because they are capable of accurate and ready

determination by resort to sources whose accuracy cannot reasonably be questioned.  Fed. R.

Evid. 201; *Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1278 (11th Cir. 1999).

    In a case brought under the False Claims Act, "courts may take judicial notice of

documents such as . . .  newspaper articles . . .  for the limited purpose of determining which

statements the documents contain (but not for determining the truth of those statements)."  *U.S.*

*ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 815 n. 4 (11th Cir. 2015); *Benak ex rel. All.*

*Premier Growth Fund v. All. Capital Mgmt. L.P.*, 435 F.3d 396, 401 (3d Cir. 2006) (affirming

district court taking judicial notice of articles which "serve[d] only to indicate what was in the

public realm at the time, not whether the contents of those articles were in fact true"); *Heliotrope*

*Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n. 18 (9th Cir. 1999) ("We take judicial notice

that the market was aware of the information contained in news articles submitted by the

defendants."); *Rodriguez v. Bear Stearns Companies, Inc.*, No. 07-CV-1816 (JCH), 2009 WL

995865, at *12 (D. Conn. Apr. 14, 2009) ("The court takes judicial notice of the existence,

publication, and/or availability of certain news articles and annual reports as requested by the defendants, but does not take notice of the truth of the matters asserted in those articles and reports." (citing *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 424 (2d Cir. 2008)); *U.S. ex rel. Lam v. Tenet Healthcare Corp.*, 481 F. Supp. 2d 673, 680 (W.D. Tex. 2006) ("Pursuant to Rule 201(b), Courts have the power to take judicial notice of the coverage and existence of newspaper and magazine articles.").

## III.   **DISCUSSION**

Defendants move to dismiss Plaintiff's SAC because: (1) Plaintiff's claims are barred by the FCA public disclosure bar; and (2) Plaintiff fails to state a claim under the False Claims Act: (a) based on a theory of implied certification; (b) by alleging a reverse false claims act claim; and (c) for conspiracy.

### A. FCA Public Disclosure Bar

The currently enacted version of Section 3730(e)(4) of the False Claims Act[1] provides:

> The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed--
>
> > (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
> >
> > (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
> >
> > (iii) from the news media,
>
> unless the action is brought by the Attorney General **or the person bringing the action is an original source of the information**.

31 U.S.C. § 3730(e)(4)(A) (emphasis added).   The public disclosure bar "creates grounds for dismissal for failure to state a claim" under Rule 12(b)(6).   *U.S. ex rel. Osheroff*, 776 F.3d at

---

[1] The parties agree that the current FCA, enacted in 2010, governs Plaintiff's claims in this action.

811. However, courts are expressly permitted to consider documents subject to judicial notice, such as news articles, websites, and other publicly available documents, "for the limited purpose of determining which statements the documents contain (but not for determining the truth of those statements)." *Id.* at 812 n. 4.

The Eleventh Circuit has articulated the following three-part test for deciding if the public disclosure bar applies: "(1) have the allegations made by the plaintiff been publicly disclosed; (2) if so, is the disclosed information the basis of the plaintiff's suit; and (3) if yes, is the plaintiff an 'original source' of that information." *Id.* (citing *Cooper*, 19 F.3d at 565 n. 4).

"The FCA is most naturally read to preclude suits based in *any part* on publicly disclosed information." *Battle v. Bd. of Regents for Georgia*, 468 F.3d 755, 762 (11th Cir. 2006). For this reason, a plaintiff basing a False Claims Act *qui tam* claim based "in any part on such publicly disclosed information must demonstrate that the plaintiff is an original source of that information." *Id.*

An "original source" is defined as "an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section." 31 U.S.C. § 3730(e)(4)(B).

i.    *Whether allegations have been publicly disclosed*

Defendants argue that the allegations contained in Plaintiff's SAC have been publicly disclosed. Defendants group Plaintiff's allegations into the following three categories: (1) that Defendants robo-signed promissory notes; (2) that Defendants used MERS to transfer mortgage

assignments; and (3) that these practices resulted in improper foreclosures, both because rubber-stamped endorsements are not good evidence of Defendants' ownership of the underlying property and because MERS does not have the power to transfer a note—and a mortgage cannot be assigned without a note.  D.E. 95 p. 10.  Defendants contend that each of these allegations "has for many years been publicly disclosed" by, at the very least: (1) the U.S. Government's published investigation in April 2011; (2) a June 2011 *Fortune* article; (3) a June 2014 website article posted by Clinton Kirby, a foreclosure plaintiff in a case against Bank of America; and (4) an April 1, 2015 *Housing Wire* article quoting a MERS executive.  *Id.* pp. 10-11.

In response, Plaintiff argues that while it is public knowledge that Defendants robo-signed promissory notes and relied on MERS' assignments <u>before</u> the April 2, 2014 Consent Judgment, it is not public knowledge that Defendants have continued these practices even after entry of the Consent Judgment. D.E. 103 pp. 6-7.

The Court agrees that Plaintiff's allegations concerning Defendants' alleged misconduct after the April 2, 2014 Consent Judgment have, in fact, been publicly disclosed.  In particular, the Court relies on, and takes judicial notice of, Exhibit 7 to Defendants' Motion for Judicial Notice, D.E. 97-7, which is a June 2014 website article posted by Clinton Kirby, a foreclosure plaintiff in a case against Bank of America.[2]  In this article, Mr. Kirby states that during his 2014 foreclosure proceeding, Bank of America produced the same unendorsed version of his promissory note until, right on the eve of trial, Bank of America produced an endorsed note bearing the names of Michele Sjolander and Laurie Meder.  D.E. 97-7.  In other words, Bank of America relied on a robo-signed promissory note, which appears to have been endorsed or, at the very least, relied on by Bank of America after entry of the April 2, 2014 Consent Judgement.

_____

[2] The Court only takes judicial notice of this article for the "limited purpose of determining which statements the documents contain," but "not for determining the truth of those statements."  *Osheroff*, 776 F.3d at 815, n. 4.

This article, standing alone, is enough to satisfy the first prong of the *Cooper* test, as the Eleventh Circuit has made clear that "a plaintiff basing an FCA qui tam claim in **any part** on such publicly disclosed information must demonstrate that the plaintiff is an original source of that information." *Battle*, 468 F.3d at 762 (emphasis added).

ii.     *Whether Plaintiff's action is based on publicly disclosed information*

Defendants also argue that because Plaintiff's suit is based, at least in part, on publicly-disclosed information, the second prong of the *Cooper* test is satisfied.  In other words, Defendants contend that Plaintiff essentially re-hashes well-publicized claims concerning Defendants' unlawful robo-signing of promissory notes and MERS' allegedly ineffective assignment of mortgages.  D.E. 95 pp. 11-12.

The Court agrees with Defendants. As an initial matter, the Eleventh Circuit has explained that the second prong of the *Cooper* test is a "quick trigger to get to the more exacting original source inquiry." *Osheroff*, 776 F.3d at 814 n. 10.  Here, Plaintiff does not re-hash well-publicized allegations that pre-date the April 2, 2014 Consent Judgment, but instead alleges claims under the False Claims Act based on conduct occurring **after** entry of the April 2, 2014 Consent Judgment.  However, it is clear that Plaintiff's claims are still based, at least in part, on information that is publicly available, as the crux of Plaintiff's claims were already disclosed by the June 2014 website article written by Clinton Kirby, which predates this lawsuit.  *See* D.E. 97-7.  Accordingly, Plaintiff's suit "may have been at least partially based upon" publicly available information, and that is enough to satisfy the substantially similar prong of the public disclosure bar.  *Cooper*, 19 F.3d at 567-68; *Battle*, 468 F.3d at 762; *U.S. ex rel. Boothe v. Sun Healthcare Grp., Inc.*, 496 F.3d 1169, 1174 (10th Cir. 2007) (rejecting "time, place and manner" distinction to find that a plaintiff's claim was "based upon" prior public disclosures).

### iii. *Whether Plaintiff is an original source of such information*

In any event, Plaintiff argues that the public disclosure does not apply because he is an "original source" under 31 U.S.C. § 3730(e)(4)(B). D.E. 103 p. 5. The Court agrees that Plaintiff is an "original source" under Section 3730(e)(4)(B) and that, for this reason, the public disclosure bar does not apply. *See Cooper*, 19 F.3d at 568 (noting that "even if a relator's claims are 'based upon' prior public disclosures, one may still navigate around the public disclosure bar by showing that he or she is an 'original source' within the meaning of Section 3730(e)(4)(A)").

As an initial matter and as discussed above, Plaintiff's claims hinge not on conduct uncovered before the Consent Judgment, but rather on Defendants' conduct <u>after</u> entry of the Consent Judgment. Accordingly, Plaintiff is an original source under Section 3730(e)(4)(B)(2) so long as he has provided the government with information based on knowledge that is "independent of" and that "materially adds to" information that has already been publicly disclosed, which is information about robo-signing and MERS assignments post-dating the April 2, 2014 Consent Judgment. 31 U.S.C. § 3730(e)(4)(B).

Plaintiff is an original source for two reasons. First, Plaintiff has independent knowledge of Defendants' allegedly unlawful activity based on his own experience litigating foreclosure cases. *See Cooper*, 19 F.3d at 568 (finding that a relator was an "original source" with "direct" and "independent" information because he acquired his knowledge of the wrongdoing through "three years of his own claims processing, research, and correspondence with members of Congress and HCFA," even though the complaint was filed after the release of Congressional reports and a hearing on similar allegations); *Lamers v. City of Green Bay*, 168 F.3d 1013, 1017 (7th Cir. 1999).

Second, the information allegedly uncovered by Plaintiff "materially adds" to publicly-disclosed information because allegations that Defendants relied on robo-signed documents and assignments to MERS after entering into the April 2, 2014 Consent Judgment—and continue to rely on robo-signed documents, in violation of HUD regulations, as well as allegedly inoperative MERS assignments—is "significant, influential or relevant information." *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016). In other words, Plaintiff is an original source of information pertaining to Defendants' use of robo-signed promissory notes and allegedly ineffective assignments of mortgages by MERS because he "contributes information—distinct from what was publicly disclosed . . . that adds in a significant way to the essential factual background: 'the who, what, when, where and how of the events at issue.'" *Majestic Blue Fisheries, LLC*, 812 F.3d at 307; *Battle*, 468 F.3d at 762 (noting that a plaintiff need not establish herself as *the* original source of the publicly disclosed information but must establish that she is *an* original source of the information in that she had direct and independent knowledge of the information on which she is basing her FCA claim"); *United States v. Med–Care Diabetic & Med. Supplies, Inc.*, No. 1081634CIVRYSKAMPHOP, 2014 WL 12279512, at *7 (S.D. Fla. Dec. 23, 2014); *Lamers v. City of Green Bay*, 168 F.3d 1013, 1017 (7th Cir. 1999) (holding that a competitor who conducted an investigation and gleaned information "readily available to the government investigators . . . or even to members of the general public" was nevertheless an original source).

For these reasons, the Court finds, strictly for purposes of ruling on Defendants' Motion to Dismiss, that Plaintiff's claims are not barred by the public disclosure doctrine. In other words, at this stage, Plaintiff has plausibly alleged that he is an "original source" for purposes of

14

the FCA's public disclosure bar and, therefore, Defendants' Motion to Dismiss on this basis should be denied.

     B. <u>Rule 12(b)(6) Failure to State a Claim</u>

Under Rule 12(b)(6), Defendants also move to dismiss Plaintiff's: (1) reverse false claim; (2) implied certification violation; and (3) conspiracy claim. The Court will address each claim in turn.

     *i.    Reverse false claim*

Plaintiff's first theory is that Defendants made a false statement in violation of the FCA by signing the Consent Judgment on April 4, 2012, because Defendants never intended to abide by the requirements of the Consent Judgment but, instead, planned to continue using rubber-stamped endorsements and MERS transfers as evidence of its ownership of mortgages. D.E. 79 ¶¶ 50-52. In other words, by signing the Consent Judgment, Defendants made a false statement to the government that reduced their obligation to pay.

Under the FCA, a defendant can be liable for a reverse false claim if it: "[k]nowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C § 3729. Accordingly, to state a claim for reverse false claim, a relator must plausibly allege, under Rule 12(b)(6) and 9(b): (1) an obligation to pay money to the government; (2) a false record or statement; (3) the defendant's knowledge of the falsity; and (4) the materiality of the misrepresentation. *U.S. ex rel. Matheny v. Medco Health Sols., Inc.*, 671 F.3d 1217, 1222 (11th Cir. 2012).

Defendants move to dismiss Plaintiff's reverse false claim for failure to allege each of these four elements.

a. <u>Obligation</u>

Defendants' principal argument is that Plaintiff fails to allege facts showing that Defendants had an obligation to pay the government.

The FCA defines an obligation as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based on similar relationship, from statute or regulation, or from the retention of any overpayment 31 U.S.C. § 3729(b)(3). Courts have held that the reverse false claims provision of the FCA "does not extend to the potential or contingent obligations to pay the government fines or penalties which have not been levied or assessed  . . . and which do not arise out of an economic relationship between the government and the defendant." *U.S. ex rel. Schaengold v. Mem'l Health, Inc.*, No. 4:11-CV-58, 2014 WL 6908856, at *16 (S.D. Ga. Dec. 8, 2014) (citing *United States ex rel. Bain v. Ga. Gulf Corp.,* 386 F.3d 648, 657 (5th Cir. 2004)). In other words, the FCA requires an allegation of "an existing legal obligation to pay or transmit money or property to the government." *Id.* (citing *United States ex rel. Bahrani v. Conagra, Inc.,* 465 F.3d 1189, 1195 (10th Cir. 2006). "[Q]uasi-contractual obligations created by statute or regulation" suffice and are thus distinguishable from "[c]ontingent obligations-those that will arise only after the exercise of discretion by government actors-[which] are not contemplated by the statute." *Id.*; *see also Am. Textile Mfrs. Inst., Inc. v. The Ltd., Inc.,* 190 F.3d 729, 738 (6th Cir. 1999).

Defendants argue that Plaintiff's SAC fails to plead an "established duty" to pay the government. D.E. 95 p. 14. Instead, Defendants contend that Plaintiff alleges "that when the HUD OIG investigated Bank of America's foreclosure practices, it identified $1.1 billion of

potentially false claims." *Id.*   Based on these claims, Plaintiff alleges that Bank of America, or its affiliates, had an obligation to pay the government because it would have been required to do so if the government: (1) "proceeded with its own suit against Bank of America for all potential claims HUD OIG identified;" and (2) "prevailed entirely in that suit." *Id.* pp. 14-15.   In other words, "Jacobs does not allege that the Government had secured a judgment against Bank of America; rather, he alleges that Defendants had an 'obligation' merely as a result of the HUD OIG investigation, which itself states only that Defendants' foreclosure practices '*may* have exposed Bank of America to liability under the False Claims Act.'" *Id.* p. 15 (citing D.E. 79-3 p. 5) (emphasis in briefing).   Because a company's potential liability, identified in a HUD investigation, does not create an obligation to pay the government, Defendant contends that Plaintiff's reverse false claims act claim must be dismissed. *Id.*

In response, Plaintiff argues that Defendants had an obligation to comply with the FCA itself and the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (the "FIRREA"), as shown by the fact that DOJ brought the enforcement action against Bank of America, as well as its affiliates, which resulted in the Consent Judgment, and that this duty is enough, at least at the motion to dismiss stage, to allege a reverse false claims act claim.   D.E. 103 p. 8.   In addition, Plaintiff argues that the government "already exercised any discretion that might have affected the existence of the alleged obligation . . . when the [government] chose to sue the Defendants to enforce the obligation itself." *Id.*

At this stage, the Court concludes that Plaintiff has plausibly alleged an obligation under the FCA.   In particular, Plaintiff alleges: (1) Bank of America, as well as its affiliates, had an obligation to pay damages under the FCA and FIRREA; (2) Bank of America Corp., Bank of America, N.A., BAC Home Loans Servicing, L.P., Countrywide Home Loans, Inc., Countrywide

Financial Corporation and Countrywide Mortgage Ventures, L.L.C. entered into the Consent Judgment, thereby directing settlement payment of $2,382,415,075; (3) the settlement payment "represented a substantial decrease of the obligations owed by Bank of America to the United States, as identified by HUD's OIG," as Bank of America's obligation to pay damages under the FCA was $3.3 billion and up to $8.9 billion under FIRREA; and (4) "Defendants made a false statement—by signing the consent judgment itself—in order to decrease their obligations as alleged in its NMS Complaint against them." D.E. 79 ¶¶ 45-50. Plaintiff's allegations are enough, at the motion to dismiss stage, to plausibly allege an obligation for purposes of a reverse false claim under the FCA. *Schaengold*, No. 4:11-CV-58, 2014 WL 6908856, at *16 ("To be sure, as Defendants argue, a lone, conclusory allegation of concealment of an obligation to pay money to the Government would be insufficient to survive a motion to dismiss. But the Government's Complaint does more than that."); *see also Am. Textile Mfrs. Inst., Inc.,* 190 F.3d at 738.

Accordingly, the Court finds that Plaintiff plausibly alleges "an existing legal obligation to pay or transmit money or property to the government."[3] *See, e.g.*, *Schaengold*, No. 4:11-CV-58, 2014 WL 6908856, at *16 (citing *Conagra, Inc.,* 465 F.3d at 1195).

### b. False statement

Defendants also argue that Plaintiff fails to allege a false statement because Plaintiff fails to "allege facts plausibly suggesting that Defendants' use of rubber-stamped endorsements or MERS transfers conflict with the 'Servicing Standards'" in the April 2, 2014 Consent Judgment. D.E. 95 pp. 15-16. In particular, Defendants argue that the "seven provisions of the Consent

---

[3] Nonetheless, the Court seriously doubts that Plaintiff will, ultimately, be able to prove that Defendants decreased their "established duty" or existing obligation to pay damages under the FCA and FIRREA based on his theory that each alleged statutory violation included in the HUD OIG report was, in fact, a proven legal obligation to pay the U.S. Government.

Judgment" described in the SAC "primarily relate to use of 'declarations, affidavits, and sworn statements' in foreclosure proceedings," but do not related to endorsed promissory notes.  *Id.* p. 16.

In response, Plaintiff argues that the SAC plausibly alleges a false statement because the Servicing Standards do not "primarily relate to Bank of America's use of 'declarations, affidavits and sworn statements' in foreclosure proceedings," but instead pertain to assurances that "factual assertions made in pleadings," as well as declarations, affidavits and sworn statements, are "accurate and complete and supported by competent and reliable evidence."  D.E. 103 p. 9.

The Court agrees with Plaintiff.  The SAC plainly alleges that the Servicing Standards contained in the Consent Judgment provided:

(1) **Servicer shall ensure that factual assertions made in pleadings** . . . , Declarations, affidavits and sworn statements **filed by or on behalf of Service in judicial foreclosures or bankruptcy proceedings and notices of default, notices of sale and similar notices** submitted by or on behalf of Service in non-judicial foreclosures **are accurate and complete and are supported by competent and reliable evidence**;

(2) Affidavits, sworn statements and Declarations **shall not contain information that is false or unsubstantiated**;

(3) Service **shall not file a [Proof of Claim]** in a bankruptcy proceeding which, when filed, **contained materially inaccurate information**; and

(4) Service **shall not rely on** [a] . . . **sworn statement or Declaration filed in a pending pre-judgment judicial foreclosure or bankruptcy proceeding which** . . . **contained materially inaccurate information in order to obtain and judgment of foreclosure, order of sale,** relief from the automatic stay or other relief in bankruptcy.

D.E. 79 ¶ 51 (emphasis added).  In other words, Defendants were required to ensure that "factual assertions," including those in pleadings, affidavits, sworn statements and Declarations, did not contain "materially inaccurate information" that would be used to "obtain a judgment of foreclosure [or] order of sale."  *Id.* ¶ 51(a)-(p).  Using rubber-stamped endorsements on promissory notes or relying on MERS transfers to foreclose on properties or obtain orders of

sales falls within the scope of actions barred by the Consent Judgment Servicing Standards, as using facially invalid promissory notes in foreclosure proceedings could constitute relying on "materially inaccurate information" in pleadings, affidavits, sworn statements, or declarations.

### c.  Defendants' knowledge of the falsity

Defendants also argue that the SAC fails to allege Defendants' knowledge of their false statements, as Plaintiff's "allegations that Bank of America intended to mislead the DOJ are not only conclusory, but suggest just the opposite . . . [as the] Consent Judgment [did not] actually address[] rubber-stamped endorsements or MERS transfers."  D.E. 95 p. 16.

The Court disagrees with Defendants.  As an initial matter, "although Rule 9(b) permits knowledge to be averred generally, [courts have often] required plaintiffs to plead the factual basis" which gives rise to reasonable inference of fraudulent intent.  *Viera v. Basf Catalysts LLC*, No. 5:16-CV-1-OC-30PRL, 2016 WL 1394333, at *3 (M.D. Fla. Apr. 8, 2016); *Innovative Biometric Tech., LLC v. Lenovo (United States), Inc.*, No. 09-81046-CIV, 2010 WL 11447535, at *2 (S.D. Fla. Oct. 12, 2010).  "A reasonable inference is one that is plausible and that flows logically from the facts alleged, including any objective indications of candor and good faith."  *Innovative Biometric Tech., LLC*, 2010 WL 11447535, at *2.  In other words, pleading knowledge under Rule 9(b) requires that a plaintiff state "sufficient allegations of underlying facts from which a court may reasonably infer that a specific individual (1) knew of the withheld material information or of the falsity of the material misrepresentation, and (2) withheld or misrepresented this information with a specific intent to deceive."  *AAMP of Florida, Inc v. Auto. Data Sols., Inc.*, No. 8:13-CV-2019-T-35TGW, 2014 WL 12620847, at *2 (M.D. Fla. Aug. 26, 2014).

Here, Plaintiff alleges, with particularity, that Defendants relied on rubber-stamped promissory notes after entry of the April 2, 2014 Consent Judgment in a least four foreclosure cases, which were litigated in April 2013, September 2014, August 2015, and October 2016. D.E. 79 ¶¶ 56(I)(a)-(II)(b).  Plaintiff then describes the promissory notes used in each of these foreclosure cases, why they were fraudulent, and how Defendants used them in alleged violation of the Consent Judgment.  *Id.*  Based on Defendants' use of these promissory notes, Plaintiff alleges that "[a]lmost immediately [after entry of the Consent Judgment], and repeatedly, the Defendants began using these false documents and evidence within their foreclosure cases in their efforts to obtain foreclosure judgments that would allow for them to make claims for mortgage insurance benefit payments from HUD."  *Id.* ¶ 52,

Strictly for purposes of deciding Defendants' Motion to Dismiss, the Court concludes that the SAC satisfies the pleading requirements concerning Defendants' knowledge under *Iqbal* and *Twombly* and Rule 9(b), as it alleges facts that give rise to a "reasonable inference" that Defendants signed the Consent Judgment with the intent to "continue pursuing mortgage foreclosures by misleadingly filing copies of promissory notes bearing rubber-stamped endorsement signatures that were not legally authorized by the purported signatories (and therefore, were invalid), and by filing copies of purported assignments by MERS, which never owned any interest in the notes that purportedly were being assigned (and therefore, were ineffective)."  *Id.* ¶ 52; *Innovative Biometric Tech., LLC*, 2010 WL 11447535, at *2; *see also Matheny*, 671 F.3d at 1224 (noting that at the pleading stage in a False Claims Act case, "knowledge, and other conditions of a person's mind may be alleged generally"); *see also Kostoski v. Steiner Transocean, Ltd.*, 278 F.R.D. 695, 698 (S.D. Fla. 2012) (finding Rule 9(b)'s

particularity requirement satisfied where counterclaim "contain[ed] sufficient factual material to suggest that the Plaintiff knowingly concealed his condition").

### d.   Materiality of misrepresentation

Lastly, Defendants argue that Plaintiff "has not plausibly alleged that Defendants' supposed deception about its use of rubber-stamped endorsements and MERS transfers was material to the DOJ's decision to enter the NMS."  D.E. 95 pp. 16-17.

Defendants' argument has no merit.  "To be material, a misrepresentation must have the ability to influence the government's decision making."  *Matheny*, 671 F.3d at 1228; 31 U.S.C. § 3729(b)(4) ("the term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.").  Here, there is little question that Defendants' alleged scheme to continue using rubber-stamped endorsements and MERS transfers—even after entry of the Consent Judgment—might have influenced, or was capable of influencing, the Government's decision to enter into the Consent Judgment; in other words, had the Government known that Defendants would continue to violate the Servicing Standards, even after entry of the Consent Judgment, it might have either crafted a different Consent Judgment or, possibly, chosen not to agree to any consent judgment. *See Matheny*, 671 F,3d at 1228; *see also United States v. Crumb*, No. CV 15-0655-WS-N, 2016 WL 4480690, at *24 (S.D. Ala. Aug. 24, 2016) (refusing to dismiss implied certification claim where "allegations of the Amended Complaint raise a compelling inference that the purported misrepresentations in question were material to the Government's payment decision").

### ii.   *Implied certification violation*

Plaintiff alleges that Defendants violated the False Claims Act based on a theory of implied certification by submitting new claims for FHA mortgage-insurance benefits based upon

foreclosures that had been obtained by: (1) relying on misleadingly rubber-stamped endorsements affixed to promissory notes; and (2) purported assignments of mortgages by MERS, without MERS owning an interest in the underlying notes.  D.E. 79 ¶ 54.

In *Universal Health Services*, the U.S. Supreme Court recently permitted a FCA claim based on the theory of implied certification, holding that "at least in certain circumstances, the implied false certification theory can be a basis for [FCA] liability."  *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 1995 (2016).  More specifically, the Court explained that liability can attach where "the defendant submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose the defendant's noncompliance with a statutory, regulatory, or contractual requirement," as long as failure to disclose this noncompliance is "material to the Government's payment decision."  *Id.* at 1995-96.

Noncompliance with a specific statute, regulation or contractual requirement may be "material," even if those requirements were not expressly designated as conditions of payment. *Id.* at 1995, 2001 ("Whether a provision is labeled a condition of payment is relevant to but not dispositive of the materiality inquiry.").  Under the FCA and the U.S. Supreme Court's decision, a requirement is "material" for the same reasons as under a theory of reverse false claim, namely that it has a "natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  *Id.* at 2002 (citing 31 U.S.C. § 3729(b)(4)).

Defendants argue that Plaintiff fails to state a claim based on a theory of implied certification because he does not plausibly allege: "(1) that Defendants failed to gain good marketable title when they foreclosed; (2) that Defendants knew they were violating any HUD

requirements when they conveyed title to HUD; or (3) that any violation was material to the FHA's decision to pay the insurance claims." D.E. 95. p. 18.

a. Marketable title

Defendants argue that the specific rubber-stamped endorsements referred to in Plaintiff's SAC conveyed marketable title and were, therefore, not false for purposes of the False Claims Act. D.E. 95 p. 18. As an initial matter, Defendants contend that Plaintiff's theory hinges on the fact that "an improperly endorsed note would not legally transfer the note to a third party, and therefore that third party would not obtain 'good marketable title' when it foreclosed on a property it did not own." *Id.* However, each of the specific examples of promissory notes mentioned in Plaintiff's SAC involved only assignments from Bank of America to one of its affiliates. Thus, each of these assignments were valid—even if the promissory notes included rubber-stamped endorsements—because an endorsement from one Defendant to another would have no "bearing on whether Bank of America still retained ownership of the note and thus obtained 'good marketable title' when it foreclosed." *Id.*

In addition, Defendants argue that "[i]t is well-settled law that MERS can assign mortgages." *Id.* p. 19. For this reason, Defendants ask the Court to reject Plaintiff's allegations that MERS cannot assign mortgages and, therefore, reject Plaintiff's allegations that foreclosures based on promissory notes assigned by MERS constitute a fraudulent act for purposes of the FCA. *Id.*

Plaintiff responds in two principal ways. First, Plaintiff argues that "'good marketable title' does not mean a title whose conveyance would ultimately survive a challenge in court," but instead means a title that is "free from reasonable doubt as to *any question* o[f] law or fact necessary to sustain its validity." D.E. 103 p. 12 (emphasis in briefing) (collecting cases).

Second, Plaintiff contends that MERS cannot assign a mortgage that it does not own—which is especially an issue if a mortgage is based on a fraudulently endorsed promissory note.  In light of this, Plaintiff contends that "a foreclosure title obtained by reliance on a MERS assignment of the mortgage (when MERS did not own and therefore could not 'sell' the note)" does not constitute "marketable title" because it can be reasonably questioned in the future.  *Id.*

The Court rejects Defendants' arguments.  The Eleventh Circuit has made clear that "[m]arketable title is unencumbered title, free from reasonable doubt as to any question of law or fact necessary to sustain its validity.  *Matter of Garfinkle*, 672 F.2d 1340, 1345 (11th Cir. 1982) (internal citations omitted).  "Marketable title is not necessarily perfect title, nor must it satisfy the purchaser or his attorney, unless there is an express stipulation to that effect."  *Id.*  For this reason, courts have explained that marketable title refers "not merely a title valid in fact but a title that must be such as to make it reasonably certain that it will not be called in question in the future" or, in other words, title that will not "subject the purchaser to the hazard of litigation with reference thereto."  *In re Aman*, 492 B.R. 550, 565–66 (Bankr. M.D. Fla. 2010); *Camp v. Commonwealth Land Title Ins. Co.*, 787 F.2d 1258, 1261 (8th Cir. 1986) ("Reasonable doubt affecting marketability is said to exist where 'there is uncertainty as to some defects appearing in the course of its deduction, and the doubt must be such as affects the value of the land, or will interfere with its sale.'").

In light of this case law, it is plausible that promissory notes containing rubber-stamped endorsements did not convey marketable title.  *Matter of Garfinkle*, 672 F.2d at 1345; *Denson v. Stack*, 997 F.2d 1356, 1363 (11th Cir. 1993) (concluding that district court "improperly concluded" that the defendant "was in a position to convey marketable title" and noting that title "is free from reasonable doubt when a litigant cannot point to a fact in the record which would

cause a reasonable person to have a doubt").  It is also plausible that promissory notes did not convey marketable title because MERS did not have the authority to assign promissory notes to anyone, as MERS did not own any interest in borrower's promissory notes.[4]  *See HSBC Bank USA, Nat. Ass'n v. Roumiantseva*, 130 A.D.3d 983, 984, 15 N.Y.S.3d 117, 119 (N.Y. App. Div. 2015) (affirming dismissal of action for lack of standing where "the documents showed that MERS was never the holder of the note and, therefore, was without authority to assign the note"); *see also Arch Bay Holdings, LLC v. Albanese*, 146 A.D.3d 849, 853, 45 N.Y.S.3d 506, 510 (N.Y. App. Div. 2017) (concluding that plaintiff "failed to establish standing based upon an assignment of the note and mortgage from MERS to Wachovia prior to commencement of the action, as Arch Bay failed to establish delivery or assignment of the note to MERS prior to its execution of the assignment to Wachovia").

### b. Knowledge

Defendants also argue that Plaintiff fails to plausibly allege that Defendants knew they were falsely certifying compliance with the "good marketable title requirement," thereby requiring that the Court dismiss Plaintiff's implied certification claim.  D.E. 95.

Defendants are mistaken.  As discussed above, Plaintiff alleges that Defendants knowingly violated HUD regulations by submitting new claims for FHA insurance benefits after April 4, 2012, which were not based on "good marketable title," based on at least four instances in which Defendants relied on rubber-stamped promissory notes in foreclosure cases.  *Supra* pp. 20-22.  This alleged use of rubber-stamped promissory notes was, possibly, a violation of HUD regulations contained in 24 C.F.R. § 203.366(a).  D.E. 79 ¶¶ 23, 54, 59.  Based on these facts and

---

[4] While there is no Eleventh Circuit precedent to squarely address whether MERS can assign promissory notes, Defendants cite to persuasive authority from other jurisdictions rejecting Plaintiff's theory that MERS lacks authority to assign mortgages.  D.E. 95.  The Court is persuaded by these decisions, but declines to reach the issue at the motion to dismiss stage.

for the reasons already discussed above, the Court concludes that Plaintiff has plausibly alleged facts to give rise to a reasonably inference that Defendants knowingly submitted false claims to FHA for insurance benefits, as these claims were not based on "good marketable title." *Matheny*, 671 F.3d at 1224; *Crumb*, No. CV-15-0655-WS-N, 2016 WL 4480690, at *17.

### c. Materiality of misrepresentation

Lastly, Defendants argues that even if Plaintiff plausibly alleges that Defendants knowingly submitted FHA insurance claims in violation of 24 C.F.R. § 203.366(a), Plaintiff fails to allege that violations of this regulation were material to the government's decision to pay these mortgage insurance claims.  D.E. 95 p. 20.  Defendants argue that any violation of HUD regulations was immaterial because: (1) the endorsements specifically described in the SAC relate only to transfer of mortgages and notes among entities that were part of the Bank of America enterprise; and (2) Plaintiff fails to allege facts to indicate that the FHA, as a general practice, refused to pay mortgage insurance claims based on noncompliance with 24 C.F.R. § 203.366(a).  *Id.* p. 21.

Plaintiff raises two main arguments in response.  First, Plaintiff argues that compliance with 24 C.F.R. § 203.366(a) and HUD regulations requiring Defendants to "obtain and convey to the Secretary of HUD good and marketable title to properties" were "obviously material," as they were the "same kind[s] of violations [that had already] led the Government to sue under the FCA" and, ultimately, enter into the 2014 Consent Judgment.  D.E. 103 p. 13.  Second, Plaintiff disputes Defendants' argument that rubber-stamped endorsements were irrelevant to promissory notes assigned to entities affiliated with Bank of America.  *Id.* p. 15.  Instead, Plaintiff contends that Bank of America's subsidiaries lacked standing to foreclose based on promissory notes with

rubber-stamped endorsements—even where these notes were only purportedly assigned from one Bank of American entity to another.  *Id.*

The Court agrees with Plaintiff that Defendants' alleged reliance on fraudulently signed promissory notes to foreclose on properties and, thereafter, collect FHA mortgage insurance, was material to the government's decision to tender payment.  In short, the government would have a "natural tendency" to be influenced by Defendants' alleged use of fraudulently signed promissory notes, which were used to improperly and unlawfully foreclose on mortgages insured by the FHA, in determining whether to pay mortgage insurance claims.  *See Universal Health Services*, 136 S. Ct. at 1995.  In other words, Defendants' alleged repeated reliance on rubber-stamped endorsements and promissory notes purportedly assigned to MERS in foreclosure cases was, without a doubt, "capable of influencing" the government's "payment . . . of money." *Id.*; *Matheny*, 671 F.3d at 1228; 31 U.S.C. § 3729(b)(4).  Because the Court can reasonably infer that the government would be affected by Defendants' allegedly fraudulently behavior, Plaintiff adequately alleges materiality under the FCA. *Matheny*, 671 F,3d at 1228; *see also Crumb*, No. CV 15-0655-WS-N, 2016 WL 4480690, at *24.

> iii.     *Conspiracy*

To state a claim for conspiracy under Section 3729(a)(1)(C) of the FCA, a plaintiff must allege: "(1) that the defendant conspired with one or more persons to get a false or fraudulent claim paid by the United States; (2) that one or more of the conspirators performed any act to effect the object of the conspiracy; and (3) that the United States suffered damages as a result of the false or fraudulent claim."  *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1014 (11th Cir. 2005); 31 U.S.C. § 3729(a)(1)(C).

Defendants argue that Plaintiff's conspiracy claim should be dismissed for two reasons. First, Defendants argue that Plaintiff fails to state any claim for a violation of the FCA, so his conspiracy claim must be dismissed.  D.E. 95 p. 21.  Second, Defendants argue that Plaintiff fails to allege sufficient facts to plausibly allege that Defendants engaged in conspiracy.  *Id.*

In response, Plaintiff argues that he has adequately alleged conspiracy because the SAC alleges that Defendants signed the April 2, 2014 Consent Judgment, which: (1) was an overt act; (2) was in violation of the False Claims Act; and (3) harmed the government.  D.E. 103 p. 15.

The Court concludes that Plaintiff has plausibly alleged a conspiracy between Defendants based on signing the April 2, 2014 Consent Judgment in violation of the FCA. D.E. 79 ¶¶ 50-52; D.E. 79-2 pp. 91-94; *see, e.g.*, *Corsello*, 428 F.3d at 1014.  However, Plaintiff's conspiracy claim is constrained to the allegations pertaining to Plaintiff's reverse false claim—which is based entirely on signing the April 2, 2014 Consent Judgment.  D.E. 79 ¶ 64.  For this reason, the Court **will not** permit Plaintiff to litigate a conspiracy claim against Defendants based on his theory of an implied certification FCA violation; in other words, Plaintiff's conspiracy claim attaches to his reverse false claim and not his FCA claim based on implied certification.  *See, e.g.*, *Corsello*, 428 F.3d at 1014 (noting that conspiracy requires an overt act).  Accordingly, it is

ORDERED AND ADJUDGED that Defendants' Motion to Dismiss, D.E. 95, is DENIED.  It is further

ORDERED AND ADJUDGED that Defendants' Motion for Judicial Notice, D.E. 96, is GRANTED with respect to Exhibit 7 to Defendants' Motion for Judicial Notice, D.E. 97-7.  The remainder of the Motion, D.E. 96, IS DENIED AS MOOT.  It is further

ORDERED AND ADJUDGED that Defendants SHALL file their Answer to Plaintiff's Second Amended Complaint, D.E. 79, no later than **Monday, April 3, 2017.**  It is further

DONE AND ORDERED in Chambers at Miami, Florida, this 20th day of March, 2017.

_____
URSULA UNGARO
UNITED STATES DISTRICT JUDGE

copies provided: counsel of record