**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 1:15-cv-24585-UNGARO/O'SULLIVAN**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
|   *ex rel.*, | ) |
| **BRUCE JACOBS,** | ) |
| | ) |
|     Plaintiffs, | ) |
| | ) |
|   v. | ) |
| | ) |
| **BANK OF AMERICA CORPORATION,** | ) |
| *et. al.* | ) |
| | ) |
|     Defendants. | ) |
| | ) |

**THE UNITED STATES OF AMERICA'S STATEMENT OF INTEREST ABOUT CERTAIN ISSUES REGARDING THE NATIONAL MORTGAGE SETTLEMENT**

The United States submits this Statement of Interest pursuant to 28 U.S.C. § 517 on one argument in Defendants' Motion for Judgment on the Pleadings and Incorporated Memorandum of Law ("Defendants' Motion for Judgment") (D.E. 169).[1] While the United States takes no position on the overall merits of Defendants' Motion for Judgment, for the reasons set forth below, the United States respectfully submits that Defendants misconstrue what is meant by an "enforcement action" under the National Mortgage Settlement ("NMS") Consent Judgment. The United States respectfully submits that Relator's False Claims Act ("FCA") claim is *not* an "enforcement action" under the NMS Consent Judgment and thus Relator need *not* submit to the pre-enforcement procedures set forth in the Consent Judgment.

---

[1] 28 U.S.C. § 517 authorizes the Attorney General of the United States to attend to the interests of the United States in any action in federal or state court. The False Claims Act is the United States' primary tool to combat fraud and recover losses as a result of fraud against the federal government. The United States therefore has a strong interest in ensuring the statute is properly interpreted and applied.

## I. BACKGROUND

### A. This Lawsuit

Relator brought this *qui tam* action on behalf of the United States alleging Defendants violated the FCA by "prosecut[ing] foreclosures using surrogate signed endorsements placed on original notes," by "submit[ting] false statements and testimony about the dates when endorsements were stamped," and by "us[ing] purported assignments to the . . . MERS . . . to mislead courts into believing that [Defendants] had received an assignment of a mortgage that would confer standing to foreclose." Omnibus Order at 4-5 (quotation marks omitted). Based on that alleged conduct, Relator asserted three FCA claims, of which only the implied-certification claim is now pending. *Id.* at 6; Reconsideration Order at 14.[2] In their Answer to the Second Amended Complaint, Defendants asserted various affirmative defenses to the implied-certification claim, including that it has been "released, in whole or in part, as part of the National Mortgage Settlement" and that it is "barred because Plaintiff failed to exhaust the dispute resolution procedures required by the National Mortgage Settlement." Second Amended Answer at 20, 22-24 (D.E. 157).

Defendants now move for judgment on the pleadings based on those two affirmative defenses. In support of the motion, Defendants advance two primary theories. *First,* Defendants argue that if the alleged underlying note-endorsement and MERS-assignment conduct occurred before February 9, 2012, Relator's implied certification claim was released by the NMS. *Second,* Defendants argue that if the conduct at issue occurred after February 8, 2012, Relator had to submit

---

[2] Upon reconsideration, this Court dismissed Relator's "reverse false claim" and the related "conspiracy claim" with prejudice. Reconsideration Order at 14.

to the pre-enforcement procedures set forth in the NMS before bringing an FCA *qui tam* action. The United States takes no position on Defendants' first argument, but disagrees with the second argument for the reasons stated below.[3]

### B. The National Mortgage Settlement

On March 12, 2012, the United States, 49 states, and the District of Columbia filed a complaint and proposed consent judgments in the United States District Court for the District of Columbia against several mortgage servicers, including Bank of America ("BoA"), alleging misconduct in Bank of America's home mortgage servicing practices and implementing a negotiated settlement resolving those allegations. *United States* v. *Bank of Am. Corp.*, No 12-cv-361, ECF Dkt. 1 (D.C. Cir.).[4] On April 4, 2012, the District Court entered a consent judgment, implementing that settlement. *Id.* (ECF. Dkt 10); *United States, et al.* v. *Bank of Am., et al.*, 753 F.3d 1335 (D.C. Cir. 2014).

Under that Consent Judgment, BoA agreed to pay a penalty; to provide various forms of consumer relief, such as loan forgiveness; and to comply with certain business practice requirements called "servicing standards." Consent Judgment ("Consent J.") ¶¶ 3, 5; Consent J. Ex. D. As part of this National Mortgage Settlement (NMS), the United States released a number of claims but did not release "[a]ny liability based upon obligations created by th[e] Consent Judgment." Consent J. Ex. F § (11)(n).

---

[3] Although, for the reasons stated above, FCA claims were never restricted by the NMS, Defendants do not dispute that all of the obligations under the Consent Judgment for conduct on or after February 9, 2012 ended when the term of the NMS expired during the third quarter of 2015. *See* Consent J. Ex. E ¶ K; https://www.jasmithmonitoring.com/omso/reports/original-servicers-final-compliance-update/ (final report on compliance of the Independent Monitor).

[4] Other defendant banks included JPMorgan Chase, Countrywide, Citibank, and Wells Fargo. *See United States, et al.* v. *Bank of Am., et al.*, No. 12-cv-361 (D.D.C.).

The Consent Judgment also contains provisions for monitoring the bank's compliance. The agreement established a Monitoring Committee, Consent J. Ex. E § B; appointed an Independent Monitor to assess compliance, Consent J. & Ex. E §§ C(1), (5), D; established metrics for evaluating compliance with certain servicing standards, Consent J. Ex. E § C(12), (23) & Sch. E-1; and set forth certain rules governing enforcement actions by the parties or Monitoring Committee, Consent J. Ex. E § J.

For servicing standards with established metrics, if the Monitor concludes BoA exceeded the allowable error rate during any particular reporting period, the Monitor notifies BoA of a "Potential Violation." Consent J. Ex. E §§ D(3), (5), E(1) to (6). BoA has a right to cure a Potential Violation within a set time frame. *Id.* § E(2). If it does so, there is no other "remedy under this Consent Judgment . . . with respect to such Potential Violation." *Id.* § E(6). "In the event of an action to enforce [BOA's] obligations . . . and to seek remedies for an uncured Potential Violation for which [BoA's] time to cure has expired," the court can award (a) "Equitable Relief," constituting "[a]n order directing non-monetary equitable relief, including injunctive relief, directing specific performance under the terms of this Consent Judgment, or other non-monetary corrective action," and (b) limited monetary "civil penalties." *Id.* Ex. E § J(3) (a) and (b). If an enforcement action is brought for violation of servicing standards not subject to a metric, or for other obligations under the NMS, the only remedy available is non-monetary injunctive relief. *Id.* § J(3)(a); *United States v. Bank of Am.*, 78 F. Supp. 3d 520, 530 (D.D.C. 2015).

The "Enforcement Terms" also state that BoA's "obligations under this Consent Judgment shall be enforceable solely in the U.S. District Court for the District of Columbia" and that "[a]n enforcement action under this Consent Judgment may be brought by any Party to this Consent Judgment or the Monitoring Committee." Consent J. Ex. E § J(2). Ordinarily "prior to commencing

any enforcement action, a Party must provide notice to the Monitoring Committee of its intent to bring an action to enforce this Consent Judgment." *Id.* The committee then has "21 days to determine whether to bring an enforcement action." *Id.* If the committee declines to do so, "the Party must wait 21 additional days . . . before commencing an enforcement action." *Id.*.

## II. ANALYSIS

Defendants contend Relator's "implied-certification claim is barred because the NMS Consent Judgment's pre-enforcement procedures have not been followed." Mot. for Judgment at 6. To the contrary, Defendants misconstrue what is meant by an "enforcement action" under the Consent Judgment. Properly understood, the agreement to undertake certain procedures before bringing an enforcement action under the Consent Judgment governs a particular kind of action—one asking the district court to compel compliance with the terms of the judgment. It does not limit or govern the broader set of actions—such as an FCA case—where the agreed-to terms are the backdrop for an alleged fraud even where the alleged misconduct might also be actionable under the Consent Judgment. Here, as in many other contexts, multiple actions may be brought under multiple sources of law for the same conduct. FCA actions are governed by the requirements of the False Claims Act, and like other actions involving fraud, FCA suits must allege more than a failure to comply with agreed-to terms, such as, for instance, the requisite scienter. Here, the Consent Judgment is merely the backdrop for the alleged misconduct, and Relator's FCA case seeks more than redress for a violation of the terms of that agreement. Relator's FCA case is not subject to the pre-enforcement requirements imposed by the Consent Judgment for an action seeking compliance with its terms.

### A. Under the Consent Judgment, An Enforcement Action Is An Action Seeking to Compel Compliance with the Terms of the Judgment

"A consent judgment or consent decree is a settlement that includes an injunction, or some other form of specific relief, and that is formally entered by the court and enforceable by contempt." *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 378 (1992). It "embodies an agreement of the parties and thus in some respects is contractual in nature. But it is an agreement that the parties desire and expect will be reflected in and be enforceable as a judicial decree that is subject to the rules generally applicable to other judgments and decrees." *Id.*; *see Frew v. Hawkins*, 540 U.S. 431, 437 (2004). A consent judgment is interpreted pursuant to "standard principles of contract law." *Bank of Am. Corp.*, 753 F.3d at 1337 (interpreting same judgment).

In a provision governing "Enforcement Terms," Consent J. ¶ 6 & Ex. E, the Judgment provides that it "shall be filed in the District Court for the District of Columbia" and "shall be enforceable therein," Consent J. Ex. E § J(1), that "obligations under this Consent Judgment shall be enforceable solely in the U.S. District Court for the District of Columbia" and that "[a]n enforcement action under this Consent Judgment may be brought by any Party to this Consent Judgment or the Monitoring Committee." *Id.* § J(2). Ordinarily, "prior to commencing any enforcement action, a Party must provide notice to the Monitoring Committee of its intent to bring an action to enforce this Consent Judgment." *Id.* The committee then has "21 days to determine whether to bring an enforcement action." *Id.* If the committee declines to do so, "the Party must wait 21 additional days . . . before commencing an enforcement action." *Id.*

These pre-enforcement procedures govern an action invoking the district court's inherent authority to compel compliance with its judgment. These procedures must occur before "commencing any enforcement action." Consent J. Ex. E § J(2). In other words, this should be

read as shorthand for the previously-described "enforcement action under this Consent Judgment," *id.*, rather than governing any enforcement action of any kind, such as an action under a separate statute or basis for recovery.

On its own, the word "under" does not have a "uniform, consistent meaning" and therefore must be read in context. *Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S. Ct. 1351, 1359 (2013). But the term "enforcement action under" ordinarily refers to the cause of action and/or governing source of law. *See, e.g., Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 86 (1998) ("enforcement action under the citizen-suit provision of the Emergency Planning and Community Right-To-Know Act of 1986"). Thus, an "enforcement action under [a] [c]onsent [j]udgment" is best read as an action invoking the district court's inherent authority to compel compliance with its judgment. The "enforcement of [a] judgment" is "[a] court's action to compel a person to comply with the terms of the judgment." BLACK'S LAW DICTIONARY 645 (10th ed. 2014); *see, e.g., Salazar v. Buono*, 559 U.S. 700, 712 (2010). This is ordinarily not an action brought under any distinct authority but rather is an invocation of a court's "ancillary jurisdiction" to use its "inherent power to enforce its judgments." *See Peacock v. Thomas*, 516 U.S. 349, 356-357 (1996). In other words, it is an "enforcement action under" the relevant judgment.

This is equally true with respect to consent judgments. One key reason to submit a settlement for entry by the court as a consent judgment is to render it "enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees." *Frew*, 540 U.S. at 437; *see Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 380-381 (1994). A "breach of the agreement would be a violation of the order, and ancillary jurisdiction to enforce the agreement would therefore exist." *Id.* at 381; *see Rufo*, 502 U.S. at 378 (consent decree "is an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is

subject to the rules generally applicable to other judgments and decrees"); *Spallone v. United States*, 493 U.S. 265, 276 (1990) (describing "inherent power" to "enforce the consent judgment"); *see also Frew*, 540 U.S. at 439 ("enforcing the decree vindicates an agreement").

Therefore, in common legal usage, actions to enforce consent judgments generally refer to requests that courts use their inherent authority to compel compliance with the judgment. *See e.g., Thatcher v. Kohl's Dep't Stores, Inc.*, 397 F.3d 1370, 1373 (Fed. Cir. 2005) (only a party to the consent decree may "proceed with a contempt action to enforce the judgment under the terms of the consent judgment").[5]

### B. Relator's FCA Case Is Not An Enforcement Action Under the Consent Judgment

This case is not an enforcement action under the Consent Judgment. Instead, it is a suit under the False Claims Act alleging fraud against the United States. As noted, the term "enforcement action under" ordinarily refers to the cause of action and/or governing source of law. Thus, a suit filed under the False Claims Act is not a suit "under" the contract or program that gave rise to the alleged fraudulent conduct. Instead, it is an "action under the False Claims Act." *See, e.g., United States ex rel. Eisenstein* v. *City of New York*, 556 U.S. 928, 928 (2009) ("when the

---

[5] *See also Tourangeau v. Uniroyal, Inc.*, 101 F.3d 300, 305, 308, 309 (2d Cir. 1996) (describing such an action as an "action to enforce the Consent Judgment"); *Travelers Indem. Co. v. Dingwell*, 884 F.2d 629, 639-640 (1st Cir. 1989) (describing possible "action to enforce the consent judgment"); *see, e.g., Doe v. District of Columbia*, 796 F.3d 96, 109 (D.C. Cir. 2015) ("Third parties to a consent decree, involving the government or not, must demonstrate that they are intended beneficiaries in order to have enforcement rights"); *Rafferty v. NYNEX Corp.*, 60 F.3d 844, 849 (D.C. Cir. 1995) ("Unless a government consent decree stipulates that it may be enforced by a third party beneficiary, only the parties to the decree can seek enforcement of it."); *see also Solis v. Current Dev. Corp.*, 557 F.3d 772, 775 (7th Cir. 2009) ("enforcement orders" with respect to consent decrees "are postjudgment orders"); *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 271 F.3d 235, 238 (6th Cir. 2001) ("the continuing enforcement of a consent judgment is rightfully considered an extension of the original lawsuit").

United States declines to formally intervene in a *qui tam* action brought under the False Claims Act . . . "); *id.* at 932 ("A private enforcement action under the FCA is called a *qui tam* action"); *United States* v. *Mcinch*, 356 U.S. 595, 595-596 (1958) ("This case . . . involves three separate actions by the Government to recover damages and forfeitures under the False Claims Act."). It is an action under the *qui tam* provisions of the FCA, which authorize relators to bring FCA claims on behalf of the United States, but not to pursue even related causes of action, *see United States ex rel. Jallali v. Sun Healthcare Group*, No. 12-61011, 2015 WL 10687577, at *10 (S.D. Fla. Sept. 17, 2015), and certainly not to invoke enforcement procedures set forth in a consent judgment entered into by the United States.[6]

If BoA failed to satisfy the requirements of the Consent Judgment, the United States could avail itself of the Consent Judgment's remedies and ask the district court to enforce that judgment. But even if BoA's alleged misconduct violated the Consent Judgment, the FCA suit here is not an effort to enforce the Consent Judgment or obligations arising under that judgment. Rather, it is an effort to enforce the distinct (though potentially overlapping) obligations imposed by the FCA. It is not an action to compel compliance with the agreement, it is an action to redress false claims that injured the government. Indeed, many garden-variety FCA suits allege that the defendant made false claims in the course of performing (or purporting to perform) its obligations under a contract. It does not follow that compliance with contractual dispute-resolution mechanisms is necessary before the United States (or a relator) can bring such FCA suits.

---

[6] The *qui tam* provisions relators must satisfy to bring an action on behalf of the United States under the FCA cannot be squared with the enforcement procedures delineated in the Consent Judgment. By contrast, the *qui tam* provisions require a relator to file under seal without serving the defendant so that the United States has a period of time to investigate and decide whether to intervene in a *qui tam* claim. 31 U.S.C. § 3730(b)(2).

Defendants principally rely on *United States ex rel. Schneider v. J.P. Morgan Chase Bank, N.A.*, No. 14-1047, 2016 WL 7408826 (D.D.C. Dec. 22, 2016), in support of their contention that Relator was obligated to comply with the Consent Judgment's pre-enforcement procedures prior to filing his *qui tam* action. In that case, currently on appeal to the D.C. Circuit, the relator brought a *qui tam* action against JPMorgan Chase, another signatory to the NMS. Among other things, Schneider alleged that the bank defendant falsely claimed compliance with the NMS—specifically, that it had complied with the relevant Servicing Standards and consumer relief provisions contained in the NMS. The court concluded that Schneider was bound by the Consent Judgment's dispute resolution procedures and thus, he was obligated to exhaust those remedies prior to filing his *qui tam* FCA suit.

While the United States believes the NMS Consent Judgment does not apply in *Schneider* and this non-binding case is currently on appeal, it is in any event, distinguishable. In *Schneider*, relator specifically alleged the bank defendant was in violation of the NMS and that violation formed the backdrop for his FCA suit. Not so here. Relator in this case does not allege that BoA was violating the FCA because it was not complying with the terms of the Consent Judgment; rather, he asserts conduct that at most could be read to overlap with the conduct underlying the NMS and the Servicing Standards set out in the Consent Judgment.

Yet even if the alleged conduct would, by itself, violate both the Consent Judgment and the False Claims Act, it does not follow that any legal proceeding under the False Claims Act is also an enforcement action under the Consent Judgment. *See United States v. Wells Fargo Bank, N.A.*, 972 F. Supp. 2d 592, 605 (S.D.N.Y. 2013) (holding that although some of the conduct that underlies the NMS was at issue, FCA case was not barred by NMS Consent Judgment). Here, as in other contexts, multiple sorts of actions may be brought under multiple sources of law for the

same conduct. *See*, *e.g., United States* v. *Batchelder*, 442 U.S. 114, 125 (1979) (prosecutors have discretion to "proceed under" or "charge under" various statutes based on the same conduct); *Seaboard A. L. Railway* v. *Koennecke*, 239 U.S. 352 (1915) (cause of death action could have been brought "under" either of two statutes); *Wall* v. *CSX Transp., Inc.*, 471 F.3d 410, 414-15 (2d Cir. 2006) ("plaintiff's claim is viable under both New York and Pennsylvania law"); *United States* v. *Sherman*, 150 F.3d 306, 312 (3d Cir. 1998) ("when conduct runs afoul of more than one prohibition of the criminal law, prosecutors have discretion to choose under which statute to prosecute").

Moreover, a suit under the FCA does not merely allege that BoA breached an agreed-to obligation. The False Claims Act is not "a vehicle for punishing garden-variety breaches of contract." *Universal Health Servs.* v. *United States ex rel. Escobar*, 136 S. Ct. 1989, 2003 (2016). It is the "primary litigative tool for the recovery of losses sustained as a result of *fraud* against the government," *Avco Corp.* v. *U.S. Dept. of Justice*, 884 F.2d 621, 622 (D.C. Cir. 1989) (emphasis added), and contains distinct elements. Most significantly, the FCA contains a scienter requirement, 31 U.S.C. §§ 3729(a)(1), (b)(1), that "help[s] to ensure that ordinary breaches of contract are not converted into FCA liability." *United States* v. *Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1271 (D.C. Cir. 2010); *see*, *e.g.*, *United States ex rel. Harper* v. *Muskingum Watershed Conservancy District*, 842 F.3d 430, 437 (6th Cir. 2016) (mens rea for "reverse" FCA claim). The scienter requirement is a distinct prerequisite to FCA liability that a party to the Consent Judgment would not need to establish in order to seek relief under the judgment itself. Whatever expectation BoA (or any other party to an agreement with the United States) may have that procedures outlined in the agreement would be the exclusive means of alleging innocent or merely negligent violations, BoA could have had no reasonable expectation that claims of knowing violations would have to be routed through those procedures.

Moreover, if Defendants' argument is correct, the Monitoring Committee would have effectively be able to "veto" the United States' ability to bring an FCA action. Following Defendants' logic, the United States could not file an FCA suit, or even a criminal case, until first notifying the Monitoring Committee and giving the committee an opportunity to act. And if the committee did "commenc[e] an enforcement action," it appears that the United States may not be able to do so. Going further, because under the NMS Consent Judgment an NMS party can only proceed with an enforcement action if the Monitoring Committee declines to bring one of its own, if the Committee decided to pursue an enforcement claim, the Government could be barred from bringing any claim whatsoever. The Monitoring Committee cannot bring an FCA claim—only a contract action to enforce the agreement. Thus, the net result of Defendants' reading of the NMS would be to impliedly read a waiver of any FCA liability into the NMS, no matter how egregious BoA's conduct may be.

The ability of a government to pursue actions for fraud against the sovereign is an important power. And the False Claims Act specifically establishes the power to bring such suits and procedures governing such suits. Agreements with the United States must be construed narrowly to avoid foreclosing the later exercise of sovereign authority. *See United States v. Cherokee Nation of Oklahoma*, 480 U.S. 700, 707 (1987); *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 148 (1982). At the very least, it would be illogical if the United States (and state parties) agreed to vastly limit their own legal authority to proceed against a bank for outright fraud. *See Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 574-575 (1984) ("it seems highly unlikely" that a city would "bargain away" important programs and "[h]ad there been any intention" to make a significant policy change, "it is much more reasonable to believe that there would have been an express provision to that effect"); *cf. United States ex rel. Onnen v. Sioux Falls Indep. Sch. Dist.*

*No. 49-5*, 688 F.3d 410, 414-415 (8th Cir. 2012); *United States v. Lahey Clinic Hosp., Inc.*, 399 F.3d 1, 8-17 (1st Cir. 2005).

Thus, Relator's FCA case should *not* be read to be an "enforcement action" under the Consent Judgment and that agreement's pre-suit procedures are *not* triggered.

## CONCLUSION

For the foregoing reasons, the Court should conclude Relator's FCA case is *not* an "enforcement action" under the Consent Judgment and thus Relator need *not* submit to the pre-enforcement procedures set forth in the NMS prior to commencing an action under the FCA. The United States takes no other position with respect to the merits of the pending motion.

Dated: June 15, 2017                                                  Respectfully submitted,

**CHAD A. READLER**                                         **BENJAMIN G. GREENBERG**
**Acting Assistant Attorney General**                **Acting United States Attorney**

By: /s/*John W. Black*                                             By:  /s/*James A. Weinkle*
    **MICHAEL D. GRANSTON**                              **JAMES A. WEINKLE**
    **SARA MCLEAN**                                                  **Assistant United States Attorney**
    **JOHN W. BLACK**                                               Fla. Bar No.: 0710891
     Fla. Bar No.: 0058231                                      99 N.E. 4th Street, Suite 300
    **Attorneys, Commercial Litigation Branch**   Miami, Florida 33132
    U.S. Department of Justice, Civil Division
    P.O. Box 261, Ben Franklin Station              Tel: 305.961.9290
    Washington, DC 20044                                   Fax: 305.530.7139

    Tel.: 202.305-2479                                             Email: James.Weinkle@usdoj.gov
    Fax: 202.307.3852
                                                                              Counsel for United States
    Email: John.W.Black@usdoj.gov

Counsel for United States

## CERTIFICATE OF FILING AND SERVICE

I HEREBY CERTIFY that on June 15, 2017, I electronically caused the foregoing document to be filed with the Clerk of Court using the CM/ECF system. I also certify that the foregoing document is being served this day on all counsel of record in the manner specified via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ *James A. Weinkle*
James A. Weinkle
Assistant United States Attorney