**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 15-24585-CV-UNGARO**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| *ex. rel.* BRUCE JACOBS, | ) |
|      **Plaintiffs,** | ) |
| | ) |
| **vs.** | ) |
| | ) |
| BANK OF AMERICA CORPORATION, | ) |
| *et al.*, | ) |
|      **Defendants.** | ) |
| _____ | ) |

**PLAINTIFF-RELATOR'S SUBMISSION FOR AUGUST 10, 2017 HEARING**

Bank of America continues to resist Plaintiff-Relator's reasonable efforts to identify documents and evidence showing the Defendants perpetrated a fraud on the United States by using an after-the-fact process to rubber stamp endorsements on mortgage notes and backdating the practice. Bank of America's obstruction and denial of knowledge of when mortgage notes were endorsed and who affixed the rubber stamp endorsements to the notes are a longstanding practice. BOA's history of refusing to reveal and produce relevant information about its foreclosure practices is illustrated in the HUD-OIG March 12, 2010 Memorandum of its investigation of BOA's robo-signing practices and false claims for FHA loans. The report described BOA's stonewalling of "an effective walkthrough of its document execution process that would have facilitated an understanding of its process." [1] This Court expressed the same concerns at the June 29, 2017 hearing (DE199, p. 64:12 - 65:5): "They want the 20 pages that relate to the assignments and the stamp and MERS."

In this instance, BOA's discovery responses are replete with claimed privacy redactions of

_____

[1] The HUD-OIG report is attached as Attachment A. Pages 4-5 are referenced.

information needed to identify specific loan files, notwithstanding the parties' use of a Confidentiality Agreement. BOA's productions are uncategorized, not even collating the materials pertaining to each loan. Documents are not in chronological order. Despite emails and a meet and confer on the point, BOA has not agreed to produce the 39 loan documents in a usable manner.

BOA has also given incomplete and evasive answers to interrogatories requesting a clear explanation of its endorsement practices, burying its responses in hundreds of pages of objections. BOA's deceptions include masking any explanation of the processes utilized to endorse notes held in their own vaults. This Court cannot allow this duplicity to continue, but must forcefully direct BOA to produce responsive, complete, and accurate note endorsement information.

### A.  Specific Discovery Requests.

BOA must be compelled to provide a complete walkthrough of its endorsement practices for the period commencing 2002 through the filing of the Complaint. All mortgage notes were at some point securely maintained and logged in the Defendants' vaults. The vault-keepers kept meticulous records of the movement and handling of original notes. The Defendants copied, scanned, faxed, and recorded the notes during a serious of practices variously labeled "90-Day Delinquent Note Endorsement Process" and "IFR Indorsement Review," among others. Yet, despite evidence contradicting the Defendants' assertions that all notes were endorsed with rubber stamps within days of origination,[2] BOA will not explain its endorsement processes or why they changed over the course of years.[3] BOA has not identified who participated in the note endorsing,

---

[2] For instance, Plaintiff-Relator's discovery in a separate mortgage foreclosure case shows that the Daniel Shapiro "indorsed" note was received within days of origination in May 2003, but there was no rubber stamp endorsement, instead there was an allonge with a handwritten signature. The Shapiro materials are attached as Attachment B.

[3] The 90 day delinquent note endorsement process became effective days after the Office of the Comptroller of the Currency found Defendants were litigating foreclosures without properly endorsed notes. *See* OCC Consent Order attached as Attachment C.

what notes were endorsed, how they were endorsed, and when.[4] This is the essence of the missing BOA discovery.

Additional detail concerning the Defendants' deficient productions is evident in the fact that BOA claims all 39 subject loans were endorsed before the NMS. However, BOA provided document management portal screenshots for only 20 loans (roughly 50%). Of these 20 loans, 8 reflect dates after the NMS when BOA first had evidence of possession of an endorsed note. Similarly, the Routing History records are provided for only 32.[5] Furthermore, BOA has improperly "clawed back" loan routing history information, misleadingly claiming privilege. Importantly, all Servicing Notes were "clawed back" and claimed as work product and/or attorney client privilege. That invocation is wrong and must be overturned.

This court should order BOA to produce the following un-redacted documents for all 39 loan files: (1) Document Management Portal Indorsement Date screenshots; (2) Servicing Notes; (3) Routing Histories; (4) MERS Assignment(s) presented in foreclosures; (5) Every copy and every version of the Notes with the uploaded metadata; (6) All FHA claims made and paid; (7) Original Notes for all 39 loans and all non-delinquent notes (to be analyzed by a documents expert). In addition, BOA should be ordered to produce: (8) Endorsement Logs; (9) All documents regarding CAIT; (10) Purged Sourcecorp documents identified in the Wren affidavit; (11) Indorsement Signature Log (for stamp distribution and logging); (12) a complete description of the IFR and 90 day Delinquent Note Endorsement Process, including the use of the subject rubber stamps;[6] (13) All testing criteria and results from the IFR Endorsement Review mandated by the OCC Consent Order; and (14) Complete description of the "IFFR" Process, including the use of

---

[4] BOA policies identify logs tracking the daily release, use, and return of endorsement stamps.
[5] Attachment E summarizes the portal screen shots for 20 of 39 loans.
[6] IFR evidence is material to show knowledge concerning standing to foreclose.

the subject rubber stamps. We also require complete, straightforward answers to interrogatories. If the Defendants do not know who affixed the stamps or when, they need to say so (under oath).

The Court must order the Defendants to produce documents in response to RFPs 1, 2, 4-9, 20-22, 24-27, 39, 42, 46-50, 57, 59-61. Even produced documents are not responsive to RFPs 23, 28, 30-38, 40, 52-54, 74-75, 82, 85-86, 90, 95, 97, 99, 103, 105, 109, and 111. RFP Set Eight requesting transcripts and videos of testimony by Defendants' Senior Executives is outstanding.

### B.   BOA Records Prove After-the-Fact Rubber Stamp Endorsements.

Attached as Attachment D is a representative example of what we have identified as the true mortgage note endorsement process, proving that BOA utilized a fraudulent practice of affixing rubber stamp endorsements after-the-fact, and backdating the practice. This example proves the fraud that is at issue, and provides compelling justification for requiring BOA to produce the mortgage and note endorsement documents, as well as an explanation of the endorsement systems. Documents depicting the Williams Loan prove the bank possessed an "unendorsed note" affixed to a foreclosure complaint in 2009 with a David J. Stern robo-signed MERS Assignment. The documentation thereafter reveals that as of July of 2013, the original note was always lost and BOA only had an unendorsed copy in its files. According to a February 2014 sworn affidavit supporting a motion for summary judgment, the bank inexplicably claimed to always have had possession of the rubber-stamped note endorsed by David Spector, who had left the bank nearly ten years earlier. This representative example of the actual note endorsement proves BOA is hiding evidence proving the fraudulent practice of back-dating notes with rubber-stamp endorsements years after the departure of the people named on the stamps (Sjolander, Spector, and Meder).

### C.   BOA Must Be Directed to Produce Individual Loan Documents in Chronological Order with All Identifiers Intact.

Despite requesting loan documents sorted in chronological order with identifiers intact,[7] BOA provided documents in no particular order through 12 productions over the course of months. The absence of loan identifiers and the haphazard nature of the production renders it impossible for Plaintiff-Relator to link related documents to particular loans and place them in order.

### D.  BOA Must Produce Complete Information for All Subject Loans.

BOA still has not produced the complete files for all 39 subject loans. Plaintiff-Relator has spent weeks sorting through the BOA productions, and still cannot piece together complete loan files and note endorsement chronologies. Some loan files are missing complaints, while others do not have complete routing histories or screenshots.

### E.  The Claim of Attorney Work Product Must be Rejected and Its Claw Back of Documents Must be Revisited.

Hiding behind a privilege claim, the Defendants "clawed back" many documents that provide a relevant history of the loans, when the notes appear unendorsed, and the loans identified as having unendorsed notes. Not only are privileges inapplicable, but the underlying documents are part of a rampant fraud scheme. As such, the crime-fraud exception negates the privilege. *See JTR Enterprises v.* Colombian Emeralds, 2017 WL 2713411, at *9 (11th Cir. June 23, 2017) (court has authority to determine existence of fraud). The crime-fraud exception was previously briefed in DE178, pages 19-20. Similarly, because it appears the "claw backs" hide the fraud scheme, this Court should order the return of the documents, or examine them *in camera.*

### <u>CONCLUSION</u>

For these reasons, the Plaintiff-Relator respectfully asks the Court to order the discovery identified in this memorandum.

---

[7] Because the parties are subject to a Confidentiality Agreement information including loan numbers, addresses, and FHA numbers should not be redacted.

Respectfully submitted,

S/ *Court E. Keeley*_____

**COURT E. KEELEY, B.C.S.**
**JACOBS KEELEY, P.L.L.C.**
Alfred I. DuPont Building
169 East Flagler St., Suite 1620
Miami, FL 33131
Keeley@JAKElegal.com
Efile@JAKElegal.com
Tel:    (305) 358-7991
Fax:    (305) 358-7992
*Lead Counsel for Plaintiff-Relator*

S/ *Benedict P. Kuehne*

**BENEDICT P. KUEHNE**
Florida Bar No. 233293
**KUEHNE DAVIS LAW, P.A.**
100 S.E. 2nd St., Suite 3550
Miami, FL 33131-2154
Tel: 305.789.5989
Fax: 305.789.5987
ben.kuehne@kuehnelaw.com
efiling@kuehnelaw.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 2, 2017, the undersigned electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  The undersigned also certifies that the foregoing document is being served this day on all counsel of record identified on the attached Service List via transmission of Notices of Electronic Filing generated by CM/ECF.

*S/ Benedict P. Kuehne*
**BENEDICT P. KUEHNE**

**SERVICE LIST**

*United States of America, ex rel., Bruce Jacobs vs. Bank of America Corporation, et.al.*
Case No. 1:15-cv-24585-Ungaro
United States District Court, Southern District of Florida

| | |
|---|---|
| **Jacobs Keeley, P.L.L.C.**<br>Court E. Keeley, B.C.S.<br>Bruce Jacobs, Esq.<br>Alfred I. DuPont Building<br>169 East Flagler St., Suite 1620<br>Miami, FL 33131<br>Keeley@JAKElegal.com<br>Jacobs@JAKElegal.com<br>Efile@JAKElegal.com<br>Tel:    (305) 358-7991<br>Fax:    (305) 358-7992<br>*Lead Counsel for Plaintiff Relator* | **Wilmer Cutler, Pickering, Hale & Dorr, L.L.P.**<br>Mathew T. Martens, Esq. (*pro hac vice*)<br>Philip Randolph Seybold. Esq. (*pro hac vice*)<br>1875 Pennsylvania Ave., N.W.<br>Washington, DC 20006<br>Matthew.Martens@WilmerHale.com<br>Randy.Seybold@WilmerHale.com<br>Tel:    (202) 663-6000<br>Fax:    (202) 663-6363<br>*Lead Counsel for Defendants* |
| **The LS Law Firm**<br>Lilly Ann Sanchez, Esq.<br>Four Seasons Tower<br>1441 Brickell Ave., Suite 1200<br>Miami, FL 33131<br>LSanchez@TheLSfirm.com<br>Tel:    (305) 503-5503<br>Fax:    (305) 503-6801<br>*Co-Counsel for Plaintiff-Relator* | **Liebler, Gonzalez & Portuondo**<br>J. Randolph Liebler, Esq.<br>Christine Manzo, Esq.<br>44 W. Flagler St., Suite 2500<br>Miami, FL 33130<br>JRL@LGPlaw.com<br>CMM@LGPlaw.com<br>Tel:    (305) 379-0400<br>Fax:    (305) 379-9626<br>*Co-Counsel for Defendants* |
| **Law Office of Benedict P. Kuehne, P.A.**<br>Benedict P. Kuehne, B.C.S.<br>100 S.E. 2nd Street, Suite 3550<br>Miami, Florida 33134-2154<br>Ben.Kuehne@KuehneLaw.com<br>Efiling@KuehneLaw.com<br>Tel:    (305) 789-5989<br>Fax:    (305) 789-5987<br>*Co-Counsel for Plaintiff-Relator* | **Office of the United States Attorney**<br>James A. Weinkle, Esq.<br>99 N.E. 4th Street, Suite 300<br>Miami, FL 33131<br>James.Weinkle@USDOJ.gov<br>Tel:    (305) 961-9290<br>Fax:    (305) 530-7139<br>*Counsel for the United States of America* |
| **Haber Slade, P.A.**<br>David B. Haber, Esq.<br>Roger Slade, Esq.<br>201 S. Biscayne Blvd., Suite 1205<br>Miami, Florida 33131<br>DHaber@DHaberLaw.com | |

| RSlade@DHaberLaw.com<br>Tel:     (305) 379-2400<br>Fax:     (305) 379-1106<br>*Co-Counsel for Plaintiff-Relator* | |

OFFICE OF AUDIT
REGION VI
FORT WORTH, TX                    MEMORANDUM OF REVIEW



OFFICE OF

# INSPECTOR GENERAL

U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

# Bank of America Corporation
# Foreclosure and Claims Process Review
# Charlotte, NC

MEMORANDUM NO. 2012-FW-1802                    MARCH 12, 2012



U.S. Department of Housing and Urban Development
**Office of Inspector General, Region VI**
819 Taylor Street, Suite 13A09
Fort Worth, TX 76102

(817) 978-9309 **FAX** (817) 978-9316
http://www.hudoig.gov
OIG Fraud Hotline 1-800-347-3735

**MEMORANDUM NO.**
**2012-FW-1802**

March 12, 2012

**MEMORANDUM**

**FOR:**     Charles S. Coulter, Deputy Assistant Secretary for Single Family Housing, HU

Craig Clemmensen, Director, Departmental Enforcement Center, CACB

*//signed//*
**FROM:**    Gerald R. Kirkland, Regional Inspector General for Audit, 6AGA

**SUBJECT:**  Bank of America Corporation
Foreclosure and Claims Process Review
Charlotte, NC


## INTRODUCTION AND BACKGROUND

As part of the Office of Inspector General's (OIG) nationwide effort to review the foreclosure practices of the five largest Federal Housing Administration (FHA) mortgage servicers (Bank of America, Wells Fargo Bank, CitiMortgage, JP Morgan Chase, and Ally Financial, Incorporated), we reviewed Bank of America's foreclosure and claims processes.  In addition to this memorandum, OIG issued separate memorandums for each of the other four reviews.[1]  OIG also plans to issue a summary memorandum reporting the results of all five memorandums.  OIG performed these reviews due to reported allegations made in the fall of 2010 that national mortgage servicers were engaged in widespread questionable foreclosure practices involving the use of foreclosure "mills" and a practice known as "robosigning"[2] of sworn documents in thousands of foreclosures throughout the United States.[3]

Bank of America is a supervised FHA direct endorsement lender that can originate, sponsor, and service FHA-insured loans.  During Federal fiscal years 2009 and 2010, it submitted 36,095 FHA claims totaling $5 billion.[4]  Bank of America acquired Countrywide Home Loans Servicing, LP, in 2008 and processed claims using Countrywide's FHA servicing identification

---

[1]   See memorandums 2012-AT-1801, 2012-KC-1801, 2012-CH-1801, and 2012-PH-1801.
[2]   We have defined the term "robosigning" as the practice of an employee or agent of the servicer signing documents automatically without a due diligence review or verification of the facts.
[3]   With respect to foreclosure procedures, there are three variations:  those States that require a complete judicial proceeding, which are referred to as "the judicial jurisdictions;" those that do not require a judicial proceeding; and those that are a hybrid.  For purposes of these reviews, we determined that there were 23 judicial States and jurisdictions.
[4]   Properties located in judicial foreclosure States and jurisdictions accounted for $1.3 billion in claims (26 percent of the claims).  Properties located in nonjudicial foreclosure States and jurisdictions accounted for $3.7 billion in claims (74 percent of the claims).  These amounts include all categories of FHA claims.

number during the review period.[5]  Approximately 90 percent of its claims during the review period, totaling more than $4.5 billion, were for loans previously serviced by Countrywide.

In early October 2010, Bank of America stated that it would halt judicial foreclosures while it reviewed its policies and procedures.  On October 18, 2010, it issued a press release reporting that it had completed its review of judicial foreclosures and while it had identified no problems, it would resubmit 102,000 affidavits in judicial foreclosure cases that had not yet gone to judgment.  On October 22, 2010, the U. S. Department of Housing and Urban Development (HUD) issued a notice of violation informing Bank of America that it was considering administrative actions and civil money penalties based on findings identified in its July 2010 servicing review.

From the beginning of our review in October 2010, Bank of America limited our access to employees and information.  After attempting to conduct interviews within Bank of America's established protocols without success, the U. S. Department of Justice (DOJ) assisted us by obtaining testimony through civil investigative demands (CID).[6]  Because we identified potential False Claims Act[7] violations, in February 2011, we provided DOJ with our analyses and preliminary conclusions as to whether Bank of America engaged in the alleged foreclosure practices.

DOJ used our review and analysis in negotiating a settlement agreement with Bank of America.  On February 9, 2012, DOJ and 49 State attorneys general announced a proposed settlement of $25 billion with Bank of America and four other mortgage servicers for their reported violations of foreclosure requirements.  As part of the proposed settlement agreement, each of the five servicers will pay a portion of the settlement to the United States and must undertake certain consumer relief activities.  The proposed settlement agreement described tentative credits that each mortgage servicer would receive for modifying loans, including principal reduction and refinancing, and established a monitoring committee[8] and a monitor to ensure compliance with agreed-upon servicing standards and the consumer relief provisions.  Once the final settlement agreement has been approved by the court, OIG will issue a separate summary memorandum detailing each of the five servicers' allocated share of payment due as a result of the settlement agreement.

Our objective was to determine whether Bank of America complied with applicable foreclosure procedures when processing foreclosures on FHA-insured loans.

## METHODOLOGY AND SCOPE

To accomplish our review objective, we

- Obtained an understanding of relevant legislation, program guidance, and criteria related to FHA single-family mortgage insurance.

---

[5]  October 1, 2008, through September 30, 2010
[6]  DOJ conducted the CID proceedings in Fort Worth, TX, and Washington, DC, between February 28 and September 20, 2011.
[7]  31 U.S.C.§ 3729 *et.seq*.
[8]  Comprised of representatives of the State attorneys general, DOJ, and HUD

- Obtained and reviewed available Bank of America written policies and procedures regarding its foreclosure process.[9]
- Obtained and examined relevant reviews of Bank of America's servicing and foreclosure processes.
- Obtained and examined the excerpts of personnel documents that Bank of America provided for selected employees.
- Obtained and reviewed various court documents related to the foreclosure practices of Bank of America and law firms that conducted work on its behalf.
- Interviewed Bank of America management and staff, including those involved in the document execution, notary, foreclosure, and claims processes.
- Worked with DOJ to issue 35 CIDs[10] to compel testimony.
- Attended testimonies given by 17 individuals pursuant to CIDs issued by DOJ.  Our audit and legal staff met with DOJ attorneys and provided information, analyses, and relevant documentation to prepare for the CID testimony proceedings.
- Coordinated with Bank of America's legal counsel, our Office of Legal Counsel, and DOJ attorneys from its Washington, DC, Civil Division Fraud Section and the Northern District of Texas.
- Identified and reviewed a statistical sample of 118 Bank of America FHA claims processed by HUD during the review period.  The sample universe included 32,699 claims records from HUD's Single Family Data Warehouse associated with Bank of America and affiliated entities.  We randomly selected an attribute sample using a presumed error rate of 10 percent, a desired precision range of 10 percent (+/- 5 percent), and a desired confidence level of 90 percent.  The sample did not include claims processed in the names of Countrywide or Taylor, Bean & Whitaker.  However, 100 of the 118 claims in our sample were previously held by Countrywide.[11]
- Reviewed FHA claims and related documents for the 118 claims in our sample.
- Obtained and analyzed FHA claims data from both Bank of America and HUD.
- Obtained and analyzed Bank of America shipping logs[12] that identified documents signed and notarized during the review period and identified the attorney who prepared the document.  However, as described in the following section, the data were incomplete.
- Issued two Inspector General administrative subpoenas for documents and records.
- Analyzed data for Bank of America FHA claims in the 23 judicial foreclosure States and jurisdictions.

---

[9]   Although we repeatedly requested policies and procedures in effect during the entire review period, Bank of America would provide only those that generally became effective between May and October 2010.

[10]   Under 31 U.S.C. § 3733 *et.seq.*, CIDs can be served on a person to give oral testimony whenever the Attorney General has reason to believe that the person may be in control of information relevant to a false claim investigation.

[11]   In August 2009, the Government National Mortgage Association hired Bank of America to service roughly $25 billion in FHA receivables it seized from the firm Taylor, Bean & Whitaker.  Our review incorporated loans previously assigned to Taylor, Bean & Whitaker only if Bank of America filed FHA claims in its own name.

[12]   Bank of America's shipping logs included FHA and non-FHA foreclosure documents.  While Bank of America had separate teams that handled FHA and non-FHA foreclosures, it could not explain material differences in the processing of the foreclosures, and its shipping logs did not distinguish between FHA and non-FHA foreclosures.  Bank of America provided incomplete data, which impeded identification of all affiants, notaries, and attorneys and the complete volume of documents.

3

During the course of our review and the drafting of this memorandum, Bank of America was actively engaged in negotiations with DOJ in an attempt to resolve potential claims under the False Claims Act or other statutes for the conduct we were reviewing.  Accordingly, OIG determined that our work product was privileged and not releasable to Bank of America for any purpose, including the solicitation of written comments on our findings from Bank of America. For this same reason, we did not provide Bank of America with a copy of the draft memorandum.  Both DOJ and HUD concurred with our determination that the work product was privileged.

OIG also issued memorandums reporting the results of the reviews of four other servicers.  The results reported in the five OIG memorandums differ due to various factors.  These factors include (1) the level of information made available to the auditors at the time of the onsite reviews or that was obtained later through subpoenas or CIDs; (2) variances between review procedures used, including the analysis of the data, that were governed in part by the amount and types of information obtained; (3) differences between the foreclosure procedures used by the servicers; and (4) scope limitations imposed by some servicers.

Our review generally covered Bank of America's foreclosure and claims processes for its FHA claims initially processed by HUD between October 1, 2008, and September 30, 2010, including its procedures for signing and notarizing sworn judgment affidavits.  The review included both judicial and nonjudicial foreclosure States and jurisdictions, which provided a comprehensive overview of Bank of America's practices and compliance with requirements.[13]  We expanded the scope as needed to accomplish our objective.  We initiated our review on October 15, 2010, and performed onsite work at Bank of America's offices in Fort Worth, Plano, and Addison, TX, and Simi Valley, CA, between October 2010 and January 2011.

## Scope Limitation

Our review was significantly hindered by Bank of America's reluctance to allow us to interview employees.  When interviews were permitted, the presence or involvement of attorneys limited the effectiveness of those interviews.  On a number of occasions, Bank of America's attorneys refused to allow employees to answer questions, stopped them in the middle of clarifying information already provided, or counseled them in private before allowing them to provide a response.  Further, Bank of America would not permit an effective walkthrough of its document execution process that would have facilitated an understanding of its process.

In addition, we issued Inspector General administrative subpoenas because Bank of America did not provide information and data in a timely manner or a point of contact who could explain and clarify data.  However, the information and data provided in response to our subpoenas were not complete.  For instance, Bank of America provided only excerpts of subpoenaed personnel files, did not provide complete foreclosure documents for the items in the sample, provided conflicting information regarding who its affiants were, and could not identify all authorized notaries.  As a result, it was not possible to know how much information Bank of America omitted that was relevant to our review.  For example, although several employees described Bank of America's foreclosure process, it was not until its employees provided sworn testimony that they disclosed that personnel in India conducted the critical foreclosure function of verifying judgment figures.

---

[13]    Analysis of potential False Claims Act liability was limited to claims filed in judicial States and jurisdictions.

4

Further, Bank of America provided FHA insurance claims data for only two of its five servicing identification numbers.  In another instance, it provided data that identified signers, notaries, and attorneys for each claim for only one-third of its FHA claims records.  These omissions impaired our review because they prevented us from measuring the complete impact of Bank of America's foreclosure practices.

In an effort to mitigate the scope limitation, DOJ issued CIDs to Bank of America and 34 current and former employees to compel testimony.  Of those, 1 corporate representative and 16 current and former employees gave sworn testimony about their knowledge concerning Bank of America's operation of and/or reliance upon so-called foreclosure mills or robosigners to process foreclosures.  In addition, DOJ facilitated discussions regarding Bank of America's response to our Inspector General administrative subpoenas.

## RESULTS OF REVIEW

Bank of America did not establish effective control over its foreclosure process.  This failure permitted a control environment in which

- Affiants[14] routinely signed foreclosure documents, including affidavits, certifying that they had personal knowledge of the facts when they did not.  Specifically, affiants signed large volumes of foreclosure documents without reviewing the supporting documentation referenced in them.  They also consistently failed to verify the accuracy of the foreclosure documents they signed.
- Notaries public routinely notarized documents without witnessing affiant signatures.  They also failed to keep required records of the documents they notarized.[15]
- It may have allowed attorneys to improperly prepare documents and misrepresent the work they performed.

Review of 118 FHA claim files showed that Bank of America did not consistently retain legal documents supporting the foreclosure.  Analysis of the mathematical accuracy of seven affidavits containing judgment figures showed inconsistent per diem interest calculations and discrepancies in accrued interest totals.  Also, in one instance, it conveyed a property to HUD with the incorrect legal description.  This flawed control environment resulted in Bank of America filing improper legal documents, thereby misrepresenting its claims to HUD and may have exposed it to liability under the False Claims Act.

### Questionable Affidavit and Foreclosure Document Processes

Bank of America failed to follow HUD requirements[16] for properties it foreclosed upon in judicial foreclosure States and jurisdictions.  These provisions required Bank of America to obtain and convey to the Secretary of HUD good and marketable title to properties.  Bank of America may have conveyed flawed or improper titles to HUD because it did not establish a

---

[14]   An affiant is a person who signs an affidavit and attests to its truthfulness before a notary public.
[15]   On July 11, 2011, we referred the apparent notary violations to the Texas Secretary of State.
[16]   24 C.F.R. § 203.366(a) and HUD Handbook 4330.4, paragraphs 2-6 and 2-23

control environment which ensured that affiants performed a due diligence review of the facts submitted to courts and that employees properly notarized documents.

Judicial foreclosures were processed through the court system beginning with Bank of America filing a complaint or petition regarding a mortgage purportedly in default. The formal legal document stated what the debt was and why the default should allow Bank of America to foreclose on the property. In many judicial foreclosures, an affidavit was part of the foreclosure documentation. Generally, a representative of Bank of America swore in a notarized affidavit that Bank of America owned or held the mortgage in question and that the borrower was in arrears. As judicial States and jurisdictions routinely resolved foreclosures through summary judgment,[17] the accuracy and propriety of the documents were essential to ensure the integrity of the foreclosure process. Bank of America used a flawed process to submit FHA conveyance claims for judicially foreclosed-upon properties and received FHA claim payments of more than $1.1 billion[18] during the review period.

*Affiants Robosigned Foreclosure Documents*

Because Bank of America would not provide us written foreclosure policies and procedures in effect during the review period, we relied on interviews and CID testimony to gain an understanding of its foreclosure practices. Employees confirmed that affiants routinely signed legal documents, including affidavits, without the supporting documentation and without reviewing and verifying the accuracy of the foreclosure information. Many affiants stated that they only checked to determine whether the foreclosure documents listed them as the signer. In an interview, a vice president in the document execution group stated that her department only checked foreclosure documents for formatting and spelling errors.[19]

Further, Bank of America had no effective quality assurance function. For example, employees who performed quality control auditing and training for the document execution group testified that their focus consisted of ensuring that name and title stamps on foreclosure documents were straight and legible. In addition, while giving sworn testimony employees could not explain to DOJ the process by which personnel in India verified the judgment figures included in foreclosure documents.[20]

When asked about the number of foreclosure documents they signed, employees were unable to provide DOJ with accurate estimates. However, they acknowledged that foreclosure document volume increased exponentially over time. For example, one notary testified that daily volume went from 60 to 200 documents per day to 20,000 documents per day with half being duplicates. One former employee described signing 12- to 18-inch stacks of documents at a time without review. Employees also admitted signing large volumes of foreclosure documents during unrelated meetings without reading them. An employee testified that she was instructed to send out an email message recruiting affiants because Bank of America needed more signers for

---

[17]   A decision made on the basis of statements and evidence presented for the record without a trial. It is used when there is no dispute as to the facts of the case and one party is entitled to judgment as a matter of law.

[18]   This amount was calculated based on information in HUD's Single Family Data Warehouse and excludes claims for deeds in lieu of foreclosure.

[19]   We have outlined this vice president's affiant and notary activities in appendix A, as manager 1.

[20]   Bank of America did not provide policies and procedures that included its India operations.

6

foreclosure documents.  In addition, a former vice president in an unrelated business unit testified that he was required to sign foreclosure documents.

Many employees testified that they relied on a system to ensure that documents they signed were accurate.  However, none effectively described the system.  One manager testified that she was volunteered to be an affiant.  According to the manager, the vice president in charge of foreclosure told her that the information had been verified and she "just simply needed to locate the sticky in which it had Sign Here and sign my name."  When asked whether she verified the information, the manager stated that she trusted that the information had been verified because the vice president told her so.  In addition, managers discussed in performance reviews an unprecedented volume increase due to high foreclosures, which resulted in Bank of America hiring additional contractors and new employees to prepare foreclosure documents.

Information provided by Bank of America also reflected an increased volume of foreclosure documents over the review period and showed that it evaluated employee performance based in part on metrics for processing high volumes of documents.  As shown in figure 1, the total monthly volume of documents signed varied from 4,000 in November 2009 to more than 64,000 in April 2010, with a total of 809,000 documents during the review period.  The 10 most prodigious affiants signed between 31,000 and 78,000 documents during the review period.[21] Appendix A contains affiant and notary narratives that describe the monthly volume of documents signed and notarized by selected employees.

**Figure 1: Document volume by month**



---

[21]   As discussed in the Scope and Methodology section, Bank of America provided incomplete data, which impeded identification of the complete volume of documents each affiant signed.

Attachment A, page 8

Bank of America's foreclosure process during the review period did not ensure that it properly executed foreclosure documents before submitting them to courts or ensure that it conveyed good and marketable title to HUD.

*Notaries Did Not Witness Signatures or Maintain Required Records*

Bank of America did not establish a control environment that ensured that its notaries met their responsibilities under State laws that required them to witness affiants' signatures on documents they notarized.[22]  Bank of America employed notaries[23] who notarized signatures on foreclosure documents, but it could not provide a complete list of these employees.  Our sample included documents with notary stamps from Texas and California.  Both States required the notary to authenticate the signer's signature and maintain a notary log book detailing specific information, such as the name of the signer, document notarized, and date.[24]

Employees stated that affiants did not routinely sign documents in front of a notary.  There was no indication that Bank of America required them to do so.  If a notary did not witness the signature, the notarization of the document was improper.  Two employees specifically testified that they raised concerns about the notary process to management, but management told them to continue the process.  In CID testimony, one of the referenced managers said she did not recall any concerns about the notary process being brought to her attention.  One notary stated that Bank of America set a target of notarizing 75 to 80 documents per hour and he was evaluated on whether he met the target.  According to the data provided, the 10 most active notaries each notarized between 14,000 and 77,000 foreclosure documents during the 2-year review period.  The data also showed that one notary, in violation of Texas law, notarized her own signature on two documents.

Despite management representations to the contrary, employee performance reviews demonstrated that Bank of America used defined goals and metrics to evaluate performance based on production in its document execution group.  For instance, the manager progress notes section of two document execution employees' 2009 and 2010 performance reviews stated:

- "Your Stats so far this year are as follows:  Affidavits 46.97 per hour (standard is 49 per hour), Assignments 54.74 per hour (standard is 51 per hour) and DocEx 49.67 per hour (standard is 46 per hour)."
-  "Your stats so far this year are as follows:  Affidavits 40.11 (standard is 49.00 an hour), Assignments 43.12 (standard is 51.00 an hour) and DocEx 36.91 (standard is 46.00 an hour).  Your numbers are low but I understand why so they are acceptable."
- "…maintains the production standards set by the Document Execution group and has very few errors…numbers are exceptional for department stats: Printing 140.77%, Prepping 148.08%, Stapling 148.02% and Notarizing 121.81%."

---

[22]  Every State's notary laws require that the notary personally administer an oath and/or personally verify the identity of the document signer.

[23]  These notaries had additional job duties and responsibilities.

[24]  Texas Government Code, Chapter 406, Notary Public, Commissioner of Deeds, and State of California Notary Law Section 8200

8

As one of the primary purposes of using a notary was to verify the authenticity of the signer, Bank of America's failure to ensure that notaries witnessed signatures was a significant control weakness.[25]  Because this type of deficiency undermined the integrity of the control environment, the affidavits and other foreclosure documents submitted by Bank of America were unreliable and inauthentic, and may have exposed it to False Claims Act liability.

*Law Firms May Have Engaged in Improper Practices*

Bank of America used law firms that may have engaged in questionable practices to process FHA-insured foreclosures.  These practices ranged from allegations of robosigning and unauthorized practice of law to a judge's ruling that in an attempt to collect on questionable debt, a firm filed deceptive documents and one of its lawyers lied in court.

For example, a high-level Bank of America official was referred to in a complaint[26] against Goldbeck, McCafferty, and McKeever, PC (GMM), a law firm that conducted foreclosure work for Bank of America.  The complaint alleged that nonlawyers in the firm engaged in the unauthorized practice of law by preparing foreclosure complaints, signing lawyers' names to those complaints, and filing those complaints in county courts around the Commonwealth of Pennsylvania.  The plaintiff averred that Bank of America knew of, directed, and profited from the conduct of the nonlawyers and that the high-level official, an attorney, was present in a courtroom when Mr. McKeever testified that it was "standard practice" for nonlawyers to engage in the unauthorized practice of law.  The complaint included transcript excerpts from the December 8-9, 2009, hearing and 27 exhibits containing signatures supporting the allegation that nonlawyer defendants prepared, signed, and filed hundreds of thousands of cases without attorney review.

GMM processed 469 foreclosure documents for Bank of America in Pennsylvania and New Jersey.  Of the 118 sample loans, 2 were processed by the firm.  As figure 2 shows, it appeared that at least 5 different individuals signed 13 documents for attorney Michael McKeever for the 2 sample loans.  If nonlawyers, on GMM's behalf, signed and filed documents for FHA-insured foreclosures, these filings may not have been valid and may have caused Bank of America to file false claims.

---

[25]   According to Bank of America, it implemented new procedures in October 2010 that required notaries to witness affiants' signatures on foreclosure documents.  However, we did not test the procedures, as Bank of America limited our review to the stated review period.

[26]   *Loughren vs. Lion, et al.*, GD-10, Allegheny County, PA

**Figure 2:  Five different signatures of attorney Michael McKeever for two sample loans**



In addition, the Chief U.S. Bankruptcy Judge for Western Pennsylvania issued a memorandum opinion and order[27] and a memorandum order[28] that were "intended to serve as a public reprimand"[29] of GMM and one of its attorneys, Leslie M. Puida.  The judge sanctioned the firm and its attorney for filing deceptive documents in a foreclosure proceeding and found that "Puida, and by extension GMM, had not been honest with this Court."[30]  The judge ruled that the firm filed copies of three key letters created after the fact in an attempt to collect on questionable debt that were never sent to the homeowner or her lawyer.  The judge stated that "the evidence that Puida lied was considerable"[31] and publicly reprimanded GMM and Leslie M. Puida for their misconduct and ordered them to report to the Disciplinary Board of the State Supreme Court.

In another Bank of America example, a notary for Phelan, Hallinan & Schmieg testified in a deposition that over a 3-year period, "he falsely acknowledged tens of thousands of mortgage assignments"[32] for the firm, often outside the signer's presence.  The notary also acknowledged under oath that he notarized documents in New Jersey when he did not hold a notary license in that State.  In addition, a partner was accused of having potential conflicts of interest in the

---

[27]  *In re Hill*, 437 B.R. 503 (Bankr. W.D. Pa., October 5, 2010)
[28]  *In re Hill*, 437 B.R. 503 (Bankr. W.D. Pa., November 24, 2010)
[29]  *In re Hill*, 437 B.R. 503 pg 8 (Bankr. W.D. Pa., November 24, 2010)
[30]  *In re Hill*, 437 B.R. 503 pg 4 (Bankr. W.D. Pa., November 24, 2010)
[31]  *In re Hill*, 437 B.R. 503 pg 5 (Bankr. W.D. Pa., November 24, 2010)
[32]  *Bank of New York v. Ukpe*, pg 6 Docket No. F-10209-08

10

assignment of mortgage notes.[33]  It was argued that the partner executed an assignment in his capacity as a Mortgage Electronic Registration Systems[34] officer while Phelan, Hallinan & Schmieg was also a vendor for Mortgage Electronic Registration Systems, the assignor.  The notary and partner had both been individually named in proceedings involving questionable foreclosure practices for servicers other than Bank of America.[35]  According to Bank of America's records, Phelan, Hallinan & Schmieg processed 931 documents for proceedings in 3 judicial foreclosure States.[36]

Our analysis of Bank of America's shipping logs showed that Bank of America used a small group of law firms to process foreclosures.  As shown in table 1, 10 law firms processed 62 and 81 percent of Bank of America's judicial and nonjudicial foreclosure documents, respectively.  Many of these law firms had been named in various court proceedings throughout the country, alleging questionable foreclosure activities.

**Table 1:  Top 10 law firms that processed Bank of America foreclosure documents**

| Judicial foreclosure States | | | Nonjudicial foreclosure States | | |
|---|---|---|---|---|---|
| Law firm | Number of documents | Percentage | Law firm | Number of documents | Percentage |
| Feiwell & Hannoy, PC | 976 | 9.81 | Prommis Solutions, LLC | 4,892 | 36.77 |
| Phelan Hallinan & Schmieg | 931 | 9.35 | Barrett Daffin Frappier Turner & Engel | 1,875 | 14.09 |
| Reisenfeld and Associates | 732 | 7.35 | Millsap & Singer, LLC | 788 | 5.92 |
| Carlisle, McNellie, Rini, Kramer & Ulrich Co. | 680 | 6.83 | Trott & Trott | 761 | 5.72 |
| Luper Neidenthal & Logan | 610 | 6.13 | McFadden, Lyon & Rouse, LLC | 580 | 4.36 |
| Pierce and Associates | 520 | 5.22 | Bierman, Geesing, Ward & Wood | 501 | 3.77 |
| Lerner, Sampson & Rothfuss | 492 | 4.94 | Martin, Leigh, Laws & Fritzlen, PC | 479 | 3.60 |
| Goldbeck McCafferty & McKeever | 469 | 4.71 | Sirote & Permutt, PC | 454 | 3.41 |
| Codilis & Associates, PC | 398 | 4.00 | Adams & Edens | 274 | 2.06 |
| Adorno & Yoss | 395 | 3.97 | Barrett Burke Wilson Castle Daffin & Frappier | 220 | 1.65 |
| **Subtotal - top 10 firms** | **6,203** | **62.32** | **Subtotal - top 10 firms** | **10,824** | **81.36** |
| Subtotal - all others | 3,750 | 37.68 | Subtotal - all others | 2,480 | 18.64 |
| **Total judicial documents** | **9,953** | | **Total nonjudicial documents** | **13,304** | |

---

[33]  *Bank of New York v. Ukpe*, Docket No. F-10209-08
[34]  Commonly referred to as MERS
[35]  *U. S. Bank NA v. Sinchegarcia*, F-18446-08. *Deutsche Bank National Trust Company v. Charlene Smith*, No. 08-3089
[36]  Bank of America provided data that accounted for only about one-third of its FHA foreclosures during our review period.  This lack of data impeded identification of the complete volume of documents each law firm prepared.

11

On November 16, 2010, the Congressional Oversight Panel released an in-depth report analyzing the robosigning allegations.[37]  Its report concluded that "[t]he foreclosure documentation irregularities unquestionably show a system riddled with errors" and emphasized "that mortgage lenders and securitization servicers should not undertake to foreclose on any homeowner unless they are able to do so in full compliance with applicable laws and their contractual agreements."

If third-party law firms engaged in questionable practices on behalf of Bank of America, the foreclosures may not have complied with laws and agreements.  These questionable practices may have exposed Bank of America to liability under the False Claims Act.

*Legal Documents Were Not Consistently Maintained*

Bank of America's FHA claim files for the 118 sample loans did not consistently contain relevant preforeclosure information that supported the legal basis for foreclosure.  Therefore, Bank of America could not demonstrate that it conveyed clear and marketable title to HUD.  In addition, the file reviews identified 23 affiants who signed foreclosure documents on Bank of America's behalf but were not authorized to do so by appropriate board resolution as provided by Bank of America.  According to its records, the 23 individuals signed 820 foreclosure documents during the review period.  HUD should require Bank of America to retain in its FHA claim files legal documents supporting the foreclosure and the underlying supporting business records for those legal documents.

*Affidavits Contained Inconsistencies and Errors*

We reviewed the seven affidavits that contained judgment figures in judicial foreclosure States to determine whether they were mathematically correct.  Bank of America calculated per diem interest charges inconsistently and had discrepancies in accrued interest totals.  Specifically, it calculated per diem interest using a 360-day year in three cases, 365 days in two cases, an undetermined method in one case, and both methods in different versions of the document in the last case.  Errors in interest calculations ranged from $16 to $470.  This error rate indicated that Bank of America lacked proper controls to ensure that it correctly and consistently calculated accrued interest charges in documents it filed in courts to support its foreclosure actions.  However, the unpaid principal balance on each affidavit matched the amount on the FHA insurance claim in all seven cases.

*Bank of America Conveyed a Property That Had an Incorrect Legal Description to HUD*

Bank of America conveyed a property located in Modesto, CA, to HUD with an incorrect legal description.[38]  California is a two-deed State, requiring a trustee deed and a grant deed.  The grant deed conveying the property title to HUD used a legal description for a property on another street.  Because the legal description was incorrect, Bank of America did not give HUD good and

---

[37]   Congressional Oversight Panel, November Oversight Report Examining the Consequences of Mortgage Irregularities for Financial Stability and Foreclosure Mitigation (November 16, 2010), available at http://cop.senate.gov/documents/cop-111610-report.pdf (submitted under section 125(b)(1) of Title 1 of the Emergency Economic Stabilization Act of 2008, Pub. L. No. 110-343)
[38]   FHA case number 045-6483650

marketable title to the property.  HUD regulations[39] required Bank of America to convey good and marketable title as well as satisfactory title evidence.  Because its internal controls did not prevent the error, its foreclosure and later conveyance of title to HUD were improper.  HUD should require Bank of America to remedy the apparent defect in title for this property.

## CONCLUSION

Bank of America did not establish an effective control environment to ensure the integrity of its foreclosure process.  Because it failed to establish proper policies and procedures that fostered compliance with laws and regulations, its affiants robosigned foreclosure documents, its notaries failed to authenticate signatures, and it used law firms that may have falsified legal foreclosure documents.  As a result of its flawed control environment, Bank of America engaged in improper practices by not fully complying with applicable foreclosure procedures when processing foreclosures on FHA-insured loans, thereby misrepresenting its claims to HUD.

During the review period, Bank of America submitted 8,973 conveyance claims[40] totaling $1.1 billion in the 23 judicial foreclosure States and jurisdictions.  DOJ used our review and analysis in negotiating the settlement agreement.

## RECOMMENDATIONS

Once the settlement agreement is approved by the court, OIG will issue a separate summary memorandum to HUD containing recommendations to correct weaknesses discussed in this and the other four memorandums.  Accordingly, this memorandum contains recommendations to address only specific Bank of America deficiencies.

We recommend that HUD's Deputy Assistant Secretary for Single Family Housing

1A.     Ensure that Bank of America retains appropriate legal documentation supporting all FHA-insured foreclosures in its FHA claim files.

IB.      Require Bank of America to remedy the apparent defect in title for the property it conveyed to HUD with the incorrect legal description (FHA case number 045-6483650).

We recommend that the Director of HUD's Departmental Enforcement Center

1C.     Pursue appropriate administrative sanctions against notaries who may have violated State notary requirements.

1D.     Pursue appropriate administrative sanctions against attorneys who may have violated professional obligations related to foreclosures of FHA-insured mortgages.

**Appendix:**

Appendix A     Affiant and Notary Narratives

---

[39]     24 C.F.R. § 203.358

[40]     Excludes deeds in lieu of foreclosure

13

Attachment A, page 14

# APPENDIX

**Appendix A**

## AFFIANT AND NOTARY NARRATIVES

The affiant and notary narratives in this appendix detail the volumes of documents signed or notarized by selected affiants and notaries.  We selected six examples of the affiant and notary narratives to include in this memorandum from the 34 employees to whom DOJ served CIDs.[41] As stated in the body of the memorandum, the data Bank of America provided accounted for only approximately one-third of its FHA foreclosures.  Therefore, we have no assurance that the figures presented in the narratives were complete and reliable.

The narratives also include excerpts from relevant testimony from CID proceedings conducted by DOJ and excerpts from personnel records provided by Bank of America.  In response to our December 2, 2010, subpoena, Bank of America submitted partial personnel documentation instead of providing complete personnel records as required.  As a result, it was not possible to know whether Bank of America omitted information relevant to our review.  However, the excerpts demonstrated that document volumes increased during the review period and Bank of America evaluated employee performance based at least in part on whether employees met predetermined metrics for processing foreclosure documents.  The primary purpose of the narratives was to assist DOJ in preparing for CID proceedings.

---

[41]   Two employees who served as both an affiant and notary, two employees who were affiants, and two employees who were notaries

# Manager 1 – Affiant and Notary

Manager 1 signed 12 foreclosure documents for 8 of our 118 sample loans, 2 of which were potentially presented as evidence in judicial State court proceedings.

*Affiant Statistics*
According to Bank of America's shipping logs, manager 1 signed 46,936 and notarized 45 foreclosure documents during the 2-year review period.

| Manager 1 signatures by month | | | |
|---|---|---|---|
| **Month** | **Documents** | **Month** | **Documents** |
| Oct 2008 | 449 | Oct 2009 | 3,203 |
| Nov 2008 | 148 | Nov 2009 | 111 |
| Dec 2008 | 673 | Dec 2009 | 8 |
| Jan 2009 | 1,136 | Jan 2010 | 1,681 |
| Feb 2009 | 1,104 | Feb 2010 | 3,911 |
| Mar 2009 | 1,187 | Mar 2010 | 5,486 |
| Apr 2009 | 1,765 | Apr 2010 | 6,098 |
| May 2009 | 499 | May 2010 | 2,903 |
| Jun 2009 | 979 | Jun 2010 | 1,812 |
| Jul 2009 | 664 | Jul 2010 | 2,652 |
| Aug 2009 | 1,760 | Aug 2010 | 6,213 |
| Sep 2009 | 1,269 | Sep 2010 | 1,225 |
| **Total documents signed** | | | **46,936** |



15

Manager 1 routinely signed foreclosure documents, including affidavits, certifying that she had personal knowledge of the facts when she did not.  She consistently failed to verify the accuracy of the foreclosure documents she signed.

*CID Testimony*

Manager 1 testified that Bank of America's process did not require her to verify the information in foreclosure documents before signing.  She agreed that the standard industry practice was to execute affidavits without reading documents.  She did not specifically recall reading documents.  She also agreed that it was industry practice to have documents notarized outside the presence of the signer.  In her testimony, manager 1 responded that her direct supervisor, a vice president, was aware and approved of the industry standard being followed.  She assumed her supervisor's boss would have approved and been aware of the same.

When asked about a paragraph manager 1 signed stating that she had personal knowledge, manager 1 said that she "didn't read the document to read personal knowledge.  Again, the process was just to sign the document."  When asked if she did anything to verify an amount that was due and owing, manager 1 responded, "No.  The process at the time was just to sign the document."  Manager 1 gave similar answers throughout her testimony.  She was also a notary and testified that she did not typically witness signatures.

*Personnel File Excerpt*

Manager 1's supervisor (manager 3) discussed goals, metrics, and a reengineered document execution process in her 2010 performance review:

- Your group "now has clear goals and metrics by which to evaluate performance.  There exists an opportunity to address poor performance issues more rapidly."
- "You have completed the re-engineering of the document execution proicess [*sic*].  This was a significant initiative you formulated that has enabled your group to rapidly scale up to match increasing volumes as well as improve turnaround time and communication."

16

Attachment A, page 17

# Manager 2– Affiant and Notary

Manager 2 signed foreclosure documents for 4 of our 118 sample loans, 1 of which was potentially presented as evidence in a judicial State court proceeding.  Manager 2 also notarized one judicial State foreclosure document.

*Affiant Statistics*
According to Bank of America's shipping logs, manager 2 signed 67,908 and notarized 1,390 foreclosure documents during the 2-year review period.  Bank of America's records indicated that manager 2 notarized her own signature on two documents.

| Manager 2 signatures by month | | | | | |
|---|---|---|---|---|---|
| **Month** | **Count** | **Month** | **Count** | **Month** | **Count** |
| Oct 2008 | 2,070 | Jun 2009 | 3,471 | Feb 2010 | 178 |
| Nov 2008 | 590 | Jul 2009 | 3,411 | Mar 2010 | 552 |
| Dec 2008 | 830 | Aug 2009 | 3,796 | Apr 2010 | 3,345 |
| Jan 2009 | 1,303 | Sep 2009 | 652 | May 2010 | 5,482 |
| Feb 2009 | 3,217 | Oct 2009 | 1,068 | Jun 2010 | 7,443 |
| Mar 2009 | 4,267 | Nov 2009 | 324 | Jul 2010 | 8,884 |
| Apr 2009 | 5,115 | Dec 2009 | 5 | Aug 2010 | 8,753 |
| May 2009 | 2,155 | Jan 2010 | 27 | Sep 2010 | 970 |
| **Total documents signed** | | | | | **67,908** |



17

Manager 2 routinely signed foreclosure documents, including affidavits, certifying that she had personal knowledge of the facts when she did not. She consistently failed to verify the accuracy of the foreclosure documents she signed. Manager 2 also routinely notarized documents without witnessing affiant signatures and failed to keep required records of the documents she notarized.

*CID Testimony*

Manager 2 acknowledged that she did not have personal knowledge when she signed foreclosure documents. Further, she would not typically have additional case-related documents available to her when she signed affidavits, but the information was available in Bank of America's computer system. However, she acknowledged that she did not routinely inform herself by looking at the computer system.

Manager 2 testified that she would read the first paragraph of the document before locating the "sign here" sticky directing her attention to the particular place she would need to sign. She estimated that she spent approximately 1½ to 2 hours per day signing documents and spent 2 to 3 minutes on each document. Notaries were not present when manager 2 signed documents, and other signers in her group did not make a habit of signing with notaries present. Further, as a notary, she did not typically witness the signing of documents and referred to Bank of America's shipping log as an electronic notary log.

*Personnel File Excerpt*

In her 2009 performance review, manager 2 and her supervisor (manager 1) discussed volume increases and departmental growth:

- "Your team continues to grow through this time of unprecedented volume."
- "When assumed the group late in 2006 had no idea, like others, volume would result with a dramatic increase. Due to the volume group has evolved from 15-20 associates to 30+ and continues to grow."
- "In order to assist the huge increase in the document request volume, contractors were hired July-August to assist with the prepping of documents…By 3rd quarter, document request volume exceeded expectations due to high foreclosure referral volume. To address increased volume, in addition to the four above new associates and [*sic*] additional eight associates were hired."

18

# Manager 3 – Affiant

Manager 3 signed 7 foreclosure documents for 6 of our 118 sample loans, 1 of which was potentially presented as evidence in a judicial State court proceeding.

*Affiant Statistics*
According to Bank of America's shipping logs, manager 3 signed 36,885 foreclosure documents during the 2-year review period.

| Manager 3 signatures by month | | | |
|---|---|---|---|
| **Month** | **Documents** | **Month** | **Documents** |
| Oct 2008 | 0 | Oct 2009 | 2,976 |
| Nov 2008 | 0 | Nov 2009 | 128 |
| Dec 2008 | 0 | Dec 2009 | 9 |
| Jan 2009 | 1 | Jan 2010 | 1,090 |
| Feb 2009 | 0 | Feb 2010 | 3,835 |
| Mar 2009 | 1 | Mar 2010 | 4,380 |
| Apr 2009 | 0 | Apr 2010 | 2,294 |
| May 2009 | 56 | May 2010 | 696 |
| Jun 2009 | 2,880 | Jun 2010 | 997 |
| Jul 2009 | 7,938 | Jul 2010 | 2 |
| Aug 2009 | 6,456 | Aug 2010 | 2 |
| Sep 2009 | 3,144 | Sep 2010 | 0 |
| **Total documents signed** | | | **36,885** |



19

Manager 3 routinely signed foreclosure documents, including affidavits, certifying that she had personal knowledge of the facts when she did not. She consistently failed to verify the accuracy of the foreclosure documents she signed.

*CID Testimony*

Manager 3 testified that documents were checked before they came to her for signature. However, she acknowledged that she did not verify information or undertake a review of a specific loan file to give herself "firsthand knowledge of the business records with respect to an actual loan before signing a document." She stated that she looked at the document, looked at the investor, and signed it. While manager 3 stated that sometimes notaries watched as she signed documents, she acknowledged that generally they did not watch her sign the documents.

Manager 3 explained that as a vice president, she managed four groups: foreclosure group, quality control group, reporting group, and document execution group. These groups were managed by three vice presidents and an assistant vice president. For the quality control group, manager 3 did not recall any written quality control policies or procedures, and she did not participate in the creation of policies. She acknowledged an increase in document volume and an expansion of the document execution group because of the increase. She knew that there were a number of affiants who were not assigned to the document execution group who signed foreclosure-related legal documents. According to her, the preparation process simply involved a stamp being placed on a particular document with a sticky identifying the page to be signed.

Manager 3 also testified that recruiting new affiants was an ongoing process and that managers made recommendations for them. She was not familiar with the process for the review team in India. In addition, she acknowledged that she understood that courts relied on documents that she signed in deciding foreclosure cases.

20

# Manager 4 – Affiant

Manager 4 signed foreclosure documents for 13 of our 118 sample loans, 5 of which were potentially presented as evidence in judicial State court proceedings.

*Affiant Statistics*

According to Bank of America's shipping logs, manager 4 signed 42,926 foreclosure documents during the 2-year review period.

| Manager 4 signatures by month | | | | | |
|---|---|---|---|---|---|
| **Month** | **Count** | **Month** | **Count** | **Month** | **Count** |
| Oct 2008 | 1,330 | Apr 2009 | 2,533 | Oct 2009 | 3,380 |
| Nov 2008 | 788 | May 2009 | 4,477 | Nov 2009 | 147 |
| Dec 2008 | 2,052 | Jun 2009 | 3,927 | Dec 2009 | 220 |
| Jan 2009 | 3,059 | Jul 2009 | 2,077 | Jan 2010 | 3,179 |
| Feb 2009 | 2,031 | Aug 2009 | 5,439 | Feb 2010 | 1,156 |
| Mar 2009 | 3,683 | Sep 2009 | 3,424 | Mar 2010 | 24 |
| **Total documents signed** | | | | | **42,926** |



21

Manager 4 routinely signed foreclosure documents, including affidavits, certifying that she had personal knowledge of the facts when she did not.  She consistently failed to verify the accuracy of the foreclosure documents she signed.

*CID Testimony*

When asked how she went about gaining an understanding of what she was supposed to do with documents that were brought to her, manager 4 testified, "I don't recall if anybody – if my supervisor spoke to me about it, I mean, you know, you just see it.  You just, you know."  Her standard process in signing documents was to scan the document, ensure that her name was listed, and then sign it.  Manager 4 estimated that she would execute 100 documents per day in ½ hour or less.  She stated that notaries were not present when she executed documents.  Manager 4 stated that she understood that the documents were verified before she signed them, but she did not recall how she gained that understanding.

22

# Notary 1

Notary 1 notarized 7 foreclosure documents for 6 of our 118 sample loans, 3 of which were potentially presented as evidence in judicial State court proceedings.  Notary 1 notarized the highest volume of documents during the 2-year review period.

*Notary Statistics*
According to Bank of America's shipping logs, notary 1 notarized 77,447 foreclosure documents, containing 94,167 signatures, during the 2-year review period.

| Documents notary 1 notarized | | | | | Signatures notary 1 notarized | | | |
|---|---|---|---|---|---|---|---|---|
| Month | Documents | Month | Documents | | Month | Signatures | Month | Signatures |
| Oct 2008 | 3,687 | Oct 2009 | 267 | | Oct 2008 | 4,493 | Oct 2009 | 419 |
| Nov 2008 | 3,370 | Nov 2009 | 0 | | Nov 2008 | 4,021 | Nov 2009 | 0 |
| Dec 2008 | 4,653 | Dec 2009 | 4 | | Dec 2008 | 5,817 | Dec 2009 | 4 |
| Jan 2009 | 5,266 | Jan 2010 | 294 | | Jan 2009 | 6,302 | Jan 2010 | 444 |
| Feb 2009 | 6,769 | Feb 2010 | 1,049 | | Feb 2009 | 8,535 | Feb 2010 | 1,160 |
| Mar 2009 | 9,760 | Mar 2010 | 2,728 | | Mar 2009 | 11,880 | Mar 2010 | 3,252 |
| Apr 2009 | 6,948 | Apr 2010 | 3,584 | | Apr 2009 | 9,273 | Apr 2010 | 3,885 |
| May 2009 | 5,355 | May 2010 | 111 | | May 2009 | 7,016 | May 2010 | 120 |
| Jun 2009 | 2,807 | Jun 2010 | 1,273 | | Jun 2009 | 3,493 | Jun 2010 | 1,430 |
| Jul 2009 | 3,761 | Jul 2010 | 2,960 | | Jul 2009 | 4,917 | Jul 2010 | 3,382 |
| Aug 2009 | 1,188 | Aug 2010 | 8,244 | | Aug 2009 | 1,448 | Aug 2010 | 9,031 |
| Sep 2009 | 616 | Sep 2010 | 2,753 | | Sep 2009 | 865 | Sep 2010 | 2,980 |
| Total documents notarized | | | 77,447 | | Total signatures notarized | | | 94,167 |



23

Notary 1 routinely notarized documents without witnessing affiant signatures and failed to keep required records of the documents she notarized.

*CID Testimony*

Notary 1 testified that she did not maintain a notary log book, but Bank of America had an Excel spreadsheet.  She explained that she knew she was required to keep a log as an individual but as an employee of the bank, she did not feel it was her responsibility.  Notary 1 also did not witness signatures or swear an oath for affiants.  She also testified that she observed affiants signing documents without reading them.

Notary 1 testified that when she began her employment, her department processed 60 to 200 documents per day.  It increased to 10,000 to 20,000 documents sitting in an in-box.  She stated that employees wondered how they were going to process them.  According to notary 1, half of the documents were duplicates, and they had a 24- to 48-hour turnaround timeframe, which notary 1 believed was unreasonable.  Notary 1 stated that employees tried to relay the unreasonableness of the turnaround time to team leaders and supervisors but were told to continue with what they were doing.

Notary 1 also testified that she and others thought they should be notarizing documents in front of the affiant.  When she raised this issue, she was told that it was acceptable not to be in the presence of an affiant when notarizing a document if the notary knew the affiant and his or her signature.  Further, she was told by management to stop checking the details on documents such as assignments, deeds, and affidavits.

*Review of Personnel File Excerpts*

Although managers represented that Bank of America had no quota system, it appeared that employees were evaluated based on production.  For example, in her 2009 evaluation, notary 1's manager made the following comment:  "continues to meet the deadlines and complying with the requirements of the attorneys.  She meets the production standards set by the Document Execution Group."  In addition, notary 1 commented that she had "always been able to meet or exceed required stats and deadlines," and her manager commented on notary 1's understanding the need to meet the set timelines.

# Notary 2

Notary 2 notarized foreclosure documents for 3 of our 118 sample loans, 2 of which were potentially presented as evidence in judicial State court proceedings.

*Notary Statistics*

According to Bank of America's shipping logs, notary 2 notarized 27,585 foreclosure documents, containing 31,236 signatures, during the 2-year review period.

| Documents notary 2 notarized | | | | | Signatures notary 2 notarized | | | |
|---|---|---|---|---|---|---|---|---|
| Month | Documents | Month | Documents | | Month | Signatures | Month | Signatures |
| Oct 2008 | 1,356 | Oct 2009 | 502 | | Oct 2008 | 1,372 | Oct 2009 | 507 |
| Nov 2008 | 691 | Nov 2009 | 145 | | Nov 2008 | 715 | Nov 2009 | 145 |
| Dec 2008 | 1,635 | Dec 2009 | | | Dec 2008 | 1,666 | Dec 2009 | 0 |
| Jan 2009 | 1,272 | Jan 2010 | 26 | | Jan 2009 | 1,288 | Jan 2010 | 30 |
| Feb 2009 | 1,215 | Feb 2010 | 213 | | Feb 2009 | 1,268 | Feb 2010 | 229 |
| Mar 2009 | 1,152 | Mar 2010 | 211 | | Mar 2009 | 1,180 | Mar 2010 | 217 |
| Apr 2009 | 2,182 | Apr 2010 | 457 | | Apr 2009 | 2,253 | Apr 2010 | 457 |
| May 2009 | 2,299 | May 2010 | 305 | | May 2009 | 2,814 | May 2010 | 305 |
| Jun 2009 | 3,278 | Jun 2010 | 902 | | Jun 2009 | 3,763 | Jun 2010 | 907 |
| July 2009 | 4,268 | July 2010 | 16 | | July 2009 | 5,299 | Jul 2010 | 16 |
| Aug 2009 | 4,514 | Aug 2010 | 0 | | Aug 2009 | 5,617 | Aug 2010 | 0 |
| Sep 2009 | 946 | Sep 2010 | 0 | | Sep 2009 | 1,188 | Sep 2010 | 0 |
| **Total documents notarized** | | | **27,585** | | **Total signatures notarized** | | | **31,236** |



25

Notary 2 routinely notarized documents without witnessing affiant signatures and failed to keep required records of the documents he notarized.

*CID Testimony*
Notary 2 testified that generally he was not present when affiants signed documents and he did not maintain a notary log book.  He stated that this was the normal practice at Countrywide and Bank of America.  In cases of rush documents (approximately 1 percent of the documents), he would witness signatures.  Notary 2 testified that supervisors were aware of his and other notaries' practice of not witnessing affiants signing documents.  Productivity was monitored by the team managers, and they would periodically change the performance metrics.

According to notary 2, Countrywide's instructions on how to notarize documents was nothing more than where to place the notary stamp and sign the document.  He received no other notary training, written materials, or oral instructions.  When he became a Bank of America employee, his process did not change.  To his recollection, Bank of America did not perform an operational review of his area when it acquired Countrywide.

26

Prepared by: D. ROBERSON

LOAN #:  6307

# NOTE

MAY 05, 2003    MIAMI       FLORIDA
[Date]       [City]         [State]

15351 SW 87 COURT, MIAMI, FL 33157-2065
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $  360,000.00   (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is
AMERICA'S WHOLESALE LENDER
I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of  7.000  %.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

(A) Time and Place of Payments
I will pay principal and interest by making a payment every month.
I will make my monthly payment on the  FIRST       day of each month beginning on
JUNE 01, 2003     . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on MAY 01, 2033        , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."
I will make my monthly payments at
P.O. Box 660694, Dallas, TX 75266-0694
or at a different place if required by the Note Holder.

(B) Amount of Monthly Payments
My monthly payment will be in the amount of U.S. $ 2,395.09

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A prepayment of all of the unpaid principal is known as a "Full Prepayment." A prepayment of only part of the unpaid principal is known as a "Partial Prepayment."

Except as provided below, I may make a Full prepayment or a Partial Prepayment without paying any penalty. If I make a Partial Prepayment equal to one or more of my monthly payments, my due date may be advanced no more than one month. If I make any other Partial Prepayment, I must still make each later payment as it becomes due and in the same amount. I may make a Full or a Partial Prepayment at any time. However,

☐ I may prepay this Note in full at any time without penalty.
☒ If within the first THIRTY SIX       months after the execution of the Note, I make any prepayment(s) within any 12-month period, the total of which exceeds 20 percent (20%) of the original Principal amount of this loan, I will pay a prepayment penalty in an amount equal to the payment of six (6) months' advance interest on the amount by which the total of my prepayment(s) within that 12-month period exceeds 20 percent (20%) of the original Principal amount of the loan.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a Partial Prepayment.





Initials: [initials]

● FLORIDA FIXED RATE NOTE - Nonconforming
2D8621FL    (10/02)      Page 1 of 3





DEFENDANT'S
EXHIBIT NO.
FOR IDENTIFICATION
DATE:  7/12/17   RPTR: TS





Attachment B, page 1

LOAN #: ██████6307

**6. BORROWER'S FAILURE TO PAY AS REQUIRED**

(A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of  FIFTEEN       calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be   5.000   % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

(B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**7. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10. APPLICABLE LAW**

I agree that this agreement is to be governed by federal law and, to the extent not preempted by federal law, by the laws of the state where the real property is located. If a law, which applies to this loan and sets maximum loan charges is finally interpreted so that the interest and other charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such interest or other charge shall be reduced by the amount necessary to reduce the interest or other charge to the permitted limit; and (b) any sums already collected from me which exceed permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a Partial Prepayment, but in no event will a prepayment charge be assessed if the Note Holder chooses to reduce my Principal balance by applying such excess amounts.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

● BC - FLORIDA FIXED RATE NOTE
2D8622FL  (10/02)                                        Page 2 of 3                          Initials:

Attachment B, page 2

LOAN #: ████6307

## 12. DOCUMENTARY TAX

The state documentary tax due on this Note has been paid on the mortgage securing this indebtedness.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
DANIEL SHAPIRO                                                        -Borrower

_____ (Seal)
RITA IRENE SHAPIRO                                                 -Borrower

_____ (Seal)
                                                                              -Borrower

_____ (Seal)
                                                                              -Borrower

*[Sign Original Only]*

● BC - FLORIDA FIXED RATE NOTE
2D6623FL  (10/02)                          Page 3 of 3

# Allonge to Deed of Trust/Mortgage Note

Loan Number: ███████005N

Allonge to one certain Deed of Trust/Mortgage Note Date:

**5/05/2003**

Executed By: Daniel Shapiro & Rita Irene Shapiro

Original Amount: $ **360,000.00**

Property Address:
15351 SE 87 Court    Miami, FL  33157-2065

Pay to the Order of:

Without Recourse:
Countrywlde Home Loans, Inc. Doing Business as America's
Wholesale Lender

By: Virginia L. Hartley
      Vice President

6307  ALL 001   001

```
                                    Session A
DOC401R                                        2/13/17
                        Document Summary                        10:16:55
   Account      6307 LLN#                       Orig Division   Wholesale
   DANIEL SHAPIRO                               Investor Type   PRIVATE
   RITA IRENE SHAPIRO              County 086   CMT/PL# PI          7386
   15351 SW 87 COURT              State   10    Pool Issue Dt  6/01/03
   MIAMI, FL  33157                             Branch/Src    0000790 11139
   Coll Custodian   115 BONY MELLON TRUST COMPANY, NA   Ln typ/sb cls  6 0
   PresentTD Cust  1644 NATIONSTAR MORTGAGE, LLC   Orig Date      5/01/03
   Servicer    NMLL NATIONSTAR MORTGAGE, LLC     Close Cd    06 12/13/13
   FHA/VA/PMI #                                  Phase Cd   9  Warn Cd  05
   Title/Order #         8554                    PMI Cd        Lock Cd  00

        Doc Requird Satisfd  Rcvd     Inst    Corr Acp  Asg   Assignor/Assignee
        Type Inv Srv Inv Srv Date     Type    Defi Ins  No.   /Endorsement type
        D1   Y   N   Y      01/07/04 Original       P
        D2   Y   N   Y      01/07/04 OrigRec        P
        D8   Y   N   Y      03/02/12 Photocpy       P    1    Mortgage El THE BANK O
        324  N   N          12/18/13 Original
        ALL  N   N          06/25/13 OrigUnrc
        N    Y   N   Y      05/12/03 Indorsed       LNV

   F2=Nav F3=Main F4=List F5=ExtFld F6=AddDoc F7=SRVLoan F8=BAC F9=Update F12=Exit
```



DEFENDANT'S
EXHIBIT NO. 16
FOR IDENTIFICATION
DATE: 7/12/17   RPTR: TS

Attachment B, page 5

DOC Case 1:15-cv-24585-UU Document 22-2 Entered on FLSD Docket 08/02/2017 Page 42 of 97

**Account**     ████ 6307  DANIEL SHAPIRO . . . . . . . . . . . . . . . .     Mtg Date  **5/05/03**
**Doc Type** <u>N</u>      NOTE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

INV    Req'd **Y**  Satisfd **Y**  Acpt **LNV**    Responsibility:
Recon  Req'd **N**  Satisfd      Acpt              Override: ___ Level: _
FCL    Req'd **N**  Satisfd      Acpt
\# Instances Received: **4**                              <u>Latest Recording</u>
Current Instance: **Indorsed Original Note**             Date
Received Date    **5/12/03**   INV    Qualified **Y**    Doc
No. of Pages                  Recon  Qualified **N/A**   Book
                              FCL    Qualified **N/A**   Page
Outstanding Corrections/Deficiencies                    No. of Pages:


Comments


**F2=Nav   F3=Main   F4=List   F7=ExtFld   F8=Add Cmt   F9=Upd   F11=Dlt Doc   F12=Exit**

```
                                Session A
DOC444R                                  2/07/17
                       Routing History                        09:02:01

    Account No  :   ████6307     DANIEL SHAPIRO
    File (F4)   :
    Document(F4):
    Instance(F4):     Type:        Status:        Received:
                                                            --Receipt--
    Type   Date/Tm/  Destination/Source/    User/Reason/ Trans.#  STS   Date
           Trk Date  Trk#                   Carrier
    ALL    001-OrigUnrc
    UPD    06/25/13  CF@DMS-Release/Reinstat              0
    CF     001-CollFile
    XRCV   05/17/03  RECON TRUST COMPANY, N.              0
    XSND   05/19/03  BONY MELLON TRUST COMPA              0   I  05/29/03
    XRCV   05/19/03  BONY MELLON TRUST COMPA              0
    RCV    06/25/12  DMS-Release/Reinstateme  004143729
    SND    06/25/12  SOURCECORP               004144738   E  06/26/12
    RCV    06/26/12  DMS-Release/Reinstateme  004145717
                                                              More...

D=Trans Detail  X=Select
F2=Navigate  F3=MainMenu  F4=List  F7=Fold/Drop          F12=Exit

DOC444R                                  2/07/17
                       Routing History                        09:02:01

    Account No  :   ████6307     DANIEL SHAPIRO
    File (F4)   :
    Document(F4):
    Instance(F4):     Type:        Status:        Received:
                                                            --Receipt--
    Type   Date/Tm/  Destination/Source/    User/Reason/ Trans.#  STS   Date
           Trk Date  Trk#
    SND    06/26/12  BROCK & SCOTT PLLC       004145917   E  11/28/12
    RCV    11/28/12  DMS-Release/Reinstateme  004403321
    SND    11/28/12  SOURCECORP SIMI          004403325   E  11/30/12
    RCV    11/30/12  DMS-Release/Reinstateme  004407690
    SND    11/30/12  R/R Hold Area SIMI       004407693   E  04/03/13
    RCV    04/03/13  DMS-Release/Reinstateme  004652301
    SND    04/03/13  SOURCECORP CARSON        004652308   E  04/04/13
    RCV    04/13/13  DMS-Release/Reinstateme  004654778
    SND    04/04/13  PCCS-Corrections/Defici  004654794   E  04/19/13
                                                              More...

D=Trans Detail  X=Select
F2=Navigate  F3=MainMenu  F4=List  F7=Fold/Drop          F12=Exit

DOC444R                                  2/07/17
                       Routing History                        09:02:01

    Account No  :   ████6307     DANIEL SHAPIRO
    File (F4)   :
    Document(F4):
    Instance(F4):     Type:        Status:        Received:
                                                            --Receipt--
    Type   Date/Tm/  Destination/Source/    User/Reason/ Trans.#  STS   Date
           Trk Date  Trk#
    RCV    04/19/13  MAILROOM - SIMI          004691021
    RCV    04/26/13  DMS-Release/Reinstateme  004708353
    SND    05/07/13  SOURCECORP SIMI          004732693   E  05/10/13
    RCV    05/10/13  DMS-Release/Reinstateme  004740729
    SND    05/10/13  INVESTOR PROCUREMENT -   004742094   E  06/24/13
                               Page 1
```

Attachment B, page 7

```
                              Session A
    RCV  06/24/13   MAILROOM - SIMI              004844494
    SND  06/24/13   DMS-Release/Reinstateme      004843880    E  06/25/13
    RCV  06/25/13   DMS-Release/Reinstateme      004849324
    SND  06/25/13   SOURCECORP SIMI              004849408    E  06/27/13
                                                                        More...


D=Trans Detail  X=Select
F2=Navigate  F3=MainMenu  F4=List  F7=Fold/Drop              F12=Exit


  DOC444R                                     2/07/17
                          Routing History                   09:02:01


     Account No  :     6307      DANIEL SHAPIRO
     File (F4)   :
     Document(F4):
     Instance(F4):      Type:         Status:        Received:
                                                                 --Receipt--
    Type  Date/Tm/   Destination/Source/     User/Reason/ Trans.#  STS   Date
          Trk Date   Trk#
    RCV  06/27/13   DMS-Release/Reinstateme      004854857
    SND  06/27/13   R/R Hold Area SIMI           004856756    E  07/10/13
    RCV  07/10/13   DMS-Release/Reinstateme      004884816    UNROUTED
    UPD  07/10/13   R/R Hold Area SIMI                    0
    RCV  07/10/13   DMS-Release/Reinstateme      004884521
    SND  07/10/13   BONY MELLON TRUST COMPA      004885381    E  11/22/13
    RCV  11/22/13   MAILROOM - SIMI              005199589
    SND  11/22/13   DMS-Release/Reinstateme      005199597    E  11/25/13
    RCV  11/25/13   DMS-Release/Reinstateme      005203348
                                                                        More...


D=Trans Detail  X=Select
F2=Navigate  F3=MainMenu  F4=List  F7=Fold/Drop              F12=Exit


  DOC444R                                     2/07/17
                          Routing History                   09:02:01


     Account No  :     6307      DANIEL SHAPIRO
     File (F4)   :
     Document(F4):
     Instance(F4):      Type:         Status:        Received:
                                                                 --Receipt--
    Type  Date/Tm/   Destination/Source/     User/Reason/ Trans.#  STS   Date
          Trk Date   Trk#
    SND  11/25/13   BAC IMAGING IN-HOUSE SI      005203350    E  11/25/13
    RCV  11/25/13   BAC IMAGING IN-HOUSE SI      005204141
    SND  11/26/13   DMS-Release/Reinstateme      005205594    E  11/26/13
    RCV  11/26/13   DMS-Release/Reinstateme      005205427
    SND  11/26/13   BROCK & SCOTT PLLC           005206063    I  12/11/13
    D1     001-Original
    SND  01/07/04   DMS Document Audit           001677942    I  01/08/04
    SND  01/09/04   BONY MELLON TRUST COMPA      001681184    I  01/26/04
    UPD  01/27/04   CF@BONY MELLON TRUST CO               0
                                                                        More...


D=Trans Detail  X=Select
F2=Navigate  F3=MainMenu  F4=List  F7=Fold/Drop              F12=Exit


  DOC444R                                     2/07/17
                          Routing History                   09:02:01


     Account No  :     6307      DANIEL SHAPIRO
     File (F4)   :
     Document(F4):
                              Page 2
```

```
                              Session A
Instance(F4):       Type:        Status:       Received:
                                                            --Receipt--
Type  Date/Tm/  Destination/Source/   User/Reason/ Trans.#  STS   Date
      Trk Date  Trk#
UPD   11/28/12  UNKNOWN                            0
D1     002-Photocpy
UPD   07/10/13  CF@DMS-Release/Reinstat            0
D2     001-OrigRec
SND   01/07/04  DMS Document Audit        001677942   I  01/08/04
SND   01/09/04  BONY MELLON TRUST COMPA   001681184   I  01/26/04
UPD   01/27/04  CF@BONY MELLON TRUST CO            0
UPD   11/28/12  UNKNOWN                            0
D2     002-Photocpy
                                                      More...


D=Trans Detail  X=Select
F2=Navigate  F3=MainMenu  F4=List  F7=Fold/Drop           F12=Exit

  DOC444R                            2/07/17
                    Routing History                   09:02:01

    Account No  :    ███6307    DANIEL SHAPIRO
    File (F4)   :
    Document(F4):
    Instance(F4):       Type:        Status:       Received:
                                                            --Receipt--
    Type  Date/Tm/  Destination/Source/  User/Reason/ Trans.#  STS  Date
          Trk Date  Trk#
    UPD   07/10/13  CF@DMS-Release/Reinstat            0
    D8     001-OrigUnrc  Asgn# 001 From Mortgage Electr To THE BANK OF NEW
    SND   02/24/12  CORE LOGIC              003981593   I  03/02/12
    D8     002-Photocpy  Asgn# 001 From Mortgage Electr To THE BANK OF NEW
    SND   03/02/12  SOURCECORP              003989833   E  04/02/12
    RCV   04/02/12  Doc Processing - Fort W 004029510
    SND   04/02/12  BONY MELLON TRUST COMPA 004029511   I  04/16/12
    SND   04/09/12  BONY MELLON TRUST COMPA 004037974   X
    UPD   04/17/12  CF@BONY MELLON TRUST CO            0
                                                      More...


  D=Trans Detail  X=Select
  F2=Navigate  F3=MainMenu  F4=List  F7=Fold/Drop           F12=Exit

  DOC444R                            2/07/17
                    Routing History                   09:02:01

    Account No  :    ███6307    DANIEL SHAPIRO
    File (F4)   :
    Document(F4):
    Instance(F4):       Type:        Status:       Received:
                                                            --Receipt--
    Type  Date/Tm/  Destination/Source/  User/Reason/ Trans.#  STS  Date
          Trk Date  Trk#
    UPD   06/25/12  UNKNOWN                            0
    N      002-Photocpy
    SND   02/15/12  SOURCECORP              003971924   X
    SND   03/07/12  RECALL- (FMS DESTRUCTIO 003995257   I  03/21/12
    N      003-Indorsed
    UPD   06/25/12  UNKNOWN                            0
    N      004-LNAVoid
    UPD   06/25/12  CF@DMS-Release/Reinstat            0
    UPD   11/30/12  UNKNOWN                            0
                                                      More...


                            Page 3
```

```
                              Session A
D=Trans Detail  X=Select
F2=Navigate  F3=MainMenu  F4=List  F7=Fold/Drop              F12=Exit

  DOC444R                                  2/07/17
                        Routing History                   09:02:01

     Account No  : ████6307    DANIEL SHAPIRO
     File (F4)   :
     Document(F4):
     Instance(F4):       Type:       Status:       Received:
                                                              --Receipt--
     Type  Date/Tm/  Destination/Source/    User/Reason/ Trans.#  STS   Date
           Trk Date  Trk#
     UPD   04/03/13  CF@DMS-Release/Reinstat            0
     UPD   05/07/13  UNKNOWN                            0
     SND   02/10/14  PENDING DESTRUCTION       005352034   I  02/12/14
     SND   04/23/14  PENDING DESTRUCTION       005489243   E  04/23/14
     RCV   04/23/14  PENDING DESTRUCTION       005489472
     SND   01/12/15  BAC IMAGING IN-HOUSE SI   005882421   E  01/12/15
     RCV   01/12/15  BAC IMAGING IN-HOUSE SI   005883915
     SND   01/13/15  PENDING DESTRUCTION       005884649   E  01/14/15
     RCV   01/14/15  PENDING DESTRUCTION       005886563
                                                            More...


D=Trans Detail  X=Select
F2=Navigate  F3=MainMenu  F4=List  F7=Fold/Drop              F12=Exit

  DOC444R                                  2/07/17
                        Routing History                   09:02:01

     Account No  : ████6307    DANIEL SHAPIRO
     File (F4)   :
     Document(F4):
     Instance(F4):       Type:       Status:       Received:
                                                              --Receipt--
     Type  Date/Tm/  Destination/Source/    User/Reason/ Trans.#  STS   Date
           Trk Date  Trk#
     SND   01/21/15  RECALL- (FMS DESTRUCTIO   005895280   X
     UPD   01/21/15  UNKNOWN                            0
     324   001-Original
     SND   12/18/13  DMS-Release/Reinstateme   005250277   E  12/27/13
     RCV   12/27/13  DMS-Release/Reinstateme   005265787
     SND   12/27/13  BAC IMAGING IN-HOUSE FT   005265788   E  12/30/13
     RCV   12/30/13  BAC IMAGING IN-HOUSE FT   005267736
     SND   12/30/13  DMS-Release/Reinstateme   005269235   E  12/31/13
     RCV   12/31/13  DMS-Release/Reinstateme   005270812
                                                            More...


D=Trans Detail  X=Select
F2=Navigate  F3=MainMenu  F4=List  F7=Fold/Drop              F12=Exit

  DOC444R                                  2/07/17
                        Routing History                   09:02:01

     Account No  : ████6307    DANIEL SHAPIRO
     File (F4)   :
     Document(F4):
     Instance(F4):       Type:       Status:       Received:
                                                              --Receipt--
     Type  Date/Tm/  Destination/Source/    User/Reason/ Trans.#  STS   Date
           Trk Date  Trk#
     SND   01/10/14  RECALL-(FMS DOCUMENT ST   005291815   I  01/16/14

                              Page 4
```

Attachment B, page 10

Session A

Bottom

```
D=Trans Detail  X=Select
F2=Navigate  F3=MainMenu  F4=List  F7=Fold/Drop              F12=Exit
```

```
                                    Session A
  DOC406R                                    2/07/17
                              Instance Summary                      09:09:16
  Account        [REDACTED]6307  DANIEL SHAPIRO & RITA IRENE SHAPIRO
  Doc Type      N              NOTE

    Inst Received Instance            R Qualify  Custodian/              CUS TFR/
    No.  Date     Type     Status     I Inv  Srv Current Location        IN-TRN
    001  05/12/03 Indorsed Active        Y       CF@BONY MELLON TRUST COMP
                                                 CF@BROCK & SCOTT PLLC
    002  02/15/12 Photocpy Active        N       CF@BONY MELLON TRUST COMP   Y
                                                 RECALL- (FMS DESTRUCTION)
    003  05/30/12 Indorsed Active        Y       CF@BONY MELLON TRUST COMP
                                                 Unknown
    004  06/25/12 LNAVoid  Destroyed     Y       N/A
                                                 N/A


                                                             Bottom

  Enter "D" for Detail
  Enter "C" to select current instance

  F2=Navigate  F3=MainMenu  F4=List  F9=Update  F12=Exit
```

Page 1

Attachment B, page 12

**UNITED STATES OF AMERICA**
**DEPARTMENT OF THE TREASURY**
**COMPTROLLER OF THE CURRENCY**

|  |  |  |
|---|---|---|
| **In the Matter of:** | ) | |
| | ) | |
| Bank of America, N.A. | ) | AA-EC-11-12 |
| Charlotte, NC | ) | |
| | ) | |
| | ) | |

**CONSENT ORDER**

The Comptroller of the Currency of the United States of America ("Comptroller"), through his national bank examiners and other staff of the Office of the Comptroller of the Currency ("OCC"), as part of an interagency horizontal review of major residential mortgage servicers, has conducted an examination of the residential real estate mortgage foreclosure processes of Bank of America, N.A., Charlotte, NC ("Bank"). The OCC has identified certain deficiencies and unsafe or unsound practices in residential mortgage servicing and in the Bank's initiation and handling of foreclosure proceedings. The OCC has informed the Bank of the findings resulting from the examination.

The Bank, by and through its duly elected and acting Board of Directors ("Board"), has executed a Stipulation and Consent to the Issuance of a Consent Order, dated April 13, 2011 ("Stipulation and Consent"), that is accepted by the Comptroller. By this Stipulation and Consent, which is incorporated by reference, the Bank has consented to the issuance of this Consent Cease and Desist Order ("Order") by the Comptroller. The Bank has committed to taking all necessary and appropriate steps to remedy the deficiencies and unsafe or unsound practices identified by the OCC, and to enhance the Bank's residential mortgage servicing and

foreclosure processes.  The Bank has begun implementing procedures to remediate the practices addressed in this Order.

ARTICLE I

COMPTROLLER'S FINDINGS

The Comptroller finds, and the Bank neither admits nor denies, the following:

(1)  The Bank is among the largest servicers of residential mortgages in the United States, and services a portfolio of 13,500,000 residential mortgage loans.  During the recent housing crisis, a substantially large number of residential mortgage loans serviced by the Bank became delinquent and resulted in foreclosure actions.  The Bank's foreclosure inventory grew substantially from January 2009 through September 2010.

(2)  In connection with certain foreclosures of loans in its residential mortgage servicing portfolio, the Bank:

(a)  filed or caused to be filed in state and federal courts affidavits executed by its employees or employees of third-party service providers making various assertions, such as ownership of the mortgage note and mortgage, the amount of the principal and interest due, and the fees and expenses chargeable to the borrower, in which the affiant represented that the assertions in the affidavit were made based on personal knowledge or based on a review by the affiant of the relevant books and records, when, in many cases, they were not based on such personal knowledge or review of the relevant books and records;

(b)  filed or caused to be filed in state and federal courts, or in local land records offices, numerous affidavits or other mortgage-related documents that were not properly notarized, including those not signed or affirmed in the presence of a notary;

2

Attachment C, page 2

(c)  litigated foreclosure proceedings and initiated non-judicial foreclosure proceedings without always ensuring that either the promissory note or the mortgage document were properly endorsed or assigned and, if necessary, in the possession of the appropriate party at the appropriate time;

(d)  failed to devote sufficient financial, staffing and managerial resources to ensure proper administration of its foreclosure processes;

(e)  failed to devote to its foreclosure processes adequate oversight, internal controls, policies, and procedures, compliance risk management, internal audit, third party management, and training; and

(f)  failed to sufficiently oversee outside counsel and other third-party providers handling foreclosure-related services.

(3)  By reason of the conduct set forth above, the Bank engaged in unsafe or unsound banking practices.

Pursuant to the authority vested in him by the Federal Deposit Insurance Act, as amended, 12 U.S.C. §1818(b), the Comptroller hereby ORDERS that:

ARTICLE II

COMPLIANCE COMMITTEE

(1)  The Board shall maintain a Compliance Committee of at least three (3) directors, of which at least two (2) may not be employees or officers of the Bank or any of its subsidiaries or affiliates.  In the event of a change of the membership, the name of any new member shall be submitted to the Examiner-in-Charge for Large Bank Supervision at the Bank ("Examiner-in-Charge").  The Compliance Committee shall be responsible for monitoring and coordinating the

3

Attachment C, page 3

Bank's compliance with the provisions of this Order.  The Compliance Committee shall meet at least monthly and maintain minutes of its meetings.

(2)  Within ninety (90) days of this Order, and within thirty (30) days after the end of each quarter thereafter, the Compliance Committee shall submit a written progress report to the Board setting forth in detail actions taken to comply with each Article of this order, and the results and status of those actions.

(3)  The Board shall forward a copy of the Compliance Committee's report, with any additional comments by the Board, to the Deputy Comptroller for Large Bank Supervision ("Deputy Comptroller") and the Examiner-in-Charge within ten (10) days of receiving such report.


ARTICLE III

COMPREHENSIVE ACTION PLAN

(1)  Within sixty (60) days of this Order, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge an acceptable plan containing a complete description of the actions that are necessary and appropriate to achieve compliance with Articles IV through XII of this Order ("Action Plan").  In the event the Deputy Comptroller asks the Bank to revise the Action Plan, the Bank shall promptly make the requested revisions and resubmit the Action Plan to the Deputy Comptroller and the Examiner-in-Charge.  Following acceptance of the Action Plan by the Deputy Comptroller, the Bank shall not take any action that would constitute a significant deviation from, or material change to, the requirements of the Action Plan or this Order, unless and until the Bank has received a prior written determination of no supervisory objection from the Deputy Comptroller.

4

(2)  The Board shall ensure that the Bank achieves and thereafter maintains compliance with this Order, including, without limitation, successful implementation of the Action Plan. The Board shall further ensure that, upon implementation of the Action Plan, the Bank achieves and maintains effective mortgage servicing, foreclosure, and loss mitigation activities (as used herein, the phrase "loss mitigation" shall include, but not be limited to, activities related to special forbearances, modifications, short refinances, short sales, cash-for-keys, and deeds-in-lieu of foreclosure and be referred to as either "Loss Mitigation" or "Loss Mitigation Activities"), as well as associated risk management, compliance, quality control, audit, training, staffing, and related functions.  In order to comply with these requirements, the Board shall:

(a)  require the timely reporting by Bank management of such actions directed by the Board to be taken under this Order;

(b)  follow-up on any non-compliance with such actions in a timely and appropriate manner; and

(c)  require corrective action be taken in a timely manner for any non-compliance with such actions.

(3)  The Action Plan shall address, at a minimum:

(a)  financial resources to develop and implement an adequate infrastructure to support existing and/or future Loss Mitigation and foreclosure activities and ensure compliance with this Order;

(b)  organizational structure, managerial resources, and staffing to support existing and/or future Loss Mitigation and foreclosure activities and ensure compliance with this Order;

Attachment C, page 5

(c)  metrics to measure and ensure the adequacy of staffing levels relative to existing and/or future Loss Mitigation and foreclosure activities, such as limits for the number of loans assigned to a Loss Mitigation employee, including the single point of contact as hereinafter defined, and deadlines to review loan modification documentation, make loan modification decisions, and provide responses to borrowers;

(d)  governance and controls to ensure compliance with all applicable federal and state laws (including the U.S. Bankruptcy Code and the Servicemembers Civil Relief Act ("SCRA")), rules, regulations, and court orders and requirements, as well as the Membership Rules of MERSCORP, servicing guides of the Government Sponsored Enterprises ("GSEs") or investors, including those with the Federal Housing Administration and those required by the Home Affordable Modification Program ("HAMP"), and loss share agreements with the Federal Deposit Insurance Corporation (collectively "Legal Requirements"), and the requirements of this Order.

(4)  The Action Plan shall specify timelines for completion of each of the requirements of Articles IV through XII of this Order.  The timelines in the Action Plan shall be consistent with any deadlines set forth in this Order.

ARTICLE IV

COMPLIANCE PROGRAM

(1)  Within sixty (60) days of this Order, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge an acceptable compliance program to ensure that the mortgage servicing and foreclosure operations, including Loss Mitigation and loan modification, comply with all applicable Legal Requirements, OCC supervisory guidance, and the

6

requirements of this Order and are conducted in a safe and sound manner ("Compliance

Program").  The Compliance Program shall be implemented within one hundred twenty (120)

days of this Order.  Any corrective action timeframe in the Compliance Program that is in excess

of one hundred twenty (120) days must be approved by the Examiner-in-Charge.  The

Compliance Program shall include, at a minimum:

       (a)  appropriate written policies and procedures to conduct, oversee, and monitor

mortgage servicing, Loss Mitigation, and foreclosure operations;

       (b)  processes to ensure that all factual assertions made in pleadings, declarations,

affidavits, or other sworn statements filed by or on behalf of the Bank are accurate, complete,

and reliable; and that affidavits and declarations are based on personal knowledge or a review of

the Bank's books and records when the affidavit or declaration so states;

       (c)  processes to ensure that affidavits filed in foreclosure proceedings are

executed and notarized in accordance with state legal requirements and applicable guidelines,

including jurat requirements;

       (d)  processes to review and approve standardized affidavits and declarations for

each jurisdiction in which the Bank files foreclosure actions to ensure compliance with

applicable laws, rules and court procedures;

       (e)  processes to ensure that the Bank has properly documented ownership of the

promissory note and mortgage (or deed of trust) under applicable state law, or is otherwise a

proper party to the action (as a result of agency or other similar status) at all stages of foreclosure

and bankruptcy litigation, including appropriate transfer and delivery of endorsed notes and

assigned mortgages or deeds of trust at the formation of a residential mortgage-backed security,

and lawful and verifiable endorsement and successive assignment of the note and mortgage or deed of trust to reflect all changes of ownership;

(f)  processes to ensure that a clear and auditable trail exists for all factual information contained in each affidavit or declaration, in support of each of the charges that are listed, including whether the amount is chargeable to the borrower and/or claimable by the investor;

(g)  processes to ensure that foreclosure sales (including the calculation of the default period, the amounts due, and compliance with notice requirements) and post-sale confirmations are in accordance with the terms of the mortgage loan and applicable state and federal law requirements;

(h)  processes to ensure that all fees, expenses, and other charges imposed on the borrower are assessed in accordance with the terms of the underlying mortgage note, mortgage, or other customer authorization with respect to the imposition of fees, charges, and expenses, and in compliance with all applicable Legal Requirements and OCC supervisory guidance;

(i)  processes to ensure that the Bank has the ability to locate and secure all documents, including the original promissory notes if required, necessary to perform mortgage servicing, foreclosure and Loss Mitigation, or loan modification functions;

(j)  ongoing testing for compliance with applicable Legal Requirements and OCC supervisory guidance that is completed by qualified persons with requisite knowledge and ability (which may include internal audit) who are independent of the Bank's business lines;

(k)  measures to ensure that policies, procedures, and processes are updated on an ongoing basis as necessary to incorporate any changes in applicable Legal Requirements and OCC supervisory guidance;

8

Attachment C, page 8

(l)  processes to ensure the qualifications of current management and supervisory personnel responsible for mortgage servicing and foreclosure processes and operations, including collections, Loss Mitigation and loan modification, are appropriate and a determination of whether any staffing changes or additions are needed;

(m)  processes to ensure that staffing levels devoted to mortgage servicing and foreclosure processes and operations, including collections, Loss Mitigation, and loan modification, are adequate to meet current and expected workload demands;

(n)  processes to ensure that workloads of mortgage servicing, foreclosure and Loss Mitigation, and loan modification personnel, including single point of contact personnel as hereinafter defined, are reviewed and managed.  Such processes, at a minimum, shall assess whether the workload levels are appropriate to ensure compliance with the requirements of Article IX of this Order, and necessary adjustments to workloads shall promptly follow the completion of the reviews.  An initial review shall be completed within ninety (90) days of this Order, and subsequent reviews shall be conducted semi-annually;

(o)  processes to ensure that the risk management, quality control, audit, and compliance programs have the requisite authority and status within the organization so that appropriate reviews of the Bank's mortgage servicing, Loss Mitigation, and foreclosure activities and operations may occur and deficiencies are identified and promptly remedied;

(p)  appropriate training programs for personnel involved in mortgage servicing and foreclosure processes and operations, including collections, Loss Mitigation, and loan modification, to ensure compliance with applicable Legal Requirements and supervisory guidance; and

9

(q)  appropriate procedures for customers in bankruptcy, including a prohibition on collection of fees in violation of bankruptcy's automatic stay (11 U.S.C. § 362), the discharge injunction (11 U.S.C. § 524), or any applicable court order.

## ARTICLE V

## THIRD PARTY MANAGEMENT

(1)  Within sixty (60) days of this Order, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge acceptable policies and procedures for outsourcing foreclosure or related functions, including Loss Mitigation and loan modification, and property management functions for residential real estate acquired through or in lieu of foreclosure, to any agent, independent contractor, consulting firm, law firm (including local counsel in foreclosure or bankruptcy proceedings retained to represent the interests of the owners of mortgages), property management firm, or other third-party (including any affiliate of the Bank) ("Third-Party Providers").  Third-party management policies and procedures shall be implemented within one hundred twenty (120) days of this Order.  Any corrective action timetable that is in excess of one hundred twenty (120) days must be approved by the Examiner-in-Charge.  The policies and procedures shall include, at a minimum:

(a)  appropriate oversight to ensure that Third-Party Providers comply with all applicable Legal Requirements, OCC supervisory guidance (including applicable portions of OCC Bulletin 2001-47), and the Bank's policies and procedures;

(b)  measures to ensure that all original records transferred from the Bank to Third-Party Providers (including the originals of promissory notes and mortgage documents) remain within the custody and control of the Third-Party Provider (unless filed with the

appropriate court or the loan is otherwise transferred to another party), and are returned to the Bank or designated custodians at the conclusion of the performed service, along with all other documents necessary for the Bank's files, and that the Bank retains imaged copies of significant documents sent to Third-Party Providers;

(c)  measures to ensure the accuracy of all documents filed or otherwise utilized on behalf of the Bank or the owners of mortgages in any judicial or non-judicial foreclosure proceeding, related bankruptcy proceeding, or in other foreclosure-related litigation, including, but not limited to, documentation sufficient to establish ownership of the promissory note and/or right to foreclose at the time the foreclosure action is commenced;

(d)  processes to perform appropriate due diligence on potential and current Third-Party Provider qualifications, expertise, capacity, reputation, complaints, information security, document custody practices, business continuity, and financial viability, and to ensure adequacy of Third-Party Provider staffing levels, training, work quality, and workload balance;

(e)  processes to ensure that contracts provide for adequate oversight, including requiring Third-Party Provider adherence to Bank foreclosure processing standards, measures to enforce Third-Party Provider contractual obligations, and processes to ensure timely action with respect to Third-Party Provider performance failures;

(f)  processes to ensure periodic reviews of Third-Party Provider work for timeliness, competence, completeness, and compliance with all applicable Legal Requirements and supervisory guidance, and to ensure that foreclosures are conducted in a safe and sound manner;

(g)  processes to review customer complaints about Third-Party Provider services;

(h)  processes to prepare contingency and business continuity plans that ensure the continuing availability of critical third-party services and business continuity of the Bank, consistent with federal banking agency guidance, both to address short-term and long-term service disruptions and to ensure an orderly transition to new service providers should that become necessary;

(i)  a review of fee structures for Third-Party Providers to ensure that the method of compensation considers the accuracy, completeness, and legal compliance of foreclosure filings and is not based solely on increased foreclosure volume and/or meeting processing timelines; and

(j)  a certification process for law firms (and recertification of existing law firm providers) that provide residential mortgage foreclosure and bankruptcy services for the Bank, on a periodic basis, as qualified to serve as Third-Party Providers to the Bank including that attorneys are licensed to practice in the relevant jurisdiction and have the experience and competence necessary to perform the services requested.

## ARTICLE VI

### MORTGAGE ELECTRONIC REGISTRATION SYSTEM

(1)  Within sixty (60) days of this Order, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge an acceptable plan to ensure appropriate controls and oversight of the Bank's activities with respect to the Mortgage Electronic Registration System ("MERS") and compliance with MERSCORP's membership rules, terms, and conditions ("MERS Requirements") ("MERS Plan").  The MERS Plan shall be implemented within one hundred twenty (120) days of this Order.  Any corrective action timetable that is in excess of one

Attachment C, page 12

hundred twenty (120) days must be approved by the Examiner-in-Charge.  The MERS Plan shall include, at a minimum:

(a)  processes to ensure that all mortgage assignments and endorsements with respect to mortgage loans serviced or owned by the Bank out of MERS' name are executed only by a certifying officer authorized by MERS and approved by the Bank;

(b)  processes to ensure that all other actions that may be taken by MERS certifying officers (with respect to mortgage loans serviced or owned by the Bank) are executed by a certifying officer authorized by MERS and approved by the Bank;

(c)  processes to ensure that the Bank maintains up-to-date corporate resolutions from MERS for all Bank employees and third-parties who are certifying officers authorized by MERS, and up-to-date lists of MERS certifying officers;

(d)  processes to ensure compliance with all MERS Requirements and with the requirements of the MERS Corporate Resolution Management System ("CRMS");

(e)  processes to ensure the accuracy and reliability of data reported to MERSCORP, including monthly system-to-system reconciliations for all MERS mandatory reporting fields, and daily capture of all rejects/warnings reports associated with registrations, transfers, and status updates on open-item aging reports.  Unresolved items must be maintained on open-item aging reports and tracked until resolution.  The Bank shall determine and report whether the foreclosures for loans serviced by the Bank that are currently pending in MERS' name are accurate and how many are listed in error, and describe how and by when the data on the MERSCORP system will be corrected; and

(f)  an appropriate MERS quality assurance workplan, which clearly describes all tests, test frequency, sampling methods, responsible parties, and the expected process for open-

item follow-up, and includes an annual independent test of the control structure of the system-to-system reconciliation process, the reject/warning error correction process, and adherence to the Bank's MERS Plan.

(2)  The Bank shall include MERS and MERSCORP in its third-party vendor management process, which shall include a detailed analysis of potential vulnerabilities, including information security, business continuity, and vendor viability assessments.


ARTICLE VII

FORECLOSURE REVIEW

(1)  Within forty-five (45) days of this Order, the Bank shall retain an independent consultant acceptable to the Deputy Comptroller and the Examiner-in-Charge to conduct an independent review of certain residential foreclosure actions regarding individual borrowers with respect to the Bank's mortgage servicing portfolio.  The review shall include residential foreclosure actions or proceedings (including foreclosures that were in process or completed) for loans serviced by the Bank, whether brought in the name of the Bank, the investor, the mortgage note holder, or any agent for the mortgage note holder (including MERS), that have been pending at any time from January 1, 2009 to December 31, 2010, as well as residential foreclosure sales that occurred during this time period ("Foreclosure Review").

(2)  Within fifteen (15) days of the engagement of the independent consultant described in this Article, but prior to the commencement of the Foreclosure Review, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge for approval an engagement letter that sets forth:

14

(a)  the methodology for conducting the Foreclosure Review, including: (i) a description of the information systems and documents to be reviewed, including the selection of criteria for cases to be reviewed; (ii) the criteria for evaluating the reasonableness of fees and penalties; (iii) other procedures necessary to make the required determinations (such as through interviews of employees and third parties and a process for submission and review of borrower claims and complaints); and (iv) any proposed sampling techniques.  In setting the scope and review methodology under clause (i) of this sub-paragraph, the independent consultant may consider any work already done by the Bank or other third-parties on behalf of the Bank.  The engagement letter shall contain a full description of the statistical basis for the sampling methods chosen, as well as procedures to increase the size of the sample depending on results of the initial sampling;

(b)  expertise and resources to be dedicated to the Foreclosure Review;

(c)  completion of the Foreclosure Review within one hundred twenty (120) days from approval of the engagement letter; and

(d) a written commitment that any workpapers associated with the Foreclosure Review shall be made available to the OCC immediately upon request.

(3)  The purpose of the Foreclosure Review shall be to determine, at a minimum:

(a)  whether at the time the foreclosure action was initiated or the pleading or affidavit filed (including in bankruptcy proceedings and in defending suits brought by borrowers), the foreclosing party or agent of the party had properly documented ownership of the promissory note and mortgage (or deed of trust) under relevant state law, or was otherwise a proper party to the action as a result of agency or similar status;

15

(b)   whether the foreclosure was in accordance with applicable state and federal law, including but not limited to the SCRA and the U.S. Bankruptcy Code;

(c)   whether a foreclosure sale occurred when an application for a loan modification or other Loss Mitigation was under consideration; when the loan was performing in accordance with a trial or permanent loan modification; or when the loan had not been in default for a sufficient period of time to authorize foreclosure pursuant to the terms of the mortgage loan documents and related agreements;

(d)   whether, with respect to non-judicial foreclosures, the procedures followed with respect to the foreclosure sale (including the calculation of the default period, the amounts due, and compliance with notice periods) and post-sale confirmations were in accordance with the terms of the mortgage loan and state law requirements;

(e)   whether a delinquent borrower's account was only charged fees and/or penalties that were permissible under the terms of the borrower's loan documents, applicable state and federal law, and were reasonable and customary;

(f)   whether the frequency that fees were assessed to any delinquent borrower's account (including broker price opinions) was excessive under the terms of the borrower's loan documents, and applicable state and federal law;

(g)   whether Loss Mitigation Activities with respect to foreclosed loans were handled in accordance with the requirements of the HAMP, and consistent with the policies and procedures applicable to the Bank's proprietary loan modifications or other loss mitigation programs, such that each borrower had an adequate opportunity to apply for a Loss Mitigation option or program, any such application was handled properly, a final decision was made on a reasonable basis, and was communicated to the borrower before the foreclosure sale; and

16

Attachment C, page 16

(h)   whether any errors, misrepresentations, or other deficiencies identified in the Foreclosure Review resulted in financial injury to the borrower or the mortgagee.

(4)   The independent consultant shall prepare a written report detailing the findings of the Foreclosure Review ("Foreclosure Report"), which shall be completed within thirty (30) days of completion of the Foreclosure Review.  Immediately upon completion, the Foreclosure Report shall be submitted to the Deputy Comptroller, Examiner-in-Charge, and the Board.

(5)   Within forty-five (45) days of submission of the Foreclosure Report to the Deputy Comptroller, Examiner-in-Charge, and the Board, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge a plan, acceptable to the OCC, to remediate all financial injury to borrowers caused by any errors, misrepresentations, or other deficiencies identified in the Foreclosure Report, by:

(a)   reimbursing or otherwise appropriately remediating borrowers for impermissible or excessive penalties, fees, or expenses, or for other financial injury identified in accordance with this Article; and

(b)   taking appropriate steps to remediate any foreclosure sale where the foreclosure was not authorized as described in this Article.

(6)   Within sixty (60) days after the OCC provides supervisory non-objection to the plan set forth in paragraph (5) above, the Bank shall make all reimbursement and remediation payments and provide all credits required by such plan, and provide the OCC with a report detailing such payments and credits.

Attachment C, page 17

ARTICLE VIII

MANAGEMENT INFORMATION SYSTEMS

(1)  Within sixty (60) days of this Order, the Bank shall submit to the Deputy

Comptroller and the Examiner-in-Charge an acceptable plan for operation of its management

information systems ("MIS") for foreclosure and Loss Mitigation or loan modification activities

to ensure the timely delivery of complete and accurate information to permit effective decision-

making.  The MIS plan shall be implemented within one hundred twenty (120) days of this

Order.  Any corrective action timeframe that is in excess of one hundred twenty (120) days must

be approved by the Examiner-in-Charge.  The plan shall include, at a minimum:

(a)  a description of the various components of MIS used by the Bank for

foreclosure and Loss Mitigation or loan modification activities;

(b)  a description of and timetable for any needed changes or upgrades to:

(i)  monitor compliance with all applicable Legal Requirements and

supervisory guidance, and the requirements of this Order;

(ii)  ensure the ongoing accuracy of records for all serviced mortgages,

including, but not limited to, records necessary to establish ownership and the right to foreclose

by the appropriate party for all serviced mortgages, outstanding balances, and fees assessed to

the borrower; and

(iii)  measures to ensure that Loss Mitigation, loan foreclosure, and

modification staffs have sufficient and timely access to information provided by the borrower

regarding loan foreclosure and modification activities;

18

(c)  testing the integrity and accuracy of the new or enhanced MIS to ensure that reports generated by the system provide necessary information for adequate monitoring and quality controls.

## ARTICLE IX

### MORTGAGE SERVICING

(1)  Within sixty (60) days of this Order, the Bank shall submit to the Deputy Comptroller and the Examiner-in-Charge an acceptable plan, along with a timeline for ensuring effective coordination of communications with borrowers, both oral and written, related to Loss Mitigation or loan modification and foreclosure activities:  (i) to ensure that communications are timely and effective and are designed to avoid confusion to borrowers; (ii) to ensure continuity in the handling of borrowers' loan files during the Loss Mitigation, loan modification, and foreclosure process by personnel knowledgeable about a specific borrower's situation; (iii) to ensure reasonable and good faith efforts, consistent with applicable Legal Requirements, are engaged in Loss Mitigation and foreclosure prevention for delinquent loans, where appropriate; and (iv) to ensure that decisions concerning Loss Mitigation or loan modifications continue to be made and communicated in a timely fashion.  Prior to submitting the plan, the Bank shall conduct a review to determine whether processes involving past due mortgage loans or foreclosures overlap in such a way that they may impair or impede a borrower's efforts to effectively pursue a loan modification, and whether Bank employee compensation practices discourage Loss Mitigation or loan modifications.  The plan shall be implemented within one hundred twenty (120) days of this Order.  Any corrective action timeframe that is in excess of

19

Attachment C, page 19

one hundred twenty (120) days must be approved by the Examiner-in-Charge.  The plan shall include, at a minimum:

(a)  measures to ensure that staff handling Loss Mitigation and loan modification requests routinely communicate and coordinate with staff processing the foreclosure on the borrower's property;

(b)  appropriate deadlines for responses to borrower communications and requests for consideration of Loss Mitigation, including deadlines for decision-making on Loss Mitigation Activities, with the metrics established not being less responsive than the timelines in the HAMP program;

(c)  establishment of an easily accessible and reliable single point of contact for each borrower so that the borrower has access to an employee of the Bank to obtain information throughout the Loss Mitigation, loan modification, and foreclosure processes;

(d)  a requirement that written communications with the borrower identify such single point of contact along with one or more direct means of communication with the contact;

(e)  measures to ensure that the single point of contact has access to current information and personnel (in-house or third-party) sufficient to timely, accurately, and adequately inform the borrower of the current status of the Loss Mitigation, loan modification, and foreclosure activities;

(f)  measures to ensure that staff are trained specifically in handling mortgage delinquencies, Loss Mitigation, and loan modifications;

(g)  procedures and controls to ensure that a final decision regarding a borrower's loan modification request (whether on a trial or permanent basis) is made and communicated to the borrower in writing, including the reason(s) why the borrower did not qualify for the trial or

permanent modification (including the net present value calculations utilized by the Bank, if applicable) by the single point of contact within a reasonable period of time before any foreclosure sale occurs;

(h)  procedures and controls to ensure that when the borrower's loan has been approved for modification on a trial or permanent basis that:  (i) no foreclosure or further legal action predicate to foreclosure occurs, unless the borrower is deemed in default on the terms of the trial or permanent modification; and (ii) the single point of contact remains available to the borrower and continues to be referenced on all written communications with the borrower;

(i)  policies and procedures to enable borrowers to make complaints regarding the Loss Mitigation or modification process, denial of modification requests, the foreclosure process, or foreclosure activities which prevent a borrower from pursuing Loss Mitigation or modification options, and a process for making borrowers aware of the complaint procedures;

(j)  procedures for the prompt review, escalation, and resolution of borrower complaints, including a process to communicate the results of the review to the borrower on a timely basis;

(k)  policies and procedures to ensure that payments are credited in a prompt and timely manner; that payments, including partial payments to the extent permissible under the terms of applicable legal instruments, are applied to scheduled principal, interest, and/or escrow before fees, and that any misapplication of borrower funds is corrected in a prompt and timely manner;

(l)  policies and procedures to ensure that timely information about Loss Mitigation options is sent to the borrower in the event of a delinquency or default, including plain language notices about loan modification and the pendency of foreclosure proceedings;

Attachment C, page 21

(m)  policies and procedures to ensure that foreclosure, Loss Mitigation, and loan modification documents provided to borrowers and third parties are appropriately maintained and tracked, and that borrowers generally will not be required to resubmit the same documented information that has already been provided, and that borrowers are notified promptly of the need for additional information; and

(n)  policies and procedures to consider loan modifications or other Loss Mitigation Activities with respect to junior lien loans owned by the Bank, and to factor the risks associated with such junior lien loans into loan loss reserving practices, where the Bank services the associated first lien mortgage and becomes aware that such first lien mortgage is delinquent or has been modified.  Such policies and procedures shall require the ongoing maintenance of appropriate loss reserves for junior lien mortgages owned by the Bank and the charge-off of such junior lien loans in accordance with FFIEC retail credit classification guidelines.

ARTICLE X

RISK ASSESSMENT AND RISK MANAGEMENT PLAN

(1)  Within ninety (90) days of this Order, the Bank shall conduct a written, comprehensive assessment of the Bank's risks in mortgage servicing operations, particularly in the areas of Loss Mitigation, foreclosure, and the administration and disposition of other real estate owned, including, but not limited to, operational, compliance, transaction, legal, and reputational risks.

(2)  The Bank shall develop an acceptable plan to effectively manage or mitigate identified risks on an ongoing basis, with oversight by the Bank's senior risk managers, senior

22

management, and the Board.  The assessment and plan shall be provided to the Deputy

Comptroller and the Examiner-in-Charge within one hundred twenty (120) days of this Order.

## ARTICLE XI

## APPROVAL, IMPLEMENTATION AND REPORTS

(1)  The Bank shall submit the written plans, programs, policies, and procedures required

by this Order for review and determination of no supervisory objection to the Deputy

Comptroller and the Examiner-in-Charge within the applicable time periods set forth in Articles

II through X.  The Bank shall adopt the plans, programs, policies, and procedures required by

this Order upon submission to the OCC, and shall immediately make any revisions requested by

the Deputy Comptroller or the Examiner-in-Charge.  Upon adoption, the Bank shall immediately

implement the plans, programs, policies, and procedures required by this Order and thereafter

fully comply with them.

(2)  During the term of this Order, the required plans, programs, policies, and procedures

shall not be amended or rescinded in any material respect without the prior written approval of

the Deputy Comptroller or the Examiner-in-Charge (except as otherwise provided in this Order).

(3)  During the term of this Order, the Bank shall revise the required plans, programs,

policies, and procedures as necessary to incorporate new or changes to applicable Legal

Requirements and supervisory guidelines.

(4)  The Board shall ensure that the Bank has processes, personnel, and control systems

to ensure implementation of and adherence to the plans, programs, policies, and procedures

required by this Order.

23

(5)  Within thirty (30) days after the end of each calendar quarter following the date of this Order, the Bank shall submit to the OCC a written progress report detailing the form and manner of all actions taken to secure compliance with the provisions of this Order and the results thereof.  The progress report shall include information sufficient to validate compliance with this Order, based on a testing program acceptable to the OCC that includes, if required by the OCC, validation by third-party independent consultants acceptable to the OCC.  The OCC may, in writing, discontinue the requirement for progress reports or modify the reporting schedule.

(6)  All communication regarding this Order shall be sent to:

(a)  Deputy Comptroller for Large Bank Supervision
Office of the Comptroller of the Currency
250 E Street, SW
Washington, DC 20219

(b)  Examiner-in-Charge, Large Bank Supervision
Office of the Comptroller of the Currency
101 South Tryon Street
Charlotte, NC 28255

## ARTICLE XII

## COMPLIANCE AND EXTENSIONS OF TIME

(1)  If the Bank contends that compliance with any provision of this Order would not be feasible or legally permissible for the Bank, or requires an extension of any timeframe within this Order, the Board shall submit a written request to the Deputy Comptroller asking for relief.  Any written requests submitted pursuant to this Article shall include a statement setting forth in detail the special circumstances that prevent the Bank from complying with a provision, that require the Deputy Comptroller to exempt the Bank from a provision, or that require an extension of a timeframe within this Order.

24

(2)  All such requests shall be accompanied by relevant supporting documentation, and to the extent requested by the Deputy Comptroller, a sworn affidavit or affidavits setting forth any other facts upon which the Bank relies.  The Deputy Comptroller's decision concerning a request is final and not subject to further review.

## ARTICLE XIII

### OTHER PROVISIONS

(1)  Although this Order requires the Bank to submit certain actions, plans, programs, policies, and procedures for the review or prior written determination of no supervisory objection by the Deputy Comptroller or the Examiner-in-Charge, the Board has the ultimate responsibility for proper and sound management of the Bank.

(2)  In each instance in this Order in which the Board is required to ensure adherence to, and undertake to perform certain obligations of the Bank, it is intended to mean that the Board shall:

(a)  authorize and adopt such actions on behalf of the Bank as may be necessary for the Bank to perform its obligations and undertakings under the terms of this Order;

(b)  require the timely reporting by Bank management of such actions directed by the Board to be taken under the terms of this Order;

(c)  follow-up on any material non-compliance with such actions in a timely and appropriate manner; and

(d)  require corrective action be taken in a timely manner of any material non-compliance with such actions.

(3)  If, at any time, the Comptroller deems it appropriate in fulfilling the responsibilities placed upon him by the several laws of the United States to undertake any action affecting the Bank, nothing in this Order shall in any way inhibit, estop, bar, or otherwise prevent the Comptroller from so doing.

(4)  This Order constitutes a settlement of the cease and desist proceeding against the Bank contemplated by the Comptroller, based on the unsafe or unsound practices described in the Comptroller's Findings set forth in Article I of this Order.  Provided, however, that nothing in this Order shall prevent the Comptroller from instituting other enforcement actions against the Bank or any of its institution-affiliated parties, including, without limitation, assessment of civil money penalties, based on the findings set forth in this Order, or any other findings.

(5)  This Order is and shall become effective upon its execution by the Comptroller, through his authorized representative whose hand appears below.  The Order shall remain effective and enforceable, except to the extent that, and until such time as, any provision of this Order shall be amended, suspended, waived, or terminated in writing by the Comptroller.

(6)  Any time limitations imposed by this Order shall begin to run from the effective date of this Order, as shown below, unless the Order specifies otherwise.

(7)  The terms and provisions of this Order apply to the Bank and its subsidiaries, even though those subsidiaries are not named as parties to this Order.  The Bank shall integrate any foreclosure or mortgage servicing activities done by a subsidiary into its plans, policies, programs, and processes required by this Order.  The Bank shall ensure that its subsidiaries comply with all terms and provisions of this Order.

(8)  This Order is intended to be, and shall be construed to be, a final order issued pursuant to 12 U.S.C. § 1818(b), and expressly does not form, and may not be construed to form,

a contract binding the Comptroller or the United States.  Nothing in this Order shall affect any

action against the Bank or its institution-affiliated parties by a bank regulatory agency, the

United States Department of Justice, or any other law enforcement agency, to the extent

permitted under applicable law.

(9)  The terms of this Order, including this paragraph, are not subject to amendment or

modification by any extraneous expression, prior agreements, or prior arrangements between the

parties, whether oral or written.

(10)  Nothing in the Stipulation and Consent or this Order, express or implied, shall give

to any person or entity, other than the parties hereto, and their successors hereunder, any benefit

or any legal or equitable right, remedy or claim under the Stipulation and Consent or this Order.

(11)  The Bank consents to the issuance of this Order before the filing of any notices, or

taking of any testimony or adjudication, and solely for the purpose of settling this matter without

a formal proceeding being filed.


IT IS SO ORDERED, this 13th day of April, 2011.



___/s/_____
Sally G. Belshaw
Deputy Comptroller
Large Bank Supervision


27

Attachment C, page 27

**UNITED STATES OF AMERICA**
**DEPARTMENT OF THE TREASURY**
**COMPTROLLER OF THE CURRENCY**

| | |
|---|---|
| **In the Matter of:** ) | |
| Bank of America, N.A. ) | AA-EC-11-12 |
| Charlotte, NC ) | |
| ) | |

**STIPULATION AND CONSENT TO THE ISSUANCE**
**OF A CONSENT ORDER**

The Comptroller of the Currency of the United States of America ("Comptroller")
intends to impose a cease and desist order on Bank of America, N.A., Charlotte, NC
("Bank") pursuant to 12 U.S.C. § § 1818(b), for unsafe or unsound banking practices
relating to mortgage servicing and the initiation and handling of foreclosure proceedings.

The Bank, in the interest of compliance and cooperation, enters into this
Stipulation and Consent to the Issuance of a Consent Order ("Stipulation") and consents
to the issuance of a Consent Order, dated April 13, 2011 ("Consent Order");

In consideration of the above premises, the Comptroller, through his authorized
representative, and the Bank, through its duly elected and acting Board of Directors,
stipulate and agree to the following:

ARTICLE I
JURISDICTION

(1)     The Bank is a national banking association chartered and examined by the
Comptroller pursuant to the National Bank Act of 1864, as amended, 12 U.S.C. § 1 *et*
*seq*.

(2)     The Comptroller is "the appropriate Federal banking agency" regarding the Bank pursuant to 12 U.S.C. §§ 1813(q) and 1818(b).

(3)     The Bank is an "insured depository institution" within the meaning of 12 U.S.C. § 1818(b)(1).

(4)     For the purposes of, and within the meaning of 12 C.F.R. §§ 5.3(g)(4), 5.51(c)(6), and 24.2(e)(4), this Consent Order shall not be construed to be a "cease and desist order" or "consent order", unless the OCC informs the Bank otherwise.


ARTICLE II
AGREEMENT

(1)     The Bank, without admitting or denying any wrongdoing, consents and agrees to issuance of the Consent Order by the Comptroller.

(2)     The Bank consents and agrees that the Consent Order shall (a) be deemed an "order issued with the consent of the depository institution" pursuant to 12 U.S.C. § 1818(h)(2), (b) become effective upon its execution by the Comptroller through his authorized representative, and (c) be fully enforceable by the Comptroller pursuant to 12 U.S.C. § 1818(i).

(3)     Notwithstanding the absence of mutuality of obligation, or of consideration, or of a contract, the Comptroller may enforce any of the commitments or obligations herein undertaken by the Bank under his supervisory powers, including 12 U.S.C. § 1818(i), and not as a matter of contract law.  The Bank expressly acknowledges that neither the Bank nor the Comptroller has any intention to enter into a contract.

(4)     The Bank declares that no separate promise or inducement of any kind has been made by the Comptroller, or by his agents or employees, to cause or induce the Bank to consent to the issuance of the Consent Order and/or execute the Consent Order.

(5)     The Bank expressly acknowledges that no officer or employee of the Comptroller has statutory or other authority to bind the United States, the United States Treasury Department, the Comptroller, or any other federal bank regulatory agency or entity, or any officer or employee of any of those entities to a contract affecting the Comptroller's exercise of his supervisory responsibilities.

(6)     The OCC releases and discharges the Bank from all potential liability for a cease and desist order that has been or might have been asserted by the OCC based on the banking practices described in the Comptroller's Findings set forth in Article I of the Consent Order, to the extent known to the OCC as of the effective date of the Consent Order.  However, the banking practices alleged in Article I of the Consent Order may be utilized by the OCC in other future enforcement actions against the Bank or its institution-affiliated parties, including, without limitation, to assess civil money penalties or to establish a pattern or practice of violations or the continuation of a pattern or practice of violations.  This release shall not preclude or affect any right of the OCC to determine and ensure compliance with the terms and provisions of this Stipulation or the Consent Order.

(7)     The terms and provisions of the Stipulation and the Consent Order shall be binding upon, and inure to the benefit of, the parties hereto and their successors in interest.  Nothing in this Stipulation or the Consent Order, express or implied, shall give to any person or entity, other than the parties hereto, and their successors hereunder, any

3

benefit or any legal or equitable right, remedy or claim under this Stipulation or the Consent Order.

## ARTICLE III
## WAIVERS

(1)     The Bank, by consenting to this Stipulation, waives:

(a)     the issuance of a Notice of Charges pursuant to 12 U.S.C. § 1818(b);

(b)     any and all procedural rights available in connection with the issuance of the Consent Order;

(c)     all rights to a hearing and a final agency decision pursuant to 12 U.S.C. §§ 1818(b) and (h), 12 C.F.R. Part 19;

(d)     all rights to seek any type of administrative or judicial review of the Consent Order;

(e)     any and all claims for fees, costs or expenses against the Comptroller, or any of his agents or employees, related in any way to this enforcement matter or this Consent Order, whether arising under common law or under the terms of any statute, including, but not limited to, the Equal Access to Justice Act, 5 U.S.C. § 504 and 28 U.S.C. § 2412; and

(f)     any and all rights to challenge or contest the validity of the Consent Order.

4

ARTICLE IV
OTHER PROVISIONS

(1)     The provisions of this Stipulation shall not inhibit, estop, bar, or otherwise prevent the Comptroller from taking any other action affecting the Bank if, at any time, it deems it appropriate to do so to fulfill the responsibilities placed upon it by the several laws of the United States of America.

(2)     Nothing in this Stipulation shall preclude any proceedings brought by the Comptroller to enforce the terms of this Consent Order, and nothing in this Stipulation constitutes, nor shall the Bank contend that it constitutes, a waiver of any right, power, or authority of any other representative of the United States or an agency thereof, including, without limitation, the United States Department of Justice, to bring other actions deemed appropriate.

(3)     The terms of the Stipulation and the Consent Order are not subject to amendment or modification by any extraneous expression, prior agreements or prior arrangements between the parties, whether oral or written.


IN TESTIMONY WHEREOF, the undersigned, authorized by the Comptroller as his representative, has hereunto set her hand on behalf of the Comptroller.


/s/                                                                                  April 13, 2011
_____            _____
Sally G. Belshaw                                                        Date
Deputy Comptroller
Large Bank Supervision

5

Attachment C, page 32

IN TESTIMONY WHEREOF, the undersigned, as the duly elected and acting

Board of Directors of the Bank, have hereunto set their hands on behalf of the Bank.


    /s/
Susan S. Bies

    3/29/11
Date


    /s/
Frank P. Bramble, Sr.

    3/29/11
Date


    /s/
Virgis W. Colbert

    3/29/11
Date


    /s/
Charles K. Gifford

    3/29/11
Date


    /s/
Charles O. Holliday, Jr.

    3/29/11
Date


    /s/
D. Paul Jones, Jr.

    3/29/11
Date


    /s/
Monica C. Lozano

    3/29/11
Date


    /s/
Thomas J. May

    3/29/11
Date

6

Attachment C, page 33

___/s/_____                    _____3/29/11_____
Brian T. Moynihan                         Date


___/s/_____                    _____3/29/11_____
Donald E. Powell                          Date


___/s/_____                    _____3/29/11_____
Charles O. Rossotti                       Date


___/s/_____                    _____3/29/11_____
Robert W. Scully                          Date

7

Attachment C, page 34

## Foreclosure /Endorsement Timeline
## Re: Sheila Williams ; Collier County 2009-CA-3580

**April 23, 2009:**

Complaint filed with a Lost Note Count and unendorsed note attached: (Exhibit A)

CASE #: FL0929644803703                                    LOAN #: 046298398

**10. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. Lender may enforce its rights under this Note against each person individually or against all signatories together. Any one person signing this Note may be required to pay all of the amounts owed under this Note.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Note.

_____ (Seal)
SHEILA WILLIAMS                          -Borrower

_____ (Seal)
                                         -Borrower

_____ (Seal)
                                         -Borrower

_____ (Seal)
                                         -Borrower

Attachment D, page 1

**July 16, 2013**

File cannot be located (Exhibit B)

```
ACTIVITIES, NO RECENT LOST NOTE AFFIDAVIT ACTIVITIES FOUND.

 SECTION- 00021 07/16/2013 08:26:41 ZK6OHR1
                     CFC@DOCCON
Document:  N Note
Follow-up: Research Initiated
STEP 6 (UPDATED)
EXTENSIVE RESEARCH INDICATES FILE CANNOT BE LOCATED, SEND 339 REQUEST TO
QC/LNA RESEARCH.
```

**July 17, 2013**

Non-Indorsed Note Found (Exhibit C)

```
 SECTION- 00025 07/17/2013 11:31:49 NBKGJJ7
                     CFC@DOCCON
Document:  N Note
Follow-up: Research Initiated
FOUND NON-INDORSED NOTE IMAGE IN <EDOC> UNDER <NOTE> - <NOTE>.
```

**July 30, 2013:**

"LINB" Executed (Exhibit C)

```
                          CFC@DOCCON
Document:  N Note
Follow-up: IFR: LNA Executed
LNIB EXECUTED AND NOTARIZED BY WILLIS.
```

Attachment D, page 2

**July 21, 2013:**

LNIB Sent to Simi (Exhibit C)



```
SECTION- 00030 07/31/2013 06:51:29 NBK1D3D
                              CFC@DOCCON
Document:  N Note
Contact:   DMS-RELEASE/REINSTATEMENT SIMI
Follow-up: Sent FEDEX
LNIB SHIPPED TO DMS-RELEASE/REINSTATEMENT SIMI
```

**February 19, 2013:**

Affidavit for MJS prepared with attached Noted endorsed by David Spector Exhibit D)



Attachment D, page 3

IN THE CIRCUIT COURT ... THE 20TH JUDICIAL
CIRCUIT, IN AND FOR COLLIER COUNTY, FLORIDA
GENERAL JURISDICTION DIVISION
CASE NO: 09-3580-CA

COUNTRYWIDE HOME LOANS SERVICING
LP

      PLAINTIFF

VS.

SHEILA WILLIAMS A/K/A SHEILA E.
RAULERSON; KYLE RAULERSON; ANY
AND ALL UNKNOWN PARTIES CLAIMING
BY, THROUGH, UNDER, AND AGAINST THE
HEREIN NAMED INDIVIDUAL
DEFENDANT(S) WHO ARE NOT KNOWN TO
BE DEAD OR ALIVE , WHETHER SAID
UNKNOWN PARTIES MAY CLAIM AN
INTEREST AS SPOUSES, HEIRS, DEVISEES,
GRANTEES OR OTHER CLAIMANTS;
JPMORGAN CHASE BANK, NATIONAL
ASSOCIATION; JOHN DOE AND JANE DOE
AS UNKNOWN TENANTS IN POSSESSION

      DEFENDANT(S)

FILED 12
COLLIER COUNTY, FLORIDA
2009 APR 23 AM 10: 02
CLERK OF COURTS
BY _____ A. RANKIN
Filed in Computer

COMPLAINT TO FORECLOSE MORTGAGE
AND TO ENFORCE LOST LOAN DOCUMENTS

Plaintiff, sues the Defendant(s) and alleges:

COUNT I

1.     THIS IS AN ACTION to foreclose a Mortgage on real property in COLLIER County, Florida.

2.     This Court has jurisdiction over the subject matter herein.

3.     On DECEMBER 4, 2003 SHEILA WILLIAMS, A SINGLE WOMAN executed and delivered a Promissory Note and a PURCHASE MONEY Mortgage securing payment of the Note to the Payee named thereon.

4.     The Mortgage was recorded on DECEMBER 15, 2003 in Official Records Book 3464 at page 1707, of the Public Records of COLLIER County, Florida, and mortgaged the property described in it, then owned by and possessed by the Mortgagors, a copy of the Mortgage AND NOTE ARE attached hereto as "Exhibit "A". Said mortgage was subsequently assigned to COUNTRYWIDE HOME LOANS SERVICING LP by virtue of an assignment to be recorded.

5.     The Plaintiff owns and holds the Note and Mortgage.

6.     The property is now owned by the Defendant(s), SHEILA WILLIAMS A/K/A SHEILA E. RAULERSON, if living and if dead, the unknown spouses, heirs and beneficiaries of SHEILA WILLIAMS A/K/A SHEILA E. RAULERSON who hold(s) possession.

7.     There is a default under the terms of the note and mortgage for the SEPTEMBER 1, 2008 payment and all payments due thereafter.

8.     All conditions precedent to the acceleration of this Mortgage Note and to foreclosure of the Mortgage have been fulfilled or have occurred.

9.     The Plaintiff declares the full amount payable under the Note and Mortgage to be due.

10. The borrowers owe Plai... iT $180,502.51 that is due in principal on the ... gage Note and Mortgage, together with interest from AUGUST 1, 2008, late charges, and all costs of collection including title search expenses for ascertaining necessary parties to this action and reasonable attorney's fees.

11. Plaintiff is obligated to pay its attorney a reasonable fee for his services rendered.

12. Defendants, John Doe and Jane Doe, may claim an interest in the property described in the Mortgage as tenants pursuant to a lease agreement, either written or oral. Said interest is subject, subordinate, and inferior to the lien of the Mortgage held by Plaintiff.

13. In addition to all other named defendants, the unknown spouses, heirs, devisees, grantees, assignees, creditors, trustees, successors in interest or other parties claiming an interest in the subject property by, through under or against any of said defendants, whether natural or corporate, who are not known to be alive or dead, dissolved or existing, are joined as defendants herein. The claims of any of said parties are subject, subordinate, and inferior to the interest of Plaintiff.

14. The Defendant, KYLE RAULERSON, is joined because HE may claim some interest in or lien upon the subject property by virtue of a possible homestead interest. Said interest is subject, subordinate and inferior to the interest of the Plaintiff's mortgage.

15. The Defendant(s), JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, IS joined because IT may claim some interest in or lien upon the subject property by virtue of a MORTGAGE recorded in Official Records Book 3995 at Page 2891 in COLLIER COUNTY which is inferior to Plaintiff's Mortgage described herein.

WHEREFORE, Plaintiff prays: That an accounting may be had and taken under the direction of this Court of what is due the Plaintiff for principal and interest on said Mortgage and Mortgage Note, and for the costs, charges and expenses, including attorney's fees and title search costs, and advancements which Plaintiff may be put to or incur in and about this suit, and that the Defendants found responsible for same be ordered to pay the Plaintiff herein the amounts so found to be due it; that in default of such payments, all right, title, interest, claim, demand, or equity of redemption of the Defendants and all other persons claiming by, through, under or against said Defendants since the filing of the Lis Pendens herein be absolutely barred and foreclosed and that said mortgage property be sold under the direction of this Court; that out of the proceeds of said sale, the amounts due the Plaintiff may be paid so far as same will suffice; and that a deficiency judgment be entered if applicable and only in the event no Order of Discharge of Personal Liability in Bankruptcy has been entered as to any of the Defendants who signed the subject Note and Mortgage and a Writ of Possession be issued.

## COUNT II

16. This is an action to enforce a lost, destroyed or stolen promissory note and Mortgage under Fla.Stat.§673.3091.

17. On DECEMBER 4, 2003, SHEILA WILLIAMS, A SINGLE WOMAN, executed and delivered a Promissory Note and a Mortgage securing payment of the Note to the payee named thereon.

18. The Mortgage was recorded on DECEMBER 15, 2003 in Official Records Book 3464 at page 1707, of the Public Records of COLLIER County, Florida, a substantial copy of the Mortgage being attached hereto as composite Exhibit "A" to the Plaintiff's original Complaint herein.

19. The Plaintiff is not presently in possession of original Note and Mortgage. However,

a) the Plaintiff \ n possession of the Note and Mortgage and w ntitled to enforce THEM when the loss of possession occurred;

b) the loss of possession was not the result of a transfer by Plaintiff or lawful seizure; and

c) the Plaintiff cannot reasonably obtain possession of the Note and Mortgage because THEIR whereabouts cannot be determined.

20. A COPY OF THE NOTE IS ATTACHED HERETO as Exhibit "  ".

21. The Plaintiff will agree to entry of a Final Judgment of Foreclosure wherein it will be required to indemnify and hold harmless Defendant(s), SHEILA WILLIAMS, from any loss they may incur by reason of a claim by another person to enforce the lost Note and Mortgage.

WHEREFORE, Plaintiff requests entry of judgment confirming its right to enforce the lost Note and Mortgage under Fla. Stat.§673.3091.

**TO ALL DEFENDANTS: PLEASE NOTE EFFECTIVE OCTOBER 13, 2006, 15 U.S.C. §1692G OF THE FAIR DEBT COLLECTION PRACTICES ACT HAS BEEN AMENDED AS FOLLOWS:**

**(a) LEGAL PLEADINGS -- Section 809 of the Fair Debt Collection Practices Act (15 U.S.C. 1692g) is amended by adding at the end the following new subsection:**

**"(d) Legal Pleadings -- A communication in the form of a formal pleading in a civil action shall not be treated as an initial communication for purposes of subsection (a)."**

VIVIEN LURLENE
Law Offices of David J. Stern, P.A.
Attorney for Plaintiff
900 South Pine Island Road SUITE 400
Plantation, FL 33324-3920
(954) 233-8000

09-38293 CWF     Bar #: 715492

Attachment D, page 6

CASE #: FL0929644803703                                    LOAN #: _____

**10. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

    If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. Lender may enforce its rights under this Note against each person individually or against all signatories together. Any one person signing this Note may be required to pay all of the amounts owed under this Note.

    BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Note.

_Sheila Williams_ _____ (Seal)
SHEILA WILLIAMS                          -Borrower

_____ (Seal)
                                         -Borrower

_____ (Seal)
                                         -Borrower

_____ (Seal)
                                         -Borrower

VMP -590(FL) (9801).01     CHL (12/02)              Page 3 of 3

Attachment D, page 7



This space is for recording purposes only

Prepared by:       DAVID J. STERN, ESQ
Record & Return to:   900 South Pine Island Road Suite 400
                      Plantation, FL 33324-3920
                      09-38293 CWF

## ASSIGNMENT OF MORTGAGE

### KNOW ALL MEN BY THESE PRESENTS:

*THAT* MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.

Residing or located at  C/O COUNTRYWIDE HOME LOANS, INC., 7105 CORPORATE DRIVE, MAIL STOP PTX-B-35, PLANO, TX 75024, herein designated as the assignor, for and in consideration of the sum of $1.00 Dollar and other good and valuable consideration, the receipt of which is hereby acknowledged, does hereby grant, bargain, sell, assign, transfer and set over unto COUNTRYWIDE HOME LOANS SERVICING LP residing or located at: C/O COUNTRYWIDE HOME LOANS, INC., 7105 CORPORATE DRIVE, MAIL STOP PTX-B-35, PLANO, TX 75024 herein designated as the assignee, the mortgage executed by SHEILA WILLIAMS, A SINGLE WOMAN recorded in COLLIER County, Florida at book 3464 and page 1707 encumbering the property more particularly described as follows:

LOT 11, BLOCK 97 OF GOLDEN GATE UNIT 3, ACCORDING TO THE PLAT THEREOF AS RECORDED IN PLAT BOOK 5, PAGE(S) 97-105, OF THE PUBLIC RECORDS OF COLLIER COUNTY, FLORIDA.

together with the note and each and every other obligation described in said mortgage and the money due and to become due thereon

TO HAVE AND TO HOLD the same unto the said assignee, its successors and assigns forever, but without recourse on the undersigned.

Pursuant to the provisions of Sec. 689.071, Florida Statutes, the within named Trustee has the power and authority to protect, conserve and to sell, or to lease, or to encumber, or otherwise to manage and dispose of the above-described mortgage and the real property encumbered thereby.

*In Witness Whereof,* the said Assignor has hereunto set his hand and seal or caused these presents to be signed by its proper corporate officers and its corporate seal to be hereto affixed , this 22 day of April , 2009 , but effective as of the 30th day of March, 2009.

                                    MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.
                                              (CORPORATE SEAL)

                              BY: _____
                              PRINT NAME: CHERYL SAMONS
                              TITLE: ASSISTANT SECRETARY

STATE OF FLORIDA
COUNTY OF BROWARD

        PERSONALLY APPEARED BEFORE ME, the undersigned authority in and for the aforesaid county and state, on this the 22 day of April , 2009, within my jurisdiction, the within named CHERYL SAMONS  who is personally known to me or who produced _____ as identification and acknowledged to me that (s)he is ASSISTANT SECRETARY and that for and on behalf of MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. and as its act and deed (s)he executed the above and foregoing instrument, after first having been duly authorized by MORTGAGE ELECTRONIC

Attachment D page 8

**IN THE CIRCUIT COURT OF THE
TWENTIETH JUDICIAL CIRCUIT IN
AND FOR COLLIER COUNTY, FLORIDA**

Case No.: 11-2009-CA-003580

Section: _____

BAC HOME LOANS SERVICING LP FKA
COUNTRYWIDE HOME LOANS
SERVICING LP

Plaintiff,

v.

SHEILA WILLIAMS A/K/A SHEILA E.
RAULERSON; KYLE RAULERSON; ANY
AND ALL UNKNOWN PARTIES CLAIMING
BY, THROUGH, UNDER, AND AGAINST
THE HEREIN NAMED INDIVIDUAL
DEFENDANT(S) WHO ARE NOT KNOWN
TO BE DEAD OR ALIVE, WHETHER SAID
UNKNOWN PARTIES MAY CLAIM AN
INTEREST AS SPOUSES, HEIRS,
DEVISEES, GRANTEES, OR OTHER
CLAIMANTS; JPMORGAN CHASE BANK,
NATIONAL ASSOCIATON
Defendant(s).
_____/

## AFFIDAVIT SUPPORTING PLAINTIFF'S MOTION FOR SUMMARY FINAL JUDGMENT

STATE OF Pennsylvania )
                            ) SS:
COUNTY OF Allegheny )

      BEFORE ME an officer authorized to take oaths this day personally appeared Tricia Ann Hurley of Bank of America, N.A., ("BANA"), who, being first duly sworn, deposes and says:

FLFC - Affidavit of Indebtedness - BANA
FL-97009936-10
2014-01-21 @ 11:40:32 / CJ

                                                  *9610961*

1.  I am authorized to sign this affidavit on behalf of plaintiff, Bank of America, N.A., As Successor by Merger to BAC Home Loans Servicing, LP FKA Countrywide Home Loans Servicing, LP, as an officer of BANA.

2.  BANA maintains records for the Loan ("the Loan").  As part of my job responsibilities for BANA, I am familiar with the type of records maintained by BANA in connection with the Loan.

3.  The information in this affidavit is taken from BANA's business records.  I have personal knowledge of BANA's procedures for creating these records.  They are: (a) made at or near the time of the occurrence of the matters recorded by persons with personal knowledge of the information in the business record, or from information transmitted by a person with personal knowledge; (b) kept in the course of BANA's regularly conducted business activities; and (c) created by BANA as a regular practice.  I personally confirmed that the loan information in this affidavit is accurate by reading the affidavit and attachments, and checking that the loan information in this affidavit matches BANA's on-line records available to me.  After confirming the loan information in this affidavit is correct, I will sign the affidavit before a notary and under oath.

4.  Bank of America N.A. held the original promissory note on BAC HOME LOANS SERVICING, LP FKA COUNTRYWIDE HOME LOANS's behalf at the time of filing the foreclosure complaint on April 23, 2009 and BAC HOME LOANS SERVICING, LP FKA COUNTRYWIDE HOME LOANS has filed the original promissory note with the court.  The promissory note has been duly indorsed.  BANK OF AMERICA, N.A. SUCCESSOR BY MERGER TO BAC HOME LOANS SERVICING, LP FKA COUNTRYWIDE HOMES LOANS SERVICING LP is the assignee of the security instrument for the referenced loan.  A true and correct copy of the note is attached.

5.  The business record attached, which I have reviewed, is a true and correct printout that is part of the business records described above.  It shows that SHEILA WILLIAMS defaulted, the default has not been cured, and the amounts stated on the attached business record are owed on the Loan.

| | |
|---|---|
| Principal Balance | $180,502.51 |
| Interest Amount | $38,751.56 |
| Interest Due<br>From 08/01/2008 to 02/28/2014<br>After 02/28/2014 interest on the principal balance will accrue monthly, in the amount of $357.24 on the first day of each month, calculated @ the variable rate in effect at that time. | |
| Pre-acceleration Late Charges | $0.00 |
| Tax Disbursements | $8,523.93 |

| | | |
|---|---|---|
| MIP/PMI Insurance | | $4,150.13 |
| Hazard Insurance Disbursements | | $26,700.28 |
| Title Fees | | $325.00 |
| Bankruptcy Fees/Costs | | $0.00 |
| Property Inspections/Preservation | | $6,575.65 |
| Prior Foreclosure Fees | | $1,170.00 |
| Escrow Balance Credit | $0.00 | |
| Unapplied Funds Credit | $0.00 | |
| Credits | | $(356.04) |
| Other | | $4,166.00 |
| Payment Advance - Principal/Interest/Escrow | $0.00 | |
| Total | | $270,509.02 |

6.  BANA has retained Morris|Hardwick|Schneider, LLC to prosecute this foreclosure action and is obligated to pay a reasonable fee and reimburse costs incurred in connection with the firm's services. The attached record includes fees and costs that are subject to change. Those attorney's fees and costs are not requested through this affidavit. Rather, the law firm will submit its own affidavit or documentation supporting and requesting the fees and costs from this action in accordance with applicable law

FURTHER AFFIANT SAYETH NAUGHT

Bank of America N.A. (Bana)
S|B|m Bac Home Loans Servicing LP
F|K|A Countrywide Home Loans
Servicing LP

_Tricia C Hurley 2-19-14_
Signature

_Tricia Ann Hurley_
Print

_Assistant Vice President (AVP)_
Title

_February 19, 2014_
Date

SWORN TO and subscribed before me this _19_ day of _February_, 2014, by _Tricia Ann Hurley_, as an _____AVP_____ of Bank of America, N.A. He/she ( ) is personally known to me or (✓) produced _Drivers License_ as identification.

_Marva L. Hair_
Notary Public
My commission expires: _10/20/2016_

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Marva LaMar, Notary Public
North Braddock Boro, Allegheny County
My Commission Expires Oct. 20, 2016
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

FLFC - Affidavit of Indebtedness - BANA
FL-97009936-10
2014-01-21 @ 11:40:32 / CJ

*9610961*

CASE #: FL0929644803703                                    LOAN # ███████

## 10. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. Lender may enforce its rights under this Note against each person individually or against all signatories together. Any one person signing this Note may be required to pay all of the amounts owed under this Note.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Note.

_____ (Seal)
SHEILA WILLIAMS                                   -Borrower

_____ (Seal)
                                                 -Borrower

_____ (Seal)
                                                 -Borrower

_____ (Seal)
                                                 -Borrower

PAY TO THE ORDER OF

Witho.t _____
Countrywide Home _____ , LP

v _____
David A. Spector
Managing Director

PAY TO THE ORDER OF
____ Home Loans Servicing LP
    H RECOURSE
  ____DE HOME LOANS, INC.

BY _____
David A. Spector
Managing Director

PAY TO THE ORDER OF
_____
COUN_____ ____ANS, INC.

BY _____
David A. Spector
Managing Director

VMP®  -590(FL) (9801).01    CHL (12/02)           Page 3 of 3

**SUMMARY OF DEFENDANTS' THIRD SUPPLEMENTAL RESPONSE TO AMENDED 3RD SET OF INTERROGATORIES**

Defendants identified these documents as relevant to determining the dates of endorsements for the 39 loans

**BACJACOBS_00019808-00025611**
- Loan Servicing History that contain NOTHING regarding endorsements dates and hundreds of documents contained within this production was claw backed and contain a significant amount of redactions

**BACJACOBS_00030940-00030957**
- This production is also heavily redacted and all the notes regarding the location of the collateral file were claw backed and redacted.

**BACJACOBS_00031420-0031439**
- Only 21 Loans contained within these "Document Detail" screenshots and contains NO information regarding endorsement dates.

**BACJACOBS_00090766**
- This screen shot does contain an entry that states "Indorsed Note" and says "Received Date 12/26/12"
  - Made a noted of this loan: pertains to FHA: 411448824 Ohio Case

**BACJACOBS_00108260-000108290**
- Only the following screenshots reference endorsements dates:
  - **00108284 :**"Indorsed Note" and says "Received Date 4/18/2011"
  - **00108285:** "Indorsed Note" and says "Received Date 1/09/2012"
  - **00108286: :**"Indorsed Original Note" and says "Received Date 5/31/2009"
  - **00108288:** "Indorsed Original Note" and says "Received Date 3/05/2008"
  - **00108289: :**"Indorsed Original Note" and says "Received Date 12/20/2011"
  - **00108290:**"Indorsed Original Note" and says "Received Date 12/22/2011"

**BACJACOBS_00108672**
- "Servicing Activities History Display" NOTHING regarding endorsements dates

**BACJACOBS_00108673**
- "Servicing Activities History Display" NOTHING regarding endorsements dates

**BACJACOBS_00125255-125606**
- o Docs in this production responsive are;
  - ▪ 125255-12557

**BACJACOBS_00127405-0012728**
- o Servicing Notes- NOTHING regarding endorsements dates

**BACJACOBS_0011409**
- o Chart: NOTHING regarding endorsements dates

**BACJACOBS_00029841-00029910**
- o Clawed back and Volume 9 CD meant to "supplant" is missing all those documents

**BACJACOBS_00088468-88478**
- o Routing history for only 4 loans and NOTHING about endorsement dates

**BACJACOBS_00090789**
- o Routing History for one loan- NOTHING about endorsement date

**BACJACOBS_00127299-00128716** ( below are the only responsive documents contained in this production- and not all of the 39 loans are included)
- o **00127299:** Note "indorsed" date: 04/06/2012
- o **00127300:** Note "indorsed" date: 12/26/2012
- o **00127301:** Note "indorsed" date: 12/30/2014
- o **00127302:** Note "indorsed" date: 12/21/2011
- o **00127303:** Note "indorsed" date: 12/05/2011
- o **00127304:** Note "indorsed" date: 11/04/2011
- o **00127305:** Note "indorsed" date: 12/14/2011
- o **00127306:** Note "indorsed" date:
  - ▪ 11/4/13
  - ▪ 1/15/13
- o **00127307:** Note "indorsed" date:
  - ▪ 03/05/2012
  - ▪ 03/11/2013
  - ▪ 10/17/2013
  - ▪ 06/12/2014
  - ▪ 01/23/2015
  - ▪ 01/26/2015
- o **00127308:** Note "indorsed" date:
  - ▪ 02/06/2012
  - ▪ 07/20/2012
  - ▪ 12/17/2013
  - ▪ 12/30/2013
- o **00127309:** Note "indorsed" date:
  - ▪ 11/14/2011
  - ▪ 11/14/2011
  - ▪ 08/07/2012

- 12/18/2013
- 07/24/2014
  - **00127310:** Note "indorsed" date: 12/06/2011
  - **00127311:** Note "indorsed" date: 12/14/2011
  - **00127312:** Note "indorsed" date:
    - 04/16/2011
    - 07/27/2011
    - 05/08/2014
  - **001273013:** Note "indorsed" date:
    - 12/19/2011
  - **001273014:** Note "indorsed" date:
    - 06/02/2012
    - 08/15/2012
  - **001273015:** Note "indorsed" date:
    - 04/06/2012
    - 01/16/2013
    - 04/11/2013
    - 03/31/2016
    - 04/01/2016
    - 04/04/2016
  - **001273015:** Note "indorsed" date:

**BACJACOBS_00127299-00128716**

  -